Wilmer Hill Grier
Attorney At Law
603 Jefferson Avenue
Brooklyn, New York 11221
Office telephone (718) 443-3873
Facsimile (718) 453-1276
Attorney for Defendants V Model Management, Inc., and
VNY Model Management, LLC.

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

LISA ATHENA S. ABU HANTASH, in her                    CIVIL  ACTION NO.:
Individual capacity and as mother and natural guardian of    CV 3363/07
JORDAN ANNETTEE JAZZMIN RICHARDSON, a minor, and
JORDAN RICHARDSON, INC., a Virginia Corporation,

                                                Plaintiffs,                    VERIFIED
                                                                       ANSWER AND
                                                                       DEMAND FOR

     V.                                                                JURY TRIAL

V MODEL MANAGEMENT NEW YORK, INC., and
VNY MODEL MANAGEMENT, LLC.

                                         Defendants.

-----------------------------------------------------------x

Defendant, V. MODELS , CORP., referred by plaintiff in the caption as (V MODEL

MANAGEMENT NEW YORK,  INC.) is a dissolved New York State Corporation

( hereinafter  called  "V")  and  defendant,  VNY  MODEL  MANAGEMENT,  LLC.,

(hereinafter called VNY.)

(hereinafter called "VNY") answers the  Plaintiffs' complaint as  follows:

1.       Defendants deny the allegations contained in Paragraph " 1" of the Complaint.

2.      Defendants deny the allegations contained in Paragraph " 2" of the Complaint.

3.      Defendants deny the allegations contained in  Paragraph " 3" of the Complaint.

4.      Defendants deny the allegations contained in Paragraph "4" of the Complaint.

5.      Defendants deny the allegations contained in Paragraph "5" of the Complaint.

6.      Defendants admit the allegations contained in Paragraph "6" of the Complaint.

7.      Defendants admit the allegations contained in paragraph "7" of the Complaint.

8.      Defendants admit the allegations contained in paragraph " 8" of the Complaint.

9.      Defendants allege that  "V" and "VNY"  are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "9" of the Complaint and denies that the allegation that 22354 Graystone Drive, Carrollton, Virginia 23314 has been the residence of the Plaintiff, LISA-ATHENA S. ABU HANTASH at all times mentioned herein.

10.     Defendants allege that "V" and "VNY" are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph"10" of the Complaint.

11.     Defendants "V" and "VNY" admit that Plaintiff Jordan was and still is a citizen of the United States of America, but deny that the Plaintiff Jordan has resided throughout

the times mentioned herein at 22354 Graystone Drive, Carrollton, Virginia 23314 because this house was purchased by the infant Jordan, sometime in 2006.

12.    Defendants admit the allegations contained in Paragraph "12" of the Complaint.

13.    Defendants deny the allegations contained in Paragraph "13" of the Complaint, because the Corporation "V MODELS CORP., (which was the legal name of "V" was dissolved August 15, 2005.

14.    Defendants admit the allegations contained in Paragraph "14" of the Complaint.

15.    Defendants admit the allegations contained in Paragraph "15" of the Complaint.

16.    Defendants deny the allegations contained in Paragraph "16" of the Complaint.

17.    Defendants admit the allegation contained in Paragraph "17" of the Complaint.

18.    Defendants allege that "V" and "VNY" are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph "18" of the Complaint.

19.    Defendants admit the allegations contained in paragraph "19" of the Complaint.

20.    Defendants admit the allegations contained in paragraph "20" of the Complaint.

21.    Defendants admit the allegations contained in paragraph "21" of the Complaint.

22.    Defendants deny the allegations contained in paragraph " 22" of the Complaint and allege that the Plaintiff, Abu Hantash, did not express any desire or willingness to travel with her daughter, the infant Model Jordan Richardson, on her modeling assignments in 2005 and 2006, except for the one modeling assignment and that was when L'Oreal, which had hired the infant Jordan to model in Buenos Aires, Argentina agreed to pay her mother, Abu Hantash, $11,000.00 airlines fare and disagreed to cover hotel cost for Plaintiff, Abu Hantash, while Jordan was performing a modeling assignment in the country of Buenos Aires, Argentina.

23.    Defendants deny the allegations contained in paragraph "23" of the Complaint.

24.    Defendants deny the allegations contained in paragraph "24" of the Complaint.

25.    Defendants deny the allegations contained in paragraph "25" of the Complaint.

26.    Defendants deny the allegations contained in paragraph "26" of the Complaint.

27.    Defendants lacks sufficient information or belief to form a belief as to the truth of the allegations contained in paragraph"27" of the Complaint.

28.    Defendants admit the allegations contained in paragraph "27" of the Complaint.

29.    Defendants admit the allegation contained in paragraph "29" which states that the 2005 Model Management Agreement was signed by Jordan, however, denies that the Plaintiff was 16 years of age when she was in fact 15 years of age, and Defendants further state that this Agreement was signed by the infant Jordan's Mother, Abu Hantash and in New York State a mother can sign a binding Model Management Agreement for her infant daughter.

30.    Defendants admit the allegations contained in paragraph "30" of the Complaint where the Plaintiff states that Plaintiff Abu Hantash signed the 2005 Management Agreement, where Abu Hantash gave her consent to the 2005 Model Management Agreement in her capacity as parent of the infant Model Jordan Richardson, but Defendants deny that Plaintiff Abu Hantash was ever the legal guardian of the infant Model Jordan Richardson and allege that the Plaintiff Abu Hantash signed said agreement giving her consent to the modeling agreement so that her daughter, the infant Model Jordan could work for advertisers as a model.

31.    Defendants admit the allegations contained in paragraph "31" and allege that Plaintiff, Abu Hantash's written consent was necessary on the Model Management Agreement where infant Model Jordan was agreeing to work for advertising purposes as a model.

32.   Defendants admit the allegations contained in paragraph "32" of the Complaint.


33.      Defendants admit the allegation contained in part in paragraph "33" where

Plaintiff states the initial term of the Jordan and V 2005 Management Agreement was for

two years, however, due to the fact that the initial Model Management Agreement was

with "V" Model Corp., a New York Corporation which was dissolved on  August 15,

2005 and the fact that the infant Model, Jordan Richardson  entered into a contract with

VNY Model Management, LLC., "V" successor Model Management Company VNY and

that the Plaintiff, Abu Hantash as parent of the infant Model Jordan Richardson signed a

written  contract  giving  her  consent  to  the  June  19,  2006-June  18,  2008  Model

Management Agreement with VNY which commenced June 19, 2006 and ends June 18,

2008 as a result  the prior 2005 Model Management Agreement  that the model Jordan

had with "V" ended as of June 18, 2006 and this issue is now moot and irrelevant.


34.     The Defendants deny the allegations contained in paragraph "34" and allege

further that this is a frivolous allegation because the 2005 Model Management Agreement

ended as of June 18, 2006 and the automatic extension issue is now moot and irrelevant.


35.    Defendants    deny    the    allegations    contained    in    paragraph    "35"

 of the Complaint and further allege that this is a frivolous allegation ( just as this entire

case is frivolous )where the Plaintiffs allege that the now **dead** 2005 Model Management

Agreement , an agreement  the Plaintiff, Abu Hantash consented to in order to allow her

infant daughter, the infant Model Jordan to work as a professional model for advertisers

**is a perpetual contract** where **said 2005  Agreement** which the Plaintiff Abu Hantash signed and executed was with a New York State Corporation which has been legally dissolved as of August 15, 2005 and where the plaintiff, Abu Hantash as the parent of the infant Model Jordan entered into a subsequent written agreement with the Defendant, "V" successor "VNY Model Management, LLC., and said Agreement commenced June 19, 2006 and ends June 18, 2008.

36.    Defendants admit that the managing member of VNY, Lana Vinderman A/K/A Lana Winters did suggest to Plaintiff, as one recommendation among several, that Abu Hantash investigate and (1) hire an accountant/lawyer to determine if setting up a corporation would help the infant Model Jordan tax wise and (2) that Lana Vinderman also at that time expressed her concerns to the Plaintiff, Abu Hantash, concerning the manner in which the Plaintiff, Abu Hantash was spending the infant Jordan's earnings from her modeling work.  (3)  Mrs. Vinderman expressed to the Plaintiff, Abu Hantash that in her opinion the ways in which the Plaintiff, Abu Hantash was spending the earnings the Plaintiff, the infant Model Jordan was earning from her modeling work; was in ways VNY managing member Lana Vinderman /a/k/a Lana Winters (4)  **perceived were not in the best interest of the infant model, Jordan and in her opinion (5) showed extremely poor financial/fiscal management and  financial judgment** on the parts of the Plaintiff, Abu Hantash and (6) as the year 2006 progressed Lana Winter observed in  **"horror"** some of Abu Hantash's purchases and actions; (7) some examples of  the manner in which the infant Jordan's earnings have been spent  by her mother, the Plaintiff, Abu Hantash herein have been to purchase a new SUV, (8)  to encourage Jordan

to spend more than $600,000.00 to purchase a home in the State of Virginia (where title is vested in infant model, Jordan and her grandmother's name) when the infant Jordan if she continues to work as a model will be based in New York City, (9) numerous electronics, electronic gadgets to the excess, especially cellular telephones, household furnishings, food, clothes for every one in her immediate family, (10) all travel costs and the support of all of the unemployed people in her family, sister, sister's baby, grandmother (maybe baby's daddy) and including the infant model Jordan's Mother Abu Hantash who has no visible means of support and (11) finally the hiring of the Nissenbaum Law Group, LLC, Gavin I. Handwerker, Esq., of Counsel to commence this frivolous legal action and whose advice so far includes the advising of the infant Model Jordan to breach her valid enforceable Model Management Agreement with VNY Model Management, LLC. (12) That the Plaintiff, Abu Hantash has done all of the above **instead of following Lana Vinderman's (A/K/A) recommendations i.e., upon information and belief of (13) setting up a saving plan and investing the infant Jordan's money in a manner where it will accumulate for the infant Jordan's future, for example higher education etc., or for her own use when she becomes an adult and (14) doing all acts which would be consistent generally with the preserving and preservation/growth of the infant model Jordan Richardson's assets as the infant model rapidly approaching emancipation and adulthood nears in 2008. Abu Hantash knows that the infant Model Jordan earnings situation are earned by the infant Model, Jordan Richardson performing modeling services as an independent contractor and are not taxed initially).**

37.     Defendants lack sufficient information or belief sufficient to form a belief as to the truth of the allegations contained in paragraph "27" of the Complaint.

38.     Defendants lack sufficient information or belief to form a belief as to the truth of the allegations contained in paragraph "28" of the Complaint.

39.     Defendants lacks sufficient information or belief sufficient to form a belief as to the truth of the allegations contained in paragraph "39" of the Complaint.

40.     Defendants lack sufficient information or belief sufficient to form a belief as to the truth of the allegations contained in paragraph "40" of the Complaint.

41.     Defendants admit the allegations contained in paragraph "41 of the Complaint.

42.     Defendants deny the allegations contained in paragraph "42" of the Complaint.

43.     Defendants deny that the Model Management Agreement with VNY was forwarded to Plaintiff, Abu Hantash as alleged in the allegations contained in paragraph "42" and "43" of the Complaint, however, Defendants admit that the 2006 Model Management Agreement was forwarded to Plaintiffs sometime before June 19, 2006.

44.     Defendants deny the allegations contained in paragraph "44" of the Complaint.

45.     Defendants deny the allegations contained in paragraph "45" of the Complaint.

46.     Defendants admit the allegations contained in paragraph "46" of the Complaint.

47.     Defendants deny the allegations contained in paragraph "47" of the Complaint.

48.     Defendants admit the allegations contained in paragraph "48" of the Complaint.

49.     Defendants deny the allegations contained in paragraph "49" of the Complaint, because this provision was modified by the Plaintiff, Abu Hantash in her own handwriting which reads "Jordan  Richardson or representative has the right to cancel the contract with a written notice 30 days prior to the expiration of the contract." This provision was initialed by Jordan Richardson's mother Abu Hantash and represents another frivolous allegation in the Plaintiff's Complaint.

50.     Defendants admit the allegation contained in paragraph "50" of the Complaint and Defendants also allege that Plaintiff, Abu Hantash initialed each and every paragraph of the 2006 Model Management Agreement  and at the end of the Agreement, she signed the Agreement , giving her consent to in writing.

51.     Defendants admit the allegations contained in paragraph "51" of the Complaint.

52.     Defendants admit the allegations contained in paragraph "52" of the Complaint.

53.     Defendants admit the Plaintiff, the infant Model Jordan's name appears on the signature page, however, the consent to the 2006 Model Management Agreement for the infant Model Jordan Richardson was given in writing by her mother, Abu Hantash and as such is legally binding in the State of New York.

54.     Defendants admit the allegations contained in paragraph "54" of the Complaint.

54.     Defendants deny the allegations contained in paragraph "55" of the Complaint.

56.     Defendants admit the allegations contained in paragraph "56" except has no knowledge sufficient to form a belief as to the exact date in June, the 2006 Model Management Agreement with VNY was signed by the Plaintiff, Abu Hantash.

57.     Defendants admit the allegations contained in paragraph "57" of the Complaint.

58.      Defendants admit allegations contained in paragraph "58" of the  Complaint, and further allege that in New York State a parent can sign in writing and create a binding and enforceable contractual agreement binding the infant model by  giving her written consent to the modeling management agreement for the infant model.

59.     Defendants deny the allegations contained in paragraph "59" of the Complaint.

60.    Defendants deny the allegations contained in paragraph "60" of the Complaint.

61.    Defendants deny the allegations contained in paragraph "61" of the Complaint and Defendants also allege that "V" and "VNY"  lack sufficient information or belief sufficient to form a belief as to the truth of the allegations in paragraph "61" where Plaintiff, Abu Hantash alleges that she did not realize until October, 2006 that VNY did not provide her with a copy of the executed 2006 Management Agreement and Defendants, especially when the record shows that the Plaintiff, Abu Hantash faxed a copy of the 2006-2008 Model Management Agreement to Defendants in July 11, 2006 from Virginia, deny the implication or statement of fact that, Plaintiff, Abu Hantash has made in her allegations contained  in paragraph "61" contained in the Complaint.

62.    Defendants deny the allegations contained in paragraph "62"  of the Complaint, except to admit that the infant, model Jordan's signature did not appear on the 2006 VNY Model Management Agreement and the infant model Jordan's signature was not required where her mother, plaintiff, Abu Hantash has already signed the 2006-2008  Model Management Agreement with VNY and where in New York State, a parent's consent was and is binding on infant Model, Jordan Richardson.

63.    Defendants deny the allegations contained in paragraph "63" of the Complaint.

64.    Defendants deny the allegations contained in paragraph "64" of the Complaint.

65.    Defendants deny the allegations contained in paragraph "65" of the Complaint and alleges that the allegations in paragraph "65" show and document the lies of the Plaintiff, Abu Hantash where the attempts invalidate the legally enforceable 2006-2008 Model Management Agreement she had signed in writing in June 2006,  binding her daughter, the infant Model Jordan Richardson, to the binding enforceable Model Management Agreement.

66.    Defendants admit the allegations contained in paragraph "66" of the Complaint where it is alleged by Plaintiff that the letter dated February 16, 2007, was sent by the Plaintiff, Abu Hantash to Defendant "VNY"  and was sent by Plaintiff upon information and belief  in an effort by plaintiff's Abu Hantash to have  the 2006-2008 declared null and void and announces the plaintiff's unilateral intention to breach the 2006-2008 contract where both the defendant, VNY Model Management, LLC ( **The February 16, 2007 upon information and belief  was sent to the defendant "VNY" because plaintiff, Abu Hantash was angry with the defendant, VNY's managing member, Lana Vinderman A/K/A  because of the  financial recommendations   and Lana's advice to plaintiff, Abu Hantash concerning her articulated opinions about the way plaintiff, Abu Hantash was misspending and misappropriating the infant model Jordan's earnings from her modeling work)** and the plaintiff, the infant Model Jordan had an executed bilateral contract and where both the plaintiffs and defendant had given their mutual assent and manifestation of Assent, where consideration was of record and where the contract had been substantially performed by both Plaintiff and Defendant, "VNY"  and where Plaintiff, infant Model Jordan had earned more that $400,000.00 all

of which had been paid by "**VNY**" and accepted by the infant, Model Jordan Richardson as compensation. The February 16, 2007 letter documents  where the 2005 Model Management Agreement **was dead and  that the 2005 Model Management Agreement with "V Model Corp.,  was a prior written Model Management Agreement  signed and executed  by plaintiff, Abu Hantash to bind her infant daughter to a model mangement agreement with a New York State Corporation known as "V" Models Corp., a New York Corporation that had been dissolved as of August 15, 2005.  That this letter was sent in an attempt to manipulate the actual facts of what had occurred previously between the parties, plaintiffs and defendants and was sent by Plaintiff, Abu Hantash who had no actual knowledge of her inability  to revive the dead 2005  Model Management Agreement she had executed with "V" Models Corp.**

67.    Defendants deny the ridiculous and frivolous allegation contained in paragraph "67" of the Complaint except admit that the Plaintiff, Abu Hantash, as mother of the infant Model Jordan signed version of the "2006-2008 Model Management Agreement was again forwarded to Plaintiff, Abu Hantash.

68.    Defendants admit the allegations contained in paragraph "68" of the Complaint.

69.    Defendants deny the allegations contained in paragraph "69' of the Complaint.

70.    Defendants admit the allegations contained in paragraph "70" the Agreement was signed and executed by the infant model Jordan's parent, Abu Hantash and the infant, model Jordan's signature was not necessary because a modeling contract provides for

work for advertising purposes.

71.    Defendants admit the allegations contained in paragraph "71" of the Complaint.

72.    Defendants admit the allegations contained in paragraph "72" where the plaintiff, Abu Hantash admits that she signed the 2006-2008 Model Management Agreement with VNY in her capacity as mother/and or legal guardian of the infant Model Jordan, and defendants further allege that said written consent by Abu Hantash was the only consent necessary to make the 2006-2008 VNY Model Management Agreement she signed with defendant, VNY and the Plaintiff, Abu Hantash's written consent made the 2006-2008 aModel Management Agreement with VNY binding on the infant Model Jordan Richardson.

73.    Defendants admit the frivolous allegations contained in paragraph "73' of the Complaint, since the infant model's mother, Abu Hantash is not a **model and the only reason she signed the 2006-2008 VNY Model Management Agreement for her daughter, the infant Model, Jordan Richardson, was/is because it is required by New York State Laws.    In New York State under the prevailing rules of law and case law modeling agreements/contracts in order to bind an infant model must be signed in writing by the infant's parent or guardian . See, <u>Brooke Shield v. Garry Gross, 448 N. E. 2nd 108, and 58 N.Y. 2d 338, (1983) ( See, a copy of this decision annexed hereto as Exhibit "D."</u>**

74.    Defendants admit the allegations contained in paragraph "74 of the Complaint.

75.    Defendants deny the frivolous allegations contained in paragraph "75" of the Complaint, because the Model Agreement was modified by the Plaintiff, Abu Hantash in her own handwriting  to change this paragraph  in the 2006-2008 Model Management Agreement and is one of the terms of the valid, enforceable 2006-2008 Model Management Agreement between the parties hereto.

76.    Defendants deny the allegations contained in paragraph "76" of the Complaint.

77.    Defendants deny the allegations contained in paragraph "77" deny the allegations contained in paragraph "77" of the Complaint and allege that said letter of March 21, 2007 documents plaintiff's intentional and unilateral breach of the 2006-2008 Model Management Agreement that the Plaintiff, has with VNY Model Management, LLC. Defendants further  deny the stupid, ridiculous allegations contained in paragraph "77" of the Complaint and assert this is another example of where the plaintiffs have attempted to revive the terms of a dead contract, an agreement plaintiff had with V Models, Corp., a dissolved New York State Corporation, after Plaintiff, the infant Model Jordan Richardson and the Defendant, VNY Model Management had substantially performed the terms of the 2006-2008 bilateral contract for a period of  more than one year pursuant to the terms of  the 2006-2008  Agreement that the infant model, Jordan's mother, Abu Hantash has given her consent to with VNY in June, 2006.

78.    Defendants deny the allegations contained in paragraph "78" of the Contract and assert a modeling contract signed by an infant model's parent in this case is binding upon said infant in New York State and cannot be disaffirmed.

79.    Defendants lack sufficient information or belief sufficient to form a belief as to the truth of the allegations contained in paragraph "79' and because decisions are being made by individuals who have not had Jordan's best financial interest  and continue not to have Jordan's best interest as their priority defendant, VNY admits that it will continue to hold the infant model Jordan to the terms of the 2006-2008 Model Management Agreement her mother, Abu Hantash gave her written consent to and will seek monetary damages for each and every breach of said Model Management Agreement and VNY will remain the infant model, Jordan Richardson, exclusive Model Management Agency until the current 2006-2008 Model Management Agreement expires on June 18, 2008.


80.    Defendants, specifically the defendant VNY admits the allegations contained in paragraph "80" of the complaint.


81.    Defendants, specifically, the defendant VNY's  admits the allegations contained in paragraph "81" of the Complaint.


82.    Defendants, specifically, the defendant, VNY's  admits the allegations contained in paragraph "82" except to qualify that payments to the infant model Jordan are disbursed as soon as they are received from the advertisers.

83.     Defendants, specifically, the defendant VNY denies that it has ever failed to remit any payments due to the infant model Jordan for the modeling services she has provided and since the parties have been involved in litigation and pre-litigation in the instant case checks for payments of modeling services have been forwarded to the infant model Jordan, by VNY but these payments (checks) have remained un-cashed and un-deposited by the infant Model Jordan.

84.     Defendants deny the allegations contained in paragraph "84" of the Complaint.

85.     Defendants  repeat, reiterate and reallege each and every denial of each and every allegation contained in the foregoing paragraphs "1" through "84" with the same force and effect as if fully set forth at length herein.

86.     Defendants admit the allegation contained in paragraph  "86" of the Complaint.

87.     Defendants deny the allegations contained in paragraph "87" of the Complaint.

88.     Defendants deny the allegations contained in paragraph "88" of the Complaint.

89.     Defendants deny the frivolous allegations contained in paragraph "89" of the Complaint, the plaintiff, Abu Hantash is not a model and clearly gave her written consent to the now dead 2005 Model Management Agreement binding her infant model daughter, Jordan Richardson to the 2005 Management Agreement.

90.    Defendants admit the allegations contained in paragraph "90" of the Complaint.

91.    Defendants deny the allegations contained in paragraph "91" of the Complaint.

92.    Defendants repeat, reiterate and reallege each and every denial of each and every allegation contained in paragraphs "1" through "91" with the same force and effect as if fully set forth at length herein.

93.    Defendants admit part of the allegations contained in paragraph "93" of the Complaint that the initial term of the 2005 Model Management Agreement commenced in 2005, except denies and asserts that the 2005 Model Management Agreement that the infant model, Jordan Richardson's Mother Abu Hantash consented to  with "V Models Corp"., did not end as of  April 22, 2007 because  that the 2005 Model Management Agreement was ended/ dead as  of June 18, 2006  the date the plaintiff's Mother gave her consent to the 2006 -2008 Model Management Agreement whereby the infant Jordan agreed to be managed by VNY Model Management, LLC., and additionally, because V. Models Corp., (VNY predecessor Model Management Agency) a New York State Corporation was dissolved as of August 15, 2005 and therefore  the  2005 Model Management agreement, plaintiff, Abu Hantash had executed with V Models Corp., ended as of June 18, 2006.

94.    Defendants deny the allegations contained in paragraph "94" contained in the Complaint and further assert this issue is moot/irrelevant because the 2005 Model

Management Agreement plaintiff, Abu Hantash signed with V Models, Corp., ended as of June 18, 2006.

95.    Defendants deny the allegations contained in paragraph "95" of the Complaint and further assert that this issue is moot/irrelevant because the 2005 Model Management Agreement plaintiff, Abu Hantash signed with V Models, Corp., ended as of June 18, 2006.

96.    Defendants deny the allegations contained in paragraph "96" of the Complaint and further assert that this issue is now moot/irrelevant because the 2005 Model Management Agreement, plaintiff, Abu Hantash signed with V. Models, Corp., ended as of June 18, 2006.

97.    Defendants deny the allegations contained in paragraph "97" of the Complaint and further assert that this issue is now moot/irrelevant because the 2005 Model Management Agreement, plaintiff, Abu Hantash signed with V. Models, Corp., ended as of June 18, 2006.

98.    Defendants deny the allegations contained in paragraph "98" of the Complaint and further assert that this issue now moot/irrelevant and represents a frivolous allegation in this complaint because the 2005 Model Management Agreement, plaintiff, Abu Hantash signed with V. Models, Corp., ended June 18, 2006.

99.    Defendants deny the allegations contained in paragraph "99" of the Complaint and assert further that this issue is now moot/irrelevant, frivolous  and without any merit because the 2005 Model Management Agreement plaintiff, Abu Hantash ended as of June 18, 2006.

100.    Defendants repeat, reallege, reiterate an reallege  and each and every denial  of each and every allegation contained in the foregoing paragraphs "1" through "99" with the same force and effect as if fully set forth at length herein.

101.    Defendants deny the allegations contained in paragraph "101" of the Complaint.

102.    Defendants admit the allegations contained in paragraph "102" of the Complaint and further allege that the 2006-2008 Model Management Agreement was signed in writing by the infant model's mother, the plaintiff, Abu Hantash.

103.    Defendants admit the allegations contained in paragraph "103" of the Complaint.

104.    Defendants deny the allegations contained in paragraph "104" in paragraph "104' accept to admit that the defendant, the infant model Jordan's Mother signed this bilateral contract and the plaintiff Jordan gave her consent/assent by her substantial performance of the contract with VNY for a period of 11 months, accepted modeling assignments from VNY Model Management, LLC,.and received payments for her modeling services for an amount in excess of $400,000.00.

105.    Defendants deny the allegation contained in paragraph "105" of the Complaint.


106.    Defendants deny that the allegation that the New York State General Obligation Law Section -701 is applicable to the 2006-2008 written, executed Model Management Agreement between VNY Model Management, LLC , an agreement signed and executed and giving her consent, by the infant model's mother, Abu Hantash.


107.    The defendants deny the allegations contained in paragraph "107" and assert it is a frivolous description of the 2006-2008 written VNY Model Management Agreement that was signed and consented to by the infant model's mother, Abu Hantash, who initialed each and every paragraph of the 2006-2008 Model Agreement and where the Agreement was signed by VNY Model Management, LLC, managing member , Lana Winters A/K/A Lana Vinderman and was signed by the infant model's mother Abu Hantash.


108.    Defendants admit the allegation contained in paragraph "108" accept to assert that the infant Jordan Richardson name is clearly written under the AGREED AND ACCEPTED MODEL portion of the 2006-2008 VNY Model Management Agreement, as Jordan-Annettee J. Richardson and where her mother, Abu Hantash, signed AGREED AND ACCEPTED MODEL'S PARENT/LEGAL GUARDIAN, Lisa Athena S. Abu Hantash.

109.     Defendants deny this  frivolous allegations contained in paragraph "109" of the Complaint.

110.     Defendants deny the allegations contained in paragraph "110" of the Complaint and assert that plaintiff, **Abu Hantash is not a model, does not look like a model** and that plaintiff Abu Hantash signed the 2006-2008 Model Management Agreement as the parent/natural guardian of  her infant model daughter, Jordan Richardson,  who accordingly rendered  services as a model  during 2006 and was managed by VNY Model Management LLC, during 2006   for several months and the infant model received consideration and earning in excess of $400,000.00  and  where both the plaintiff, Jordan Richardson and the defendant VNY have substantially performed the contract until the plaintiff's announced their unilateral breach of the Contract as of April 22, 2007.

111.    Defendants deny the allegations contained in paragraph "111" of the Complaint and it is frivolous in its entirety, the plaintiff, Abu Hantash is not a model, upon information and belief  is not suitable to be a model, as she is well aware of  and probably would not be contracted to render modeling services under any circumstances by any Modeling Agency on the globe because of  her age and weight and the only reason the plaintiff, Abu Hantash signed the 2006-2008 was so that the VNY Model Management Agreement would be binding on her infant model daughter, Jordan Richardson, who has worked as a model since 2005 and earned more than $400,000.00 during 2006  and so that upon information and belief plaintiff, Abu Hantash could continue to spend/exploit the infant model Jordan's earnings for her own private benefit; especially before VNY Model Management, LLC, managing member, Lana Winters "pulled the plug" and

notified the New York Supreme Court of how the infant Jordan's income was being misused, misappropriated and not being preserved by her Mother, the plaintiff, Abu Hantash herein.

112.    Defendants admit the allegations contained in paragraph "112" of the Complaint.


113.    Defendants deny the allegations contained in paragraph "113" of the Complaint.


114.    Defendants deny the allegations contained in paragraph "114" of the Complaint.


115.    Defendants deny the allegations contained in paragraph "115" of the Complaint.


116.    Defendants deny the allegations contained in paragraph "116" of the Complaint.


117.    Defendants deny that the 2006-2008 Model Management Agreement that Plaintiff, Abu Hantash signed with the Defendant, VNY Model Management is unenforceable and assert that said 2006-2008 VNY Model Management Agreement is legally binding and enforceable.

118.    Defendants, repeat, reiterate and reallege each and every denial of each and every allegation contained in the foregoing paragraphs "1" through "117" with the same force and effect as if fully set forth at length herein.


119.    Defendants deny that the allegations that    the 2006-2008 VNY Model Management is null and void with respect to Plaintiff, Abu Hantash, and plaintiff, Jordan

Richardson, and Jordan Richardson, Inc..

120.    Defendants admit the allegation contained in paragraph "120" of the Complaint.

121.    Defendants deny the allegations contained in paragraph "121" of the Complaint.

122.    Defendants admit the allegations contained in paragraph "122" of the Complaint.

123.    Defendants deny the allegations contained in paragraph "123" of the Complaint.

124.    Defendants deny that the 2006 Model Management Agreement as alleged in paragraph "124" of the Complaint is null and void and the plaintiff, Jordan Richardson is not obligation to perform there under.

125.    Defendants repeat, reiterate and reallege each and every denial  of each and every allegation contained in the foregoing paragraphs "1" through "124" with the same force and effect as if, fully set forth at length herein.

126.    Defendants admit the allegations contained in paragraph "126" of the complaint and further assert this was because V Models Corp., defendant, VNY Model Management LLC had been dissolved as of August 15, 2005 and that plaintiff's did not refuse or object to the signing of the  2006 Model Management Agreement with VNY Model Management, LLC..

127.    Defendants deny the allegations contained in paragraph "127" of the Complaint.

128.    Defendants deny the allegations contained in paragraph "128" of the Complaint.

129.    Defendants deny the allegations contained in paragraph "129" of the Complaint.

130.    Defendants deny the allegations contained in paragraph "130" of the Complaint.

131.    Defendants deny that the  2006 Management Agreement was fraudulently induced by Defendants and assert that the   court does not have any reason to rescind the 2006 Management Agreement as alleged by plaintiffs in paragraph "131" of the Complaint.

132.    Defendants repeat, reiterate and reallege each and every allegation contained in the foregoing paragraphs "1" through "131" with the same force and effect as if fully set forth herein.

133.    Defendants lack sufficient information or belief sufficient to form a belief as to the truth of the allegations contained in paragraph "133" of the Complaint.

134.    Defendants deny that the plaintiffs have a like hood of success on the merits of this case and that the allegations of plaintiffs that 2006 Management agreement is " unenforceable and/or null and void and/or rescinded has no merit and are frivolous allegations as alleged by plaintiffs in paragraph "134" of the Complaint.

135.    Defendants deny the allegations contained in paragraph "135" of the Complaint.

136.    Defendants lack sufficient information or belief sufficient to form a belief as to the truth of the allegations contained in paragraph "136th of the Complaint.

137.    Defendants deny the allegations contained in paragraph "137" of the Complaint.

138.    Defendants deny that the plaintiff are entitled to a permanent injunction restraining and enjoining defendants from asserting and enforcing the 2005 agreement in said allegations contained in paragraph "138" of the Complaint.

139.    Defendants repeat, reiterate and reallege each and every denial of each and every allegation contained in the foregoing paragraphs "1" through "138 with the same force and effect as if fully set forth at length herein.

140.    Defendants deny the allegations contained in paragraph "140" of the Complaint.

141.    Defendants deny the allegations contained in paragraph "141" of the Complaint.

142.    Defendant deny that the court needs to issue an order ordering Defendants to account for all monies received from third person with regard to the infant, model Jordan's modeling service and the amount and description of all deductions made by

Defendants with respect to these payment as stated in the allegations contained in paragraph "142" of the

Complaint.

## **AFFIRMATIVE DEFENSES**

143.    Defendants repeat and relterate and reallege each and every denial of each and every allegation contained in the foregoing paragraphs "1" through "142" with the same force and effect as if fully set forth at length herein.

144.    As and for a first Affirmative defense, defendants allege that the  Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

145.    As and for a second Affirmative defense defendants allege that 2005 Model Management Agreement that the plaintiff, Abu Hantash consented to with V Model Corp., to enable her daughter, the infant model Jordan Richardson to be managed by the defendant V Models, Corp., and to render modeling services is null and void and has been null and void since June 18, 2006.

146.    As and for a third Affirmative defense defendants allege that the defendant, V Model Corp., is a now dissolved New York State Corporation and was dissolved as of August 15, 2005 and additionally, that V Models Corp.,  2005 Model Management Agreement with the infant model Jordan Richardson as agreed to consented to  and signed by her Mother/natural guardian, Abu Hantash ended the day before the plaintiff,

Abu Hantash entered into the 2006 Model Management Agreement with the defendant, VNY to wit; June 18, 2006 and one day prior to June 19, 2006 the date the plaintiffs entered into the 2006 Model Management Agreement. ( See copy of dissolution filling receipt for the N. Y. S. Department of State Division of Corporations and State Records annexed hereto as Exhibit "A.")

147.    As a Fourth Affirmative defense defendants allege that the 2006 Model Management Agreement was duly signed, executed by the plaintiff, Abu Hantash in June/July 2006 mother/parent of the infant model Jordan Richardson and said Agreement contains the plaintiff, Abu Hantash's signature and acknowledgement where she acknowledged that she was agreeing and giving her consent to said 2006 modeling managing agreement to enable her infant daughter model, Jordan Richardson to be managed by VNY and to perform modeling services as a model and said agreement is binding and enforceable.

148.   As and for a Fifth Affirmative defense defendants allege that New York State General Obligation Law Section 3-105 requiring prior court approval of infant's contract applies only to performing artists, such as actors, musicians, dancers and professional athletes and therefore Court approval was not necessary to make the 2006 model management agreement as signed by plaintiff, Abu Hantash as a parent of the infant model Jordan Richardson binding and enforceable.

149.   As and for a Sixth Affirmative defense the 2006 VNY Model Management

Agreement was signed in writing by an infant model's mother, in this case Abu Hantash

in 2006 and Lana Winters as the managing member of VNY Model Management, LLC

and as a result the 2006 Model Management Agreement is valid and legally enforceable.

See copy of 2006-2008 duly executed VNY Model Management Agreement annexed

hereto as Exhibit "B"

150.   As and for a Seventh Affirmative defense the Defendants allege that the 2006

modeling agreement duly executed by the plaintiff, Abu Hantash, who is the mother and

natural guardian of the infant model, Jordan Richardson and where said 2006 Model

Management Agreement was also signed by the managing member of VNY Model

Management, LLC, Lana Winters that said agreement is a legally binding and

enforceable contractual agreement, especially in this situation, where there is mutual

assent, consideration and a bilateral contract and where both the plaintiff, VNY and the

infant Model, Jordan Richardson have duly performed services in accordance with the

terms of the 2006 Model Management Agreement, ( See copies of cancelled checks

issued by VNY to Jordan Richardson issued subsequent to June 19, 2006 as Exhibit "C"

151.   As and for an Eight Affirmative defense the Defendants allege upon information

and belief that the only reason the plaintiff, Abu Hantash and defendant, Lana Winters no

longer have a harmonious relationship and the reason plaintiffs have commenced this

frivolous legal action against the defendant is because the defendant, VNY Model

Management, LLC., managing member articulated her concerns to the plaintiff, Abu

Hantash i.e. "that the plaintiff Abu Hantash was in her opinion not demonstrating that

she was not protecting the infant model, Jordan Richardson's best financial

interest/interest of her child as demonstrated by the manner in which plaintiff, Abu Hantash was spending and utilizing the infant model Jordan's earnings from rendering model services, and that the Plaintiff, Abu Hantash who upon information and belief has always been unemployed with no visible means of financial support was spending and wasting the infant Jordan's income to cover her own financial responsibilities and that these facts are demonstrated by the Plaintiff, Abu Hantash purchase of a new SUV, a more than $600,000.00 home in the State of Virigina, electronic, shoes, clothes, furnishing, food etc., and the support of other members of Abu Hantash's family and that the Plaintiff, Abu Hantash was doing no acts consistent with the investment and protection of the infant model Jordan income, so that some of her assets would be preserved once the infant Jordan reaches her rapidly approaching majority and perhaps at a time in which the infant Jordan, may need money to obtain a higher education and to meet her other necessity needs once she becomes an adult.

## AS AND FOR A FIRST COUNTERCLAIM

152. Defendants repeat, reiterate and realleges and incorporate by references to the allegations contained in the foregoing paragraphs "1" through "151" of the Answer and as set forth in defendants' Affirmative Defenses with the same force and effect as if fully set forth at length herein.

153. Defendants allege as and for defendants first Counterclaim that the plaintiffs have unilaterally breached the 2006 VNY Model Management Agreement, by refusing to take modeling assignments and that the plaintiff were urged to take this position by plaintiff's

attorneys.

154.   That as a result of the plaintiff, the minor model Jordan's refusal to take any modeling assignment the defendants have been damaged in the sum of an amount exceeding $180,000.00 or more  that will be determined a trial.


## PRAYER

1.      Defendants pray that:

2.       Plaintiffs' complaint be dismissed because it fails to state a Cause of action.

3.       That the  court declare that the 2005 Model Management Agreement between Plaintiffs and Defendant, V Models, Corp., is null and void and as been null and void since June 18, 2006.

4.       Plaintiffs' complaint be dismissed with prejudice and that the court issue its decision affirming that the 2006-2008 VNY Model Management Agreement is a valid and enforceable Model Managment Agreement and that the plaintiff, Abu Hantash as the infant model, Jordan Richardson's parent could and did bind the infant model  to the 2006-2008 Model Management Agreement when she signed the Model Management Agreement  in 2006 as the infant model, Jordan Richardson's parent/natural guardian.

5.       That the New York Supreme Court's prior approval of the 2006 VNY Model Management Agreement was not necessary and was not required by New York State General Obligations Law Section 3-105.

6.       Defendants be awarded  all sums due and owing to it under the 2006 VNY  Model Management Agreement based on the plaintiffs breach of contract as described in the Counterclaim above in the sum of at least $180,000.00 or an amount to be determined at

trial..

7.      Defendants be awarded   Defendants reasonable attorney's fees and expenses
incurred in responding to this action.

8.      Defendants be awarded pre and post judgment interest as allowed by law.

9.      Defendants be awarded Defendants costs of suit.


10.     Defendants be granted any and other relief that the Court deems just and proper.


Dated: May 17, 2007                          Yours etc.,
                                             Wilmer Hill Grier
                                             Attorney At Law
                                             By:
                                                 Wilmer Hill Grier, Esq.,
                                                 Attorney for Defendants,
                                                 V Models, Corp., and VNY
                                                 Model Management, LLC

## **DEMAND FOR JURY**

Defendants, VNY MODEL MANAGEMENT, LLC and V MODELS, CORP.,demand

trial by jury for all triable issues in this action.

                                             Wilmer Hill Grier, Esq.,
                                             Attorney for Defendants.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------x          **VERIFICATION**

LISA -ATHENA S. ABU HANTASH, in her
Individual capacity and as mother and natural      CIVIL CASE No.: 3363/07
Guardian of Jordan-Annette Jazzmin Richardson,
A minor, and JORDAN RICHARDSON A
VIRGINIA CORPORATION,

                    PLAINTIFFS,


        V.

V MODEL MANAGEMENT NEW YORK, INC.,
And VNY MODEL MANAGEMENT, LLC.
                DEFENDANTS.


---------------------------------------------x
State of New York
County of New York ) s. s:

LANA VINDERMAN A/K/A  LANA WINTERS  being duly sworn depose and say:

1. I am the managing member of VNY Model Management, LLC and I was the

President of V Models, Corp., a dissolved New York State Corporation the defendants

in the within action;  I have read the foregoing Verified Answer, Affirmative Defenses

and Counterclaim and know the contents thereof: the same is true to my own

knowledge, except as to the matters therein stated to be alleged on information and

belief, and as to those matters I believe it to be true.

Dated:  May 17, 2007        VNY MODEL MANAGEMENT, LLC and
                             V MODELS, CORP.,

New York, New York

                             BY: LANA VINDERMAN A/K/A LANA WINTERS

                             BY:  LANA VINDERMAN A/K/A LANA WINTERS,
                             MANAGING MEMBER of VNY MODEL MANAGEMENT, LLC
                             and as President of V MODELS, CORP., a dissolved
                             New York State Corporation.

SWORN TO BEFORE ME
THIS 17th DAY of May, 2007

_Wilmer Hill Grier_

NOTARY PUBLIC

**Wilmer Hill Grier**
**Notary Public State of New York**
**No: 02GR6041333**
**Qualified Kings County**
**Commission Expires 06/26/10**

# EXHIBIT "A"

N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS AND STATE RECORDS         ALBANY, NY 12231-0001

                              FILING RECEIPT
================================================================================
ENTITY NAME: V. MODELS CORP.


DOCUMENT TYPE: DISSOLUTION (DOMESTIC)                    COUNTY: KING

SERVICE COMPANY: ** NO SERVICE COMPANY **              SERVICE CODE: 00

================================================================================
FILED:08/15/2005 DURATION:********   CASH#:050815000642 FILM #:050815000655

 ADDRESS FOR PROCESS
 -------------------



 REGISTERED AGENT
 ----------------



================================================================================
FILER                      FEES       60.00   PAYMENTS        60.00
-----                      ----                --------
                           FILING     60.00   CASH            0.00
                           TAX         0.00   CHECK          60.00
ANATOLY OSADCHY CPA        CERT        0.00   CHARGE          0.00
3173 SHORE PARKWAY         COPIES      0.00 DRAWDOWN          0.00
                           HANDLING    0.00     OPAL          0.00
BROOKLYN, NY 11235                           REFUND          0.00
                                             ------
================================================================================
                                             DOS-1025 (11/89)

May 10 07 04:37p    VNY Model Management    05/10/2007 16:30 FAX 718 891 5295

212206365S                                              ☑001
                                                        p.1

# EXHIBIT "B"

Apr 17 07 11:32a      VNY Model Management
0√11/2005  16:55      7578383025                    OFFICE DEPOT               PAGE 02/39

# VNY MODEL MANAGEMENT, LLC.

## MODEL MANAGEMENT AGREEMENT

AGREEMENT made as of the _19_ day of _June_____ , 200 _6_ , by and between VNY MODEL MANAGEMENT, LLC., 928 Broadway, Suite 801, New York, NY 10010 ("Manager"), and _____, _Jordan Richardson Inc_ _____ ("Model").

**WITNESSETH:**

IN CONSIDERATION of the sum of One Dollar ($1.00), each to the other paid in hand and the mutual covenants and promises herein contained, the parties hereto agree as follows:

1.  Model hereby engages the services of Manager as Model's sole and exclusive manager, representative and advisor throughout the world with respect to Model's professional career, talents, services and business affairs in the fashion, modeling and entertainment industries ("Career"). Manager hereby accepts such engagement, and agrees to counsel, confer and advise Model in the guidance of Model's career and/ activities; to use reasonable efforts to arrange for, exploit and commercialize Model's name, talent and abilities in connection therewith; supervise, negotiate and arrange the terms of any and all offers of employment or contracts for services of any nature whatsoever. Manager agrees to render advice and assistance with respect to the development and improvement of Model's Career and all business interest related thereto.

2.  (A) Manager is not and shall not act as an agent for Model.. Model shall promptly refer to Manager all offers, communications or requests for Model's appearances or services.

(B) Manager shall not be required to render services exclusively to Model, and shall, at all times, be free to perform the same or similar services for others, as well as engage in any and all other business activities.

3. The term of this Agreement (the "Term") shall consist of an initial period plus any and all option periods. The initial period of this Agreement shall be two (2) years commencing on the date first above written and ending on _June_____ , 200 _8_ (the "Initial Period"). The Term shall be automatically extended for additional periods of two (2) years each (collectively, "Option Periods"), unless Manager notifies Model, in writing, that it wishes to terminate this Agreement at any time before the expiration of the Term.. In the event Manager gives Model notice of termination, this Agreement shall terminate thirty (30) days from the date of such notice, unless the notice states otherwise.

Manager's obligation to continue to pay Model its fees hereunder, if any, shall survive termination of this Agreement.

4.      (A) As compensation for Manager's services hereunder, Model shall pay Manager sums equal to twenty percent (20%) of all "gross receipts" ("Fee") as hereinafter defined, off the top, from all sources paid or accrued to, or earned or received by Model or on Model's behalf or for Model's benefit, directly or indirectly, during the Term of this Agreement, and thereafter: (i) for any employment, engagement, commitment or contract in existence on the date hereof or negotiated for or entered into during the Term, and any renewal, extension, modification, amendment thereof or addition thereto, including a new agreement for an additional term with the same or related parties; (ii) any employment, engagement, commitment or contract substituted for or replacing, directly or indirectly, employments, engagements, commitments or contracts currently in existence or negotiated for or entered into during the Term and any renewal, extension, modification, amendment thereof or addition thereto, including a new agreement for an additional term with the same or related parties; and, (iii) any and all judgments, awards, settlements, payments, damages and proceeds relating to any suits, claims, actions or proceedings arising out of the alleged breach of non-performance by others of any of the contracts, engagements, commitments or other agreements referred to herein.    Expiration or termination of this Agreement shall not affect Manager's rights to compensation as herein provided.

        (B) Manager's full participation in Model's gross receipts from contracts / agreements entered into or substantially negotiated during the Term hereof shall continue for as long as gross receipts are payable to Model per the terms of said contracts / agreements, and any renewals, extensions, re-negotiations, modifications, or amendments thereof.

        (C) The term "gross receipts" as used herein shall be deemed to include all forms of income payments, consideration and compensation including but not limited to advances, earnings, fees, royalties, bonuses and income in kind, regardless of by whom procured, secured or arranged, however, within the scope of Model's Career and professional activities hereunder.    The term Model's "professional activities" shall include without limitation, any use of Model's talents and activities throughout the fashion, modeling and entertainment industries.

        (D) Model understands that Manager is entitled to receive from some or all of the clients who may utilize Model's services a service charge, agency fee or other compensation ("Client Fee") over and above the Fee Manager receives from Model, and Model acknowledges that such compensation is an additional inducement for Manager to act on Model's behalf and an important element in the compensation Manager receives from representing Model.  In the event that Model accepts a booking for which his/her fee includes the Client Fee, Model agrees that Manager has the right to deduct such Client Fee from Model's gross compensation paid by the client in addition to Manager's Fee.  Manager's Fee and Client Fee extend to any booking or engagement performed by Model subsequent to the termination of this Agreement if such booking or

2

Apr 17 07 11:32a      VNY Model Management                        2122063655              p.3

07/11/2006  16:55   7578308025              OFFICE DEPOT                    PAGE  04/09

engagement was negotiated, solicited or accepted by Model prior to such termination or is a continuation or work which began prior to termination, including renewals, options and renegotiated contracts.



5.  (A)  Gross receipts shall be sent to Manager.  Model shall cause all contracts and agreements with third parties concerning Model's professional activities to provide for Model's compensation under those contracts and agreements to be paid directly to Manager.  Upon Manager's receipt of gross receipts, Manager shall deduct from such gross receipts: (i) any and all fees, costs, and expenses advanced or incurred by Manager on Model's behalf, including any and all expenses advanced or incurred by Manager on Model's behalf before and after execution of this Agreement; and, (ii) all compensation or consideration due Manager hereunder.  Manager shall remit the balance of gross receipts, if any, to Model no later than ten (10) calendar days after receipt of gross receipts by Manager.



(B)  In the event that gross receipts are sent to Model, Model shall promptly notify Manager of its receipt of same.  In this event, Model shall promptly, and in no event later than five (5) calendar days after receipt thereof send the entire gross receipts proceeds to Manager for allocation and distribution as per Par. 5(A), above.



6.  Model shall, notwithstanding anything elsewhere contained herein, reimburse Manager for any and all costs or expenses Manager may incur, or any moneys Manager may advance in connection with Model's Career and professional activities hereunder, including but not limited to photographs, clothing and accessories, any and all equipment, advertising, publicity or promotion costs, long-distance telephone calls, travel and transportation expenses, administration, auditing fees, and any and all other costs incurred by Manager, from any and all monies earned by Model hereunder, and, if no monies are earned by Model hereunder or monies earned are insufficient to cover Manager's expenses, Model shall nevertheless reimburse Manager within six (6) months of Manager's incurring any particular expense.  Manager may, but shall not be obligated to, commence legal proceedings to collect amounts due to Model from clients, but if Manager does, Model shall bear the expenses associated with such proceedings.



7.  Model grants to Manager during the Term the nonexclusive right to use and publish and to permit others to use and publish Model's professional name, likeness and biographical material concerning Model, for advertising and purposes of trade and otherwise without limitation in connection with the furtherance of Model's Career and professional activities.  Manager shall have the right to advertise the fact that Manager represents Model in connection with Model's activities hereunder.  Manager shall have the right, within Manager's sole discretion, to publish Model's name, likeness, image, biographical information and statistics on its website for as long as Model is represented by Manager.



8.  (A) Model warrants and represents that Model: (i) has the full right, power and authority to enter into this agreement and to grant to Manager the rights granted herein; (ii) is under no obligation or disability or prohibition which will or might prevent Model



3

Apr 17 07 11:33a    VNY Model Management                2122063655            p.4

07/11/2006  16:55    7578388825            OFFICE DEPOT            PAGE  05/09

from keeping or performing Model's covenants, promises, representations and warranties contained herein; (iii) will not, during the Term, enter into any agreement or commitment which shall or might in any manner interfere with or prevent Model's carrying out the terms and conditions of this Agreement; and, (iv) will not, during the Term, engage any other person, firm or corporation to act as Model's personal manager or in any similar capacity.



(B) Model shall indemnify and hold Manager harmless from any loss, liability or damage (including reasonable attorney's fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties, representations, covenants or promises made by Model hereunder. Model will reimburse Manager on demand for any payment made by Manager at any time in respect of any liability or claim to which the foregoing indemnity relates.



9. Model hereby authorizes and appoints Manager to be Model's agent and attorney-in-fact for the purpose of (a) negotiating, renegotiating, contracting and executing for Model and in Model's name and on Model's behalf and any and all agreements, documents, and instruments providing for Model's services to clients pursuant hereto; (b) approving and permitting the use of Model's name, image, voice, caricatures and the like for the purposes of advertising and publicity; (c) collecting and receiving sums payable to Model, endorsing Model's name upon and depositing in Manager's account all checks payable to Model, and retaining therefrom all sums owing to Manager; and, (d) demanding, suing for and collecting, all claims, money, interest and other items that may be due Model or belong to Model.

10. Manager shall have the right to assign this Agreement and any of Manager's rights hereunder without limitation. Manager shall have the right to delegate the performance of Manager's obligations hereunder without limitation. Model shall not have the right to assign this Agreement or delegate any of Model's obligations hereunder.

11. Manager shall not be liable for any breach of contract or act or omission on the part of anyone with whom any engagement or contract is negotiated, arranged or secured.

12. No breach or failure to perform any terms of this Agreement by either Manager or Model which would otherwise be a material breach of this Agreement, shall be considered a material breach of this Agreement, unless the party alleged to be in breach does not cure the same within a further period of thirty (30) days after receipt of written notice from the alleging party.

13. Manager shall have the right, at Manager's election, to suspend the operation of this Agreement if for any reason whatsoever Model is unable or unwilling to render services in the entertainment industries. Such suspension shall commence upon written notice to Model and shall last for the duration of any such unavailability or unwillingness to render services. At Manager's election, a period of time equal to the duration of such suspension shall be added to Term. In addition, if Model fails to render services in the



entertainment industries as aforesaid, then Manager may, in addition to other remedies provided for herein, terminate this contract upon written notice to Model. Notwithstanding anything to the contrary contained herein, Model shall be responsible for reimbursing Manager for any and all costs and expenses incurred by Manager in connection with Model's Career and professional activities within ten (10) calendar days of the date of termination. In the event that Model fails to so reimburse Manager, Manager shall have the right to avail itself of any all relief, including damages, injunction and equity, available to it under the law.

14.  Any notice hereunder shall be sent to Model at the address above specified or any other address of which Model gives Manager notice. Any notices hereunder shall be sent to Manager at the address above specified or any other address of which Manager gives Model notice, with a copy to Natalia Nastaskin, Esq., 250 West 57th Street, Suite 917, New York, New York 10107. All notices shall be delivered personally, by mail, e-mail, facsimile or telegraph. The date of personal delivery, mailing receipt date, e-mail date, facsimile date or delivery to a telegraph office shall be the effective date of the notice.

15.  This Agreement does not constitute or acknowledge any partnership or joint venture between the parties. Model understands and agrees that he / she is an independent contractor and not an employee of Manager, and, as such, shall be responsible for paying his/her own taxes from any and all monies earned hereunder.

16.  This Agreement represents the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any provision thereof, shall be binding unless in writing signed by Model and Manager. No waiver of any provision or default under this Agreement shall affect Manager's rights thereafter to enforce such provisions or to exercise any right or remedy in the event of any other default, whether or not similar. This Agreement shall be construed in accordance with the laws of the State of New York, applicable to contracts entered into and wholly performed therein. If any provision of this Agreement violates or conflicts with any law, governmental rule or regulation or judicial decree, including any requirements for judicial approval, to the extent required, of all or any part of this Agreement, such provision or provisions shall be deemed amended to the minimum extent necessary to effect compliance with such law, rule, regulation or decree and as so amended shall remain in full force and effect.

17.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, administrators, executors, successors and assigns.

18.   MODEL REPRESENTS AND WARRANTS THAT MODEL HAS BEEN ADVISED OF MODEL'S RIGHT TO SEEK LEGAL COUNSEL OF MODEL'S OWN CHOOSING IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS CONTRACT.

19.  IF MODEL IS EIGHTEEN (18) YEARS OF AGE OR OVER, MODEL MAY SIGN THIS AGREEMENT ON HIS/HER OWN BEHALF, AND BY SO DOING MODEL

5

Apr 17 07 11:34a    VNY Model Management                    2122063655              p.6

07/17/2006  19:31    7578308825              OFFICE DEPOT                    PAGE  02/82

EXPRESSLY REPRESENTS AND WARRANTS THAT MODEL HAS REACHED 18
YEARS OF AGE.  IF MODEL HAS NOT YET REACHED 18 YEARS OF AGE,
HIS/HER  PARENT(S)  OR  LEGAL  GUARDIAN(S)  MUST  READ  THIS
AGREEMENT AND SIGN WHERE INDICATED BELOW. IN ADDITION, MODEL
AND HIS/HER PARENT(S) OR LEGAL GUARDIAN(S) ACKNOWLEDGE THAT IT
IS MODEL'S AND THEIR RESPONSIBILITY TO OBTAIN ALL NECESSARY
GOVERNMENTAL CONSENTS, PERMITS AND APPROVALS REQUIRED BY
STATE AND FEDERAL LAWS AND REGULATIONS FOR THE PERFORMANCE
OF SERVICES HEREUDNER BY MINORS, INCLUDING WITHOUT LIMITATION
WORK PERMITS VISAS, AND COURT APPROVALS WHERE NECESSARY. AT
MODEL'S REQUEST MANAGER WILL GUIDE AND COUNSEL MODEL WITH
RESPECT  TO  OBTAINING  SUCH  CONSENTS,  PERMITS,  VISAS  AND
APPROVALS, AND MODEL AGREES TO SIGN ALL DOCUMENTS REQUIRED IN
CONNECTION THEREWITH.  MODEL ACKNOWLEDGES THAT UPON HIS/HER
REACHING 18 YEARS OF AGE THIS AGREEMENT WILL CONTINUE IN FULL
FORCE  AND  EFFECT  THROUGHOUT  ITS  TERM  AND  ANY  RENEWALS
THEREOF, AND MODEL'S CONTINUED ACCEPTANCE OF ASSIGNMENTS
FROM MANAGER SHALL CONSTITUTE RATIFICATION OF ALL OF THE
TERMS AND CONDITIONS HEREOF.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and
year first above written.

**MANAGER:**
**VNY MODEL MANAGEMENT, LLC.**

BY: _____
                Lana Winters

TITLE:        President


**AGREED AND ACCEPTED:**
**MODEL:**


_____

Jordan-Annettee J Richardson
Print Name


_____

Model's Soc. Sec. #: 230558610

*[handwritten notes, right side:]*
× homework 3 hr
per day minimum

× home time with
prior notification

Jordan Richardson has the
right to cancel the contract with
a written notice 30 days prior
to the expiration of the contract

**AGREED AND ACCEPTED:**
**MODEL'S PARENT /**
**LEGAL GUARDIAN**

_____

_____
Print Name

_____
Capacity in which signed

# EXHIBIT "C"

Check 2394 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 1/29/07 — $17,241.15 — CHASE — FEB 02 — $17,241.15

Check 2430 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 2/1/07 — $4,621.64 — CHASE — FEB 27 — $4,621.64

Check 2436 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 2/14/07 — $1,600.00 — CHASE — MAR 07 — $1,600.00

Check 2438 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 2/15/07 — $4,014.50 — CHASE — MAR 07 — $4,014.50

Check 2449 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 2/20/07 — $23,083.00 — CHASE — FEB 27 — $23,083.00

Check 2465 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 2/26/07 — $1,691.47 — CHASE — MAR 07 — $1,691.47

Check 2488 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 3/5/07 — $3,092.00 — CHASE — MAR 23 — $3,092.00

Check 2527 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 3/15/07 — $2,379.75 — CHASE — MAR 23 — $2,379.75

Check 2537 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 3/16/07 — $2,800.00 — CHASE — MAR 27 — $2,800.00

Check 2560 — VNY MODEL MANAGEMENT LLC — Pay to the order of Jordan Richardson — Date 3/29/07 — $20,585.00 — CHASE — APR 10 — $20,585.00

$4,949.95     OCT 25     $4,949.95



OCT 25     $18,097.75



OCT 25     $10,595.09



NOV 01     $9,403.43



NOV 10     $3,225.76



NOV 08     $6,400.00



NOV 20     $3,630.40



NOV 24     $2,983.05



NOV 30     $55,962.00



JAN 16     $4,581.46

CHECK NO.   1808         $4,769.72   PAID 06/28

CHECK NO.   1835         $70,308.15   PAID 07/25

CHECK NO.   1879         $103,950.95   PAID 08/02

CHECK NO.   1897         $11,003.10   PAID 08/03

CHECK NO.   1915         $2,530.00   PAID 08/14

CHECK NO.   1935         $39,661.22   PAID 08/24

SEP 14         $2,860.31

SEP 14         $2,734.69

SEP 05         $2,658.50

OCT 06         $7,770.83

FROM :bella                    FAX NO. :7183320403              Apr. 19 2007 04:19PM  P1

☐ **CORRECTED (if checked)**

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| V N Y  MODEL  MANAGEMENT  LLC<br><br>928  BROADWAY,  STE. 801<br>NEW  YORK, NY 10010<br>(    )    - | $<br>2 Royalties<br><br>$ | **2006**<br><br>Form 1099-MISC | **Miscellaneous Income** |
| | 3 Other Income<br><br>$ | 4 Federal income tax withheld<br><br>$ | **Copy B<br>For Recipient** |
| PAYER'S Federal identification number ▓▓▓▓ | RECIPIENT'S identification number ▓▓▓▓ | 5 Fishing boat proceeds<br><br>$ | 6 Medical and health care payments<br><br>$ | |
| RECIPIENT'S name<br><br>JORDAN  RICHARDSON | 7 Nonemployee compensation<br><br>$    405713.79 | 8 Substitute payments in lieu of dividends or interest<br><br>$ | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| Street address (including apt. no.) | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br><br>$ | |
| City, state, and ZIP code<br>, | 11 ▓▓▓▓ | 12 ▓▓▓▓ | |
| Account number (see instructions)<br><br>2 | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney<br><br>$ | |
| 15a Section 409A deferrals<br><br>$ | 15b Section 409A income<br><br>$ | 16 State tax withheld<br><br>$<br>$ | 17 State/Payer's state no.<br>▓▓▓▓ | 18 State income<br><br>$<br>$ |

Form **1099-MISC**    NV1099M-B              (Keep for your records.)        Department of the Treasury - Internal Revenue Service

# EXHIBIT "D"

# NISSENBAUM LAW GROUP, LLC

(FORMERLY NISSENBAUM & ASSOCIATES, LLC)

ATTORNEYS AT LAW

WWW.GDNLAW.COM

2400 MORRIS AVENUE
UNION, NEW JERSEY 07083

P. 908.686.8000
F. 908.686.8550

GARY D. NISSENBAUM, ESQ.*
GDN@GDNLAW.COM

GAVIN I. HANDWERKER, ESQ.*
GIH@GDNLAW.COM

LAURA J. FREEDMAN, ESQ.*
LJF@GDNLAW.COM

NEELAM K. SINGH, ESQ.*
NS@GDNLAW.COM

CHRISTINE M. YEARING, ESQ.*
CMY@GDNLAW.COM

OLIVIA R. GONZALEZ, ESQ.*
OG@GDNLAW.COM

CAROLE J. ZEMPEL, PARALEGAL
CZ@GDNLAW.COM

AMY PRZYTYCKI, PARALEGAL
AP@GDNLAW.COM

**NISSENBAUM**
LAW GROUP, LLC

*Please reply to:*  x *NJ*  __ *NY:*

NEW YORK:
140 BROADWAY, 46TH FLOOR
NEW YORK, NEW YORK 10005

P. 212.871.5711
F. 212.871.5712

\* *Admitted in both*
*New Jersey and New York*

April 23, 2007

**VIA FACSIMILE ONLY**
Wilmer Grier, Esq.
603 Jefferson Avenue
Brooklyn, New York 11221

Re:    Jordan Richardson, Jordan Richardson, Inc.
and Lisa-Athena S. Abu Hantash

Dear Ms. Grier:

In response to your inquiry regarding work for Jordan, you were previously advised that Ms. Richardson's obligation to perform any modeling services for your clients ended on April 22, 2007. That has not changed. As such, she does not intend to accept any assignments from V Model Management and/or VNY Model Management now or in the future.

NISSENBAUM LAW GROUP, LLC

By:

Gavin I. Handwerker

s. Appeal was taken. The Supreme
Appellate Division, First Judicial De-
nt, 88 A.D.2d 846, 451 N.Y.S.2d 419,
d the judgment and granted the
t permanent injunction enjoining the
rapher from using the pictures for
s of advertising or trade. Cross-ap-
were taken. The Court of Appeals,
, J., held that: (1) the model could
intain an action against the photog-
where the model's mother had effec-
consented, and (2) the section requir-
ior court approval of infants' con-
did not apply to the model.

der modified and, as modified, af-

sen, J., dissented with an opinion in
Fuchsberg and Meyer, JJ., concurred.

**ts ⊆⊃8.5(8)**

ection creating civil cause of action
e of person's name, portrait or picture
vertising purposes without prior writ-
nsent acts to restrict advertiser's pri-
estrained common-law right to use
r's photograph until written consent
ined; once written consent is obtain-
otograph may be published as permit-
ts terms. McKinney's Civil Rights
51.

**ints ⊆⊃47**

here statute expressly permits cer-
lass of agreements to be made by
, that settles the question and makes
ent valid and enforceable.

**ls ⊆⊃8.5(8)**

der section creating civil cause of
for use of person's name, portrait or
for advertising purposes without
ritten consent, parent's consent was
on infant model and no words pro-
disaffirmance were necessary to ef-
e legislative intent. McKinney's
ights Law § 51.

**ints ⊆⊃49**

neral Obligations Law section re-
prior court approval of infants' con-
applies only to performing artists,

such as actors, musicians, dancers and pro-
fessional athletes. McKinney's General Ob-
ligations Law § 3–105.

**5. Infants ⊆⊃49**

General Obligations Law section re-
quiring trial court approval of infants' con-
tracts did not apply to child model. McKin-
ney's General Obligations Law § 3–105.

**6. Infants ⊆⊃49**

Procedures for prior court approval of
infants' contracts set forth in General Obli-
gations Law, while entirely appropriate and
necessary for performing artists and profes-
sional athletes, are impractical for child
model who, whether employed regularly or
sporadically, works from session to session,
sometimes for many different photogra-
phers. McKinney's General Obligations
Law § 3–105.

**7. Torts ⊆⊃8.5(8)**

Parent who wishes to limit publicity
and exposure of her child need only limit
the use authorized in the consent, for de-
fendant's immunity from claim for invasion
of privacy is no broader than consent exe-
cuted to him. McKinney's Civil Rights Law
§ 51.

Richard Golub and Gary S. Graifman,
New York City, for appellant-respondent.

Sandor Frankel and Peter M. Thall, New
York City, for respondent-appellant.

**OPINION OF THE COURT**

SIMONS, Judge.

The issue on this appeal is whether an
infant model may disaffirm a prior unre-
stricted consent executed on her behalf by
her parent and maintain an action pursuant

* The consents provided in pertinent part:
"I hereby give the photographer, his legal
representatives, and assigns, those for whom
the photographer is acting, and those acting
with his permission, or his employees, the right
and permission to copyright and/or use, reuse
and/or publish, and republish photographic
pictures or portraits of me, or in which I may
be distorted in character, or form, in conjunc-
tion with my own or a fictitious name, on

to section 51 of the Civil Rights Law
against her photographer for republication
of photographs of her. We hold that she
may not.

Plaintiff is now a well-known actress.
For many years prior to these events she
had been a child model and in 1975, when
she was 10 years of age, she obtained sever-
al modeling jobs with defendant through
her agent, the Ford Model Agency. One of
the jobs, a series of photographs to be fi-
nanced by Playboy Press, required plaintiff
to pose nude in a bathtub. It was intended
that these photos would be used in a publi-
cation entitled "Portfolio 8" (later renamed
"Sugar and Spice"). Before the photo-
graphic sessions, plaintiff's mother and le-
gal guardian, Teri Shields, executed two
consents in favor of defendant.* After the
pictures were taken, they were used not
only in "Sugar and Spice" but also, to the
knowledge of plaintiff and her mother, in
other publications and in a display of larg-
er-than-life photo enlargements in the win-
dows of a store on Fifth Avenue in New
York City. Indeed, plaintiff subsequently
used the photos in a book that she published
about herself and to do so her mother
obtained an authorization from defendant
to use them. Over the years defendant has
also photographed plaintiff for *Penthouse
Magazine, New York Magazine* and for ad-
vertising by the Courtauldts and Avon com-
panies.

In 1980 plaintiff learned that several of
the 1975 photographs had appeared in a
French magazine called "Photo" and, dis-
turbed by that publication and by informa-
tion that defendant intended others, she
attempted to buy the negatives. In 1981,
she commenced this action in tort and con-
tract seeking compensatory and punitive
damages and an injunction permanently en-

reproductions thereof in color, or black and
white made through any media by the photog-
rapher at his studio or elsewhere, for any pur-
pose whatsoever, including the use of any
printed matter in conjunction therewith.

"I hereby waive any right to inspect or ap-
prove the finished photograph or advertising
copy or printed matter that may be used in
conjunction therewith or to the eventual use
that it might be applied."

plaintiff's subse-

ss appeals. De-
nent of the trial
requests, in the
of the Appellate
iking the limita-
purposes of ad-
the order of the
be affirmed or,
a new trial be
ate Division ac-
ndings that the
nrestricted as to
ated with only a
erning the legal ___346
arent's consents.

ommon law did
tion for invasion
*ew York Times*
.Y.S.2d 941, 434
*Rochester Fold-*
4 N.E. 442). In
to the *Roberson*
acted sections 50
Law. Section 50
demeanor to use
rtrait or picture
without prior
n 51 is remedial
use of action on
permitting relief
see *Arrington v.*
, 55 N.Y.2d at p.
4 N.E.2d 1319;
N.Y.2d 276, 280,
d 853). Section
the prior "writ-
the civil action
d", referring to
n turn, provides
corporation that
ses, or for the
me, portrait or
*without having
consent of such
or her parent or
demeanor*" (em-

*oberson*, the in-
f action against

the advertiser under the common law for
using her pictures, the new statute gives a
cause of action to those similarly situated
unless they have executed a consent or re-
lease in writing to the advertiser before use
of the photographs. The statute acts to
restrict an advertiser's prior unrestrained
common-law right to use another's photo-
graph until written consent is obtained.
Once written consent is obtained, however,
the photograph may be published as permit-
ted by its terms (see *Welch v. Mr. Christ-
mas*, 57 N.Y.2d 143, 454 N.Y.S.2d 971, 440
N.E.2d 1317).

[2, 3] Concededly, at common law an in-
fant could disaffirm his written consent
(see *Joseph v. Schatzkin*, 259 N.Y. 241, 181
N.E. 464; *Casey v. Kastel*, 237 N.Y. 305, 142
N.E. 671) or, for that matter, a consent
executed by another on his or her behalf
(see *Lee v. Silver*, 262 App.Div. 149, 28
N.Y.S.2d 333, affd. 287 N.Y. 575, 38 N.E.2d
233; *Goldfinger v. Doherty*, 153 Misc. 826,
276 N.Y.S. 289, affd. 244 App.Div. 779, 280
N.Y.S. 778; *Aborn v. Janis*, 62 Misc. 95, 113
N.Y.S. 309, affd. 122 App.Div. 893, 106
N.Y.S. 1115). Notwithstanding these rules,
it is clear that the Legislature may abro-
gate an infant's common-law right to disaf-
firm (see, e.g., General Obligations Law,
§ 3–101, subd. 3; § 3–102, subd. 1; § 3–
103; Education Law, § 281; Insurance
Law, § 145) or, conversely, it may confer
upon infants the right to make binding
contracts (see *Matter of T.W.C.*, 38 N.Y.2d
128, 130, 379 N.Y.S.2d 1, 341 N.E.2d 526
[Domestic Relations Law, § 115–b]; *Hamm
v. Prudential Ins. Co. of Amer.*, 137 App.
Div. 504, 122 N.Y.S. 35 [Insurance Law,
§ 145, formerly § 55]; *Matter of Presler*,
171 Misc. 559, 13 N.Y.S.2d 49). Where a
statute expressly permits a certain class of
agreements to be made by infants, that
settles the question and makes the agree-
ment valid and enforceable. That is pre-
cisely what happened here. The Legisla-
ture, by adopting section 51, created a new
cause of action and it provided in the stat-
ute itself the method for obtaining an in-
fant's consent to avoid liability. Construing
the statute strictly, as we must since it is in
derogation of the common law (see McKin-

ney's Cons. Laws of N.Y., Book 1, Statutes,
§ 301, subd. b), the parent's consent is bind-
ing on the infant and no words prohibiting
disaffirmance are necessary to effectuate
the legislative intent. Inasmuch as the con-
sents in this case complied with the statuto-
ry requirements, they were valid and may
not be disaffirmed (see *Matter of T.W.C.*,
*supra*).

[4, 5] Nor do we believe that the con-
sents may be considered void because the
parties failed to comply with the provisions
of section 3–105 of the General Obligations
Law requiring prior court approval of in-
fants' contracts. By its terms, section 3–
105 applies only to performing artists, such
as actors, musicians, dancers and profession-
al athletes moreover, it is apparent by com-
paring other statutes with it that the Legis-
lature knowingly has differentiated be-
tween child performers and child models.
Thus, section 3229 (formerly § 3216–c) of
the Education Law, which applies to "Child
performers", is referred to in section 3–105
(subd. 2, par. a) of the General Obligations
Law but section 3230 of the Education Law,
which applies to child models, is not. Child
models are also recognized as a separate
work classification in section 172 (subd. 2,
par. f) of the Labor Law. Furthermore,
section 3–105 was not designed to expand
the rights of infants to disaffirm their con-
tracts, as the concurring Justice at the Ap-
pellate Division would apply it, but to pro-
vide assurance to those required to deal
with infants that the infants would not
later disaffirm executory contracts to the
adult contracting party's disadvantage (see
*Matter of Prinze [Jonas]*, 38 N.Y.2d 570,
575, 381 N.Y.S.2d 824, 345 N.E.2d 295).
Sections 50 and 51 as we interpret them
serve the same purpose, to bring certainty
to an important industry which necessarily
uses minors for its work. This same need
for certainty was the impetus behind not
only section 3–105 but the various other
sections of the General Obligations Law
which prohibit disaffirmance of an infant's
contract.

**[6]** Realistically, the procedures of prior court approval set forth in section 3–105, while entirely appropriate and necessary for performing artists and professional athletes, are impractical for a child model who, whether employed regularly or sporadically, works from session to session, sometimes for many different photographers. Moreover, they work for fees which are relatively modest when compared to those received by actors or professional athletes who may be employed by one employer at considerably greater remuneration for a statutorily permissible three-year term. Indeed, the fee in this case was $450, hardly sufficient to warrant the elaborate court proceedings required by section 3–105 or to necessitate a court's determination of what part should be set aside and preserved for the infant's future needs. Nor do we think court approval, necessary, under the circumstances existing in the normal child model's career. Given the nature of the employment, it is entirely reasonable for the Legislature to substitute the parents' judgment and approval of what is best for their child for that of a court.

It should be noted that plaintiff did not contend that the photographs were obscene or pornographic. Her only complaint was that she was embarrassed because "they [the photographs] are not me now." The trial court specifically found that the photographs were not pornographic and it enjoined use of them in pornographic publications. Thus, there is no need to discuss the unenforceability of certain contracts which violate public policy (see, e.g., Penal Law, § 235.00 *et seq.*) or to equate an infant's common-law right to disaffirm with that principle, as the dissent apparently does.

**[7]** Finally, it is claimed that the application of the statute as we interpret it may result in unanticipated and untoward consequences. If that be so, there is an obvious remedy. A parent who wishes to limit the publicity and exposure of her child need only limit the use authorized in the consent, for a defendant's immunity from a claim for invasion of privacy is no broader than the consent executed to him (see *Welch v.*

*Mr. Christmas,* 57 N.Y.2d 143, 454 N.Y.S.2d 971, 440 N.E.2d 1317, *supra; Adrian v. Unterman,* 281 App.Div. 81, 118 N.Y.S.2d 121, affd. 306 N.Y. 771, 118 N.E.2d 477).

The order of the Appellate Division should be modified by striking the further injunction against use of the photographs for uses of advertising and trade, and as so modified, the order should be affirmed.

JASEN, Judge (dissenting).

Since I believe that the interests of society and this State in protecting its children must be placed above any concern for trade or commercialism, I am compelled to dissent. The State has the right and indeed the obligation to afford extraordinary protection to minors.

At the outset, it should be made clear that this case does not involve the undoing of a written consent given by a mother to invade her infant daughter's privacy so as to affect *prior* benefits derived by a person relying on the validity of the consent pursuant to sections 50 and 51 of the Civil Rights Law. Rather, what is involved is the right of an infant, now 17 years of age, to disaffirm her mother's consent with respect to *future* use of a nude photograph taken of her at age 10.

The majority holds, as a matter of law, not only in this case but as to all present and future consents executed by parents on behalf of children pursuant to sections 50 and 51 of the Civil Rights Law, that once a parent consents to the invasion of privacy of a child, the child is forever bound by that consent and may never disaffirm the continued invasion of his or her privacy, even where the continued invasion of the child's privacy may cause the child enormous embarrassment, distress and humiliation.

I find this difficult to accept as a rational rule of law, particularly so when one considers that it has long been the rule in this State that a minor enjoys an almost absolute right to disaffirm a contract entered into either by the minor or by the minor's parent on behalf of the minor (*Sternlieb v. Normandie Nat. Securities Corp.,* 263 N.Y.

*[Right column, partially cut off:]*

58 N.Y.2d 349

245, 188 N.E. 726; Josep[...]
N.Y. 241, 181 N.E. 464; [...]
Book Co. v. Connelly, 20[...]
722; Rice v. Butler, 160 [...]
275; Sparman v. Keim, [...]
v. Green, 69 N.Y. 553) [...]
question does not in an[...]
this salutary right.

This right has been [...]
fact that the minor hel[...]
an adult (*Sternlieb v. N[...]
rities Corp., supra*) or [...]
attempted to contractua[...]
(*Kaufman v. American [...]
Misc.2d 8, 174 N.Y.S.2d [...]
grounds 6 A.D.2d 223, [...]
mod. and certified qu[...]
negative 5 N.Y.2d 1016 [...]
158 N.E.2d 128). Signif[...]
not the minor can rest[...]
tracting party to the [...]
prior to entering the c[...]
only to the extent that [...]
firming the contract, [...]
into a better position th[...]
entering the contract. [...]
*mandie Nat. Securities [...]
Butler, supra*.) In the [...]
noted that those who c[...]
do so at their own peril. [...]
*kin, supra,* at p. 243.)

Understandably, such [...]
evolved as a result of t[...]
provide children with a[...]
possible against being [...]
or exploited by adults. [...]
scind is a legal right [...]
protection of the infan[...]
*supra,* at p. 556). This [...]
the legal concept that a[...]
of contracting because [...]
stand the scope of his r[...]
appreciate the consequ[...]
tions of his decisions. [...]
feared that as an infa[...]
under the complete infl[...]
may be unable to act in[...]
would allow him to de[...]
interests. (28 N.Y.Jur [...]
221–222.) Allowing a [...]
disaffirm a contract is [...]
common law developed [...]

245, 188 N.E. 726; *Joseph v. Schatzkin*, 259 N.Y. 241, 181 N.E. 464; *International Text Book Co. v. Connelly*, 206 N.Y. 188, 99 N.E. 722; *Rice v. Butler*, 160 N.Y. 578, 55 N.E. 275; *Sparman v. Keim*, 83 N.Y. 245; *Green v. Green*, 69 N.Y. 553) and the statute in question does not in any manner abrogate this salutary right.

This right has been upheld despite the fact that the minor held himself out to be an adult (*Sternlieb v. Normandie Nat. Securities Corp., supra*) or that a parent also attempted to contractually bind the minor (*Kaufman v. American Youth Hostels*, 13 Misc.2d 8, 174 N.Y.S.2d 580, mod. on other grounds 6 A.D.2d 223, 177 N.Y.S.2d 587, mod. and certified question answered in negative 5 N.Y.2d 1016, 185 N.Y.S.2d 268, 158 N.E.2d 128). Significantly, whether or not the minor can restore the other contracting party to the position he was in prior to entering the contract is pertinent only to the extent that the minor, by disaffirming the contract, cannot put himself into a better position than he was in before entering the contract. (*Sternlieb v. Normandie Nat. Securities Corp., supra; Rice v. Butler, supra.*) In the past, this court has noted that those who contract with minors do so at their own peril. (*Joseph v. Schatzkin, supra,* at p. 243.)

Understandably, such a broad right has evolved as a result of the State's policy to provide children with as much protection as possible against being taken advantage of or exploited by adults. "The right to rescind is a legal right established for the protection of the infant" (*Green v. Green, supra,* at p. 556). This right is founded in the legal concept that an infant is incapable of contracting because he does not understand the scope of his rights and he cannot appreciate the consequences and ramifications of his decisions. Furthermore, it is feared that as an infant he may well be under the complete influence of an adult or may be unable to act in any manner which would allow him to defend his rights and interests. (28 N.Y.Jur., Infants, § 3, pp. 221–222.) Allowing a minor the right to disaffirm a contract is merely one way the common law developed to resolve those in-

equities and afford children the protection they require to compensate for their immaturity.

Can there be any question that the State has a compelling interest in protecting children? Indeed, the most priceless possessions we have in the Nation are our children. Recognizing this compelling interest in children, the State has assumed the role of *parens patriae*, undertaking with that role the responsibility of protecting children from their own inexperience. Acting in that capacity, the State has put the interests of minors above that of adults, organizations or businesses. (*Rice v. Butler, supra; Kaufman v. American Youth Hostels, supra; Sternlieb v. Normandie Nat. Securities Corp., supra.*) The broad right given a minor to disaffirm a contract is, of course, an obvious example of the State's attempt to afford an infant protection against exploitation by adults. (28 NY Jur, Infants, *op. cit.*) Thus, I am persuaded that, in this case, 17-year-old Brooke Shields should be afforded the right to disaffirm her mother's consent to use a photograph of her in the nude, taken when she was 10 years old, unless it can be said, as the majority holds, that the Legislature intended to abrogate that right when it enacted sections 50 and 51 of the Civil Rights Law.

The legislative history of this statute enacted in the early 1900's is understandably scarce. The case law prior to its passage, however, indicates that a minor's right to disaffirm a contract under the common law was well established at that time. Additionally, it is well accepted that this statute was enacted in response to this court's decision in *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442; see, also, *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 439, 449 N.Y.S.2d 941, 434 N.E.2d 1319, in which the court held that a minor had no recourse against an entrepreneur who made commercial use out of her picture without her consent. Apparently, in order to alleviate litigation over whether or not consent had been given, the Legislature required that such consent be in writing and, if the person was a minor, that the

to be sitting outside the judicial department of his residence. The short answer to this argument is that our Constitution specifically provides that once a Justice is properly assigned in accordance with subdivision g of section 26, as Justice Roberts was, he acquires all of "the powers, duties and jurisdiction of a judge or justice of the court to which assigned." (Art. VI, § 26, subd. k.) Since Special Narcotics Court Judges have, as we interpret CPL 700.05 (subd. 4) in light of article 5–B of the Judiciary Law, been given city-wide jurisdiction to authorize the interception of drug-related conversations, Justice Roberts' assignment fully complied with both subdivisions g and k of section 26 of article VI of the New York Constitution.

Accordingly, the orders of the Appellate Division should be affirmed.

COOKE, C.J., and JONES, WACHTLER, FUCHSBERG, MEYER and SIMONS, JJ., concur.

In each case: Order affirmed.



448 N.E.2d 108
58 N.Y.2d 338

[338] Brooke SHIELDS, Respondent-Appellant,

v.

Garry GROSS, Appellant-Respondent.

Court of Appeals of New York.

March 29, 1983.

Infant model brought action against photographer seeking damages and injunctive relief to prevent the photographer from using photographs taken when the model was ten years old. The Supreme Court, Trial Term, New York County, Edward J. Greenfield, J., denied the application for a permanent injunction except to the extent of enjoining the photographer from licensing or permitting the licensing of photographs for use in pornographic publications. Appeal was taken. The Supreme Court, Appellate Division, First Judicial Department, 88 A.D.2d 846, 451 N.Y.S.2d 419, modified the judgment and granted the model a permanent injunction enjoining the photographer from using the pictures for purposes of advertising or trade. Cross-appeals were taken. The Court of Appeals, Simons, J., held that: (1) the model could not maintain an action against the photographer where the model's mother had effectively consented, and (2) the section requiring prior court approval of infants' contracts did not apply to the model.

Order modified and, as modified, affirmed.

Jasen, J., dissented with an opinion in which Fuchsberg and Meyer, JJ., concurred.

1. Torts ⬥8.5(8)

Section creating civil cause of action for use of person's name, portrait or picture for advertising purposes without prior written consent acts to restrict advertiser's prior unrestrained common-law right to use another's photograph until written consent is obtained; once written consent is obtained, photograph may be published as permitted by its terms. McKinney's Civil Rights Law § 51.

2. Infants ⬥47

Where statute expressly permits certain class of agreements to be made by infants, that settles the question and makes agreement valid and enforceable.

3. Torts ⬥8.5(8)

Under section creating civil cause of action for use of person's name, portrait or picture for advertising purposes without prior written consent, parent's consent was binding on infant model and no words prohibiting disaffirmance were necessary to effectuate legislative intent. McKinney's Civil Rights Law § 51.

4. Infants ⬥49

General Obligations Law section requiring prior court approval of infants' contracts applies only to performing artists,

58 N.Y.2d 342

such as actors, mu[...] fessional athletes. [...] ligations Law § 3–[...]

5. Infants ⬥49

General Oblig[...] quiring trial court [...] tracts did not apply [...] ney's General Ob[...]

6. Infants ⬥49

Procedures for [...] infants' contracts s[...] gations Law, while [...] necessary for perfo[...] sional athletes, ar[...] model who, whethe[...] sporadically, works [...] sometimes for ma[...] phers. McKinney[...] Law § 3–105.

7. Torts ⬥8.5(8)

Parent who w[...] and exposure of h[...] the use authorized [...] fendant's immunity [...] of privacy is no br[...] cuted to him. McK[...] § 51.

[339] A. Richard Golub [...] New York City, fo[...]

[340] Sandor Frankel a[...] York City, for resp[...]

[341] OPINION [...]

SIMONS, Judge.

The issue on thi[...] infant model may [...] stricted consent exe[...] her parent and main[...]

* The consents provid[...]
  "I hereby give t[...] represent[atives, and [...] the photographer i[...] with his permission, [...] and permission to c[...] and/or publish, [...] pictures or portraits [...] be distorted in char[...] tion with my own [...]

parent sign the consent form. There is no indication that by requiring consent from the minor's parents, the Legislature intended in any way to abrogate that minor's right to disaffirm a contract at some future date. Indeed, the requirement of parental consent, like the broad right to disaffirm a contract, was granted in order to afford the minor as much protection against exploitation as possible. The assumption, of course, was that a parent would protect the child's interests. But if that assumption proves invalid, as may well be the case if a minor upon reaching the age of maturity realizes that the parent, too, has been exploiting him or her or had failed to adequately guard his or her interest by giving consent for pictures which caused humiliation, embarrassment and distress, then the child should be able to cure the problem by disaffirming the parent's consent. To say, as does the majority, that the mother could have limited her consent avoids the issue. If the parent has failed to put any restrictions on the consent, as occurred in this case, and has thus failed to protect the child's future interests, I see no reason why the child must continue to bear the burden imposed by her mother's bad judgment. This means the child is forever bound by its parent's decisions, even if those decisions turn out to have been exploitative of the child and detrimental to the child's best interests.

Furthermore, nothing compels the majority's conclusion that the right to disaffirm a contract was eliminated when the Legislature created a new cause of action for invasion of privacy merely because that statute provided safeguards for the child's privacy by giving the parent the right to grant or withhold consent. When both rights are

viewed, as I believe they must be, as protection for the child, logic and policy compels the conclusion that the two rights should exist coextensively. The requirement that a parent consent before the child's privacy can be invaded by commercial interests establishes the parent as the first guardian of the child's interest. But the State retains its long-standing role of *parens patriae* so that if the parent fails to protect the child's interests, the State will intervene and do so. One means of doing so is to allow the child to exercise its right to disaffirm if the child concludes that its parent improvidently consented to the invasion of the child's privacy interests. Given the strong policy concern of the State in the child's best interests,* I can only conclude that the Legislature did not intend to abrogate the child's common-law right to disaffirm a contract when it required, by statute, the additional protection of written, parental consent prior to any commercial use of the child's image.

This conclusion is further supported by other statutes in which the Legislature has clearly abrogated the infant's right to disaffirm a contract in those situations in which it has determined that the damage incurred by the minor will be minimal and the cost to the contracting party or society would be great. Invariably, these are contractual situations in which the minor has incurred a contractual obligation in order to receive a benefit which cannot be deemed anything other than a benefit. For example, section 281 of the Education Law negates a minor's right to disaffirm a contract when that contract afforded him a student loan to pursue an advanced education. (See, also, General Obligations Law, § 3-103.) No one can argue that the contract was any-

* The discussion in this opinion of the policy behind affording a child the extraordinary protection of the right to disaffirm a contract should not be read, as the majority does, to equate the right to disaffirm with the principle that a court will refuse to enforce contracts which violate public policy. Indeed, had the courts below found that her mother had contracted for her daughter to pose in an obscene manner or that the photographs were obscene or pornographic, then we would not need to decide the applicability of the infant's right to

disaffirm that contract as I assume the majority would find the contract and the consent incorporated in it to violate public policy. (Penal Law, § 235.00 *et seq.*; *People v. Ferber*, 52 N.Y.2d 674, 439 N.Y.S.2d 863, 422 N.E.2d 523 [Jasen, J., dissenting], rev. —— U.S. ——, 102 S.Ct. 3348, 73 L.Ed.2d 1113, on remand, 57 N.Y.2d 256, 455 N.Y.S.2d 582, 441 N.E.2d 1100.) A contract held to be unenforceable because it violates public policy is void *ab initio* and, thus, there is no need to consider whether or not it may be disaffirmed.

thing other than beneficia[...] Such legislation was endor[...] Revision Commission on th[...] lative finding "that the [...] involved is clearly for th[...] infant". (1961 Report o[...] Comm., pp. 269, 275, citin[...] tracts Relating to the Ser[...] Minors and the Treatmen[...] ings Therefrom.)

Two factors distinguish [...] of the Civil Rights Law fr[...] ry provisions which do, in [...] abolish the minor's right t[...] tract. The first is that i[...] the Legislature has inten[...] have made their intention[...] language which directly [...] fant's common-law right. [...] any reference in the Civil [...] minor's right to disaffirm [...] cially when it is clear [...] disaffirm was well esta[...] that the Legislature did n[...] that right. Secondly, unli[...] of contracts which the L[...] ignated as immune from [...] to disaffirm, it cannot b[...] tract releasing all rights [...] even limited rights to the[...] essarily beneficial to th[...] even more true when the [...] case, are of the variety [...] ploited in the future or u[...] of questionable taste.

I do not believe that [...] intent in enacting section[...] Civil Rights Law was t[...] ests of business and co[...] the State's interest in [...] dren. Since this statu[...] response to this court's d[...] *v. Rochester Folding Bo*[...] denied an infant plainti[...] the invasion of her priva[...] enterprise in using her [...] consent, it would seem t[...] lative intent was to exp[...] tections, rather than to [...] commercial enterprises.

must be, as protec-
and policy compels
two rights should
e requirement that
the child's privacy
nercial interests es-
he first guardian of
t the State retains
f *parens patriae* so
o protect the child's
ntervene and do so.
s to allow the child
isaffirm if the child
. improvidently con-
: the child's privacy
rong policy concern
l's best interests,* I
the Legislature did
he child's common-
a contract when it
e additional protec-
al consent prior to
the child's image.

rther supported by
the Legislature has
'ant's right to dis-
situations in which
he damage incurred
inimal and the cost
or society would be
are contractual sit-
inor has incurred a
order to receive a
e deemed anything
'or example, section
w negates a minor's
ontract when that
a student loan to
location. (See, also,
iw, § 3–103.) No
contract was any-

; I assume the majori-
act and the consent
e public policy. (Pe-
; People v. Ferber, 52
i 863, 422 N.E.2d 523
v. —— U.S. ——, 102
1113, on remand, 57
2d 582, 441 N.E.2d
to be unenforceable
policy is void *ab initio*
d to consider whether
ned.

---

thing other than beneficial to the minor. Such legislation was endorsed by the Law Revision Commission on the basis of a legislative finding "that the type of contract involved is clearly for the benefit of the infant". (1961 Report of N.Y.Law Rev. Comm., pp. 269, 275, citing Touster, Contracts Relating to the Services of Talented Minors and the Treatment of Their Earnings Therefrom.)

Two factors distinguish sections 50 and 51 of the Civil Rights Law from those statutory provisions which do, in certain contexts, abolish the minor's right to disaffirm a contract. The first is that in all cases when the Legislature has intended to do so, they have made their intention clear by specific language which directly refers to the infant's common-law right. The absence of any reference in the Civil Rights Law to the minor's right to disaffirm a contract, especially when it is clear that the right to disaffirm was well established, indicates that the Legislature did not intend to affect that right. Secondly, unlike the other kinds of contracts which the Legislature has designated as immune from the minor's right to disaffirm, it cannot be said that a contract releasing all rights to photographs or even limited rights to those pictures is necessarily beneficial to the infant. This is even more true when the pictures, as in this case, are of the variety which can be exploited in the future or used in publications of questionable taste.

I do not believe that the Legislature's intent in enacting sections 50 and 51 of the Civil Rights Law was to elevate the interests of business and commercialism above the State's interest in protecting its children. Since this statute was enacted in response to this court's decision in *Roberson v. Rochester Folding Box Co. (supra)*, which denied an infant plaintiff any recovery for the invasion of her privacy by a commercial enterprise in using her picture without her consent, it would seem to me that the legislative intent was to expand individual protections, rather than to afford protection to commercial enterprises.

The fact that when an infant disaffirms a contract there may be harsh results to the person or commercial enterprise attempting to exploit the child has never caused the courts to alter the scope of the protection that right affords the child. The overriding interest of society in protecting its children has long been held to outweigh the interests of merchants who attempt to contract with children. (*Sternlieb v. Normandie Nat. Securities Corp., supra*, 263 N.Y. at p. 250, 188 N.E. 726.)

In those situations in which the Legislature has decided that business ventures need additional protection, it has done so not merely by abolishing the infant's right to disaffirm, but, rather, by providing alternative protection. Section 3–105 of the General Obligations Law provides for judicial approval of contracts for the services of child performers or professional athletes. It is clear that the statute protects not only the business interests which are investing in and profiting from the child's talents, but also the child. For instance, paragraph d of subdivision 2 generally restricts such contracts to a three-year period and paragraph e of subdivision 2 provides that even after approving a contract of a child performer, the court may, if it finds that the child's well-being is in any way being impaired by its performance under the contract, revoke or modify the contract so as to protect the child. Similarly, it provides for supervision by the court of the child's earnings to assure that the child will benefit from his labors. The clear intent of such provisions is to protect the child against any exploitation. The failure of the Legislature to cover child models in this provision indicates to me that they intended child models to retain the protections afforded by the common-law right to disaffirm a contract. It is unfortunate that by virtue of the majority's interpretation of the Civil Rights Law those children may not in the future be afforded protection against exploitation by their own parents.

It is even more unfortunate that by its interpretation of sections 50 and 51 the majority takes away a large part of the

protection those children had at common law.

COOKE, C.J., and JONES and WACHTLER, JJ., concur with SIMONS, J.

JASEN, J., dissents in part and votes to affirm in a separate opinion in which FUCHSBERG and MEYER, JJ., concur.

Order modified, with costs to defendant, in accordance with the opinion herein and, as so modified, affirmed.



448 N.E.2d 116
58 N.Y.2d 354

In the Matter of LOCAL 252, TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, Respondent,

v.

NEW YORK STATE PUBLIC EMPLOYMENT RELATIONS BOARD, Appellant,

and

Metropolitan Suburban Bus Authority, Intervenor-Appellant.

Court of Appeals of New York.

March 30, 1983.

Petition was filed seeking review of a determination of the Public Employment Relations Board that a union engaged in a strike during a certain time period in January 1980. The Supreme Court, Appellate Division, First Department, 89 A.D.2d 551, 453 N.Y.S.2d 17, annulled the determination. Appeal was taken. The Court of Appeals, Jones, J., held that the determination of the PERB that a strike occurred when bus drivers refused to drive buses which violated the requirements of the Vehicle and Traffic Law was supported by substantial evidence.

Judgment reversed.

**1. Labor Relations** ⟜578

Conclusion of Public Employment Relations Board that union's invoking reference to provisions of Vehicle and Traffic Law in order to justify drivers refusing to drive buses which violated requirements of law was merely pretext for concerted refusal of drivers to operate buses was amply supported in record. McKinney's Civil Service Law § 209; McKinney's Vehicle and Traffic Law § 100 et seq.

**2. Labor Relations** ⟜290

Where reliance on sudden concern for overly meticulous and abnormal observance of statutory commands is purely a subterfuge, incidental circumstance that continued performance of duties in normal manner might entail violation of statute does not legally preclude finding that there has been "strike." McKinney's Civil Service Law § 209.

**3. Labor Relations** ⟜578

Public Employment Relations Board's finding that strike occurred when bus drivers refused to drive buses which violated requirements of Vehicle and Traffic Law was supported by substantial evidence, including evidence that union was responsible for job action, job action was timed to occur immediately following expiration of interim inpasse arrangement and only violations posing no imminent danger to safety of public or drivers were involved in charge. McKinney's Civil Service Law § 209; McKinney's Vehicle and Traffic Law § 100 et seq.

Martin L. Barr and Anthony Cagliostro, Albany, for appellant.

Mary P. Bass and Lester G. Freundlich, New York City, for intervenor-appellant.

Amy Gladstein and Walter M. Meginniss, Jr., Brooklyn, for respondent.

Marc Silverman, Ruth Raisfeld and Laura Jacobs, New York City, for "Straphangers Campaign," amicus curiae.

OPINION OF THE COURT

JONES, Judge.

The Public Employment Relations is not precluded from determining tha certed refusal of bus drivers to pe duties in the normal manner for the pose of securing job-related demands tutes a strike in violation of the Taylo although the normal manner of per ance would entail violation of the V and Traffic Law where citation to violations is only a pretext. In th stance the record contains substantia dence to sustain such determination by the board.

Local 252 of the Transport Worker ion of America, AFL–CIO, is the cer bargaining representative for a negoti unit of some 640 public employees o Metropolitan Suburban Bus Auth Approximately 460 of these employees group which is the subject of the in illegal strike charge, are bus drivers ir authority's surface transportation sy which serves areas in Nassau County.

The authority and the union were un to reach agreement on a contract for calendar year 1979, the prior agreen having expired on December 31, 1978. result, the unit members were working der terms and conditions imposed by authority pursuant to the inpasse pr dures of section 209 of the Civil Ser Law. In November of 1979, the union the authority began negotiations for a gaining agreement to take effect in 1

Sometime in November, the president the union instructed the bus drivers "safety classes" that they did not have operate buses which violated the requi ments of the Vehicle and Traffic Law. told them that the union would back th up if they refused to drive buses with vic tions but that any bus which was in com ance with provisions of law was to be dr en.

At a negotiating meeting in December 1979, the union president warned the a thority that there would be "big trouble" the parties did not agree on a contract

**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x  CIVIL CASE NUMBER: 3363/07
LISA ATHENA S. ABU HANTASH, in her
Individual capacity and as mother and natural guardian of
JORDAN ANNETTEE JAZZMIN RICHARDSON, a minor, and
JORDAN RICHARDSON, INC., a VIRGINIA CORPORATION

PLAINTIFFS,

V.

V MODEL MANAGEMENT NEW YORK, INC., and
VNY MODEL MANAGEMENT, LLC

DEFENDANTS.

------------------------------------------------------------------
VERIFIED ANSWER , AFFIRMATIVE DEFENSES, AND COUNTERCLAIM
------------------------------------------------------------------

WILMER HILL GRIER
ATTORNEY AT LAW
Attorney for DEFENDANTS
V MODELS, CORP., AND VNY MODEL MANAGEMENT, LLC
603 JEFFERSON AVENUE
BROOKLYN, NEW YORK 11221
OFFICE (718) 443-3873
FACSIMILE (718) 453-1276

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York
State, certifies, that, upon information and belief and reasonable inquiry, the contentions, in the annexed
document are not frivolous.
Dated:  MAY/JUNE_____, 2007

_____

WILMER HILL GRIER, ESQ.

Service of a copy of the within is hereby admitted.

_____

Attorney for  RESPONDENT(S)

PLEASE TAKE NOTICE:
[NOTICE OF ENTRY]
That the within is a (certified) true copy of a *Verified Answer Affirmative Defenses*
Duly entered in the office of the clerk of the within named court on *with Counterclaim*
*United States District* ,2007 . *Southern District*
NOTICE OF SETTLEMENT
That an order              of which the within is a true copy will be
Presented for settlement to the
On the _____ day of _____ at 9:30 A.    M.
Dated: May/ June _____ 2007              Yours,    Wilmer Hill Grier