Not Reported in F.Supp.2d, 2004 WL 1087784 (S.D.N.Y.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.
NYC MANAGEMENT GROUP INC., La Model Management, La Look Model Inc., and Heinz Holba,
Plaintiffs,
v.
Michele BROWN-MILLER, International Model Management, Defendants.
No. 03 Civ. 2617(RJH).
May 14, 2004.

*OPINION*

HOLWELL, J.
***1*** Plaintiffs NYC Management Group, Inc., L.A. Model Management, and Heinz Holba, a principal of both corporate plaintiffs, (collectively "NY Models"), brought suit against defendants Michele Brown-Miller ("Miller") and International Model Management ("IMM"), alleging tortious interference with contract, tortious interference with prospective economic relations, breach of contract, breach of implied covenant of good faith and fair dealing, defamation, unfair competition, and misrepresentation. Defendants move for summary judgment as to all claims advanced by plaintiffs. For the reasons set forth below, defendants' motion is granted in its entirety and plaintiffs' complaint is dismissed.

FACTS

The events giving rise to this action began in March 2002, when defendant Miller, in her capacity as principal of defendant IMM, a Canadian modeling agency, brought with her to New York City several of the models represented by Miller and IMM. The apparent purpose of the trip was to secure agency representation for those models within the New York market. The parties appear to agree that it is not an unusual arrangement for one agency with a primary relationship with a model-a "mother agency"-to contract with a second agency for the management of that model in a particular market or region. Such a contract is called a "mother agency agreement."

On that trip, Miller introduced defendant N.Y. Models to Jessica Stam ("Stam"), then a relatively unknown young model whom Miller sought to place. NY Models was interested in Stam, and entered her in a modeling contest that it was sponsoring with a first-place prize of a two-year contract with a guarantee of $100,000 against the winner's modeling earnings during that period. (Aff. of Erin Lundgren in Opp. to Defs.' Mot. for Summ. J. ("Lundgren Aff."), Ex. A.) On or about July 15, 2002, Miller and N.Y. Models entered into an agreement ("the Mother Agency Agreement") according to which Stam would be represented by N.Y. Models "in New York, N.Y. ONLY." (Decl. of Michele Brown-Miller ("Miller Decl."), Ex. A.) Under the terms of the Mother Agency Agreement, IMM would receive ten percent of Stam's earnings (to be computed prior to N.Y. Model's deduction of its own commissions) [FN1] from modeling jobs booked by N.Y. Models. The Mother Agency Agreement by its terms would remain in force "until the date [Stam] is no longer represented by [NY Models]." ( *Id.*)

> FN1. Two versions of the Mother Agency Agreement are in the record, both submitted by defendant, and both signed by Miller and by Marion Smith, a principal of N.Y. Models. Both contain the following language: "[IMM's] commission will be 10% (ten percent) of the Model's Gross earnings. Gross earnings are defined as the revenues attributable to the model prior to the withholding of [NY Models'] commission or the repayment of any

debts owed to the agency by the model." (Miller Decl. Ex. A; Reply Decl. of Edward H. Rosenthal, defendants' attorney ("Rosenthal Reply Decl."), Ex. D.) In one version, a handwritten notation at the bottom reads "Michele Not accepted," and in that version both instances of "Gross" are crossed out and the word "Net" is entered in place of each. However, the terms themselves are not changed in that version, indicating no apparent disagreement as to how commissions would be computed.

On or about September 5, 2002, Stam won the modeling contest. (Lundgren Aff. ¶ 25.) In September 2002, an agreement entitled "L .A. Models/New York Model Management Agreement" ("Stam Agreement") was executed by Stam, N.Y. Models employee Marion Smith, and Debbie Stam, Stam's mother. (Lundgren Aff. Ex. A.) Debbie Stam's signature was required because Stam was 16 years old when she signed the Stam Agreement, which read:

In the event the CONTESTANT is under 18 years of age, your parent or guardian is required to execute this agreement on your behalf.

*2 *Id.* In a separate undated signed document, Debbie Stam consented to Stam's participation in the Stam Agreement. *Id.*

The Stam Agreement sets forth the terms governing contest prizewinners, including a provision stating:

During the term of the modeling contract you agree to be represented by L.A. MODELS/NEW YORK MODEL MANAGEMENT and its affiliates throughout the world. You agree that L.A. MODELS/NEW YORK MODEL MANAGEMENT shall be your exclusive representative as a print, television, runway model or otherwise on an exclusive basis except in a market where a mother agency agreement with L.A. MODELS/NEW YORK MODEL MANAGEMENT exists.

*Id.*

After only a few months, however, relations soured between Stam and N.Y. Models, due in large part to undisputed conflicts among Stam, her parents, and her agencies. The first point of contention centered on whether Stam should participate in the Paris "ready-to-wear" fashion shows in Fall 2002. Stam and Miller were excited by the prospect of doing the shows as both thought it would be a boost to Stam's career and provide her with valuable exposure. (Miller Decl. ¶ 10; Affidavit of Jessica Stam ("Stam Aff.") ¶ 5.) George Speros, Stam's booking agent at N.Y. Models ("Speros"), opposed the idea and did not think that the Paris shows would be a "good move" for Stam. (Aff. of George Speros in Opp. to Defs.' Mot. for Summ. J. ("Speros Aff.") ¶ 26). Speros ultimately relented but maintained that the shows were a disappointment and that Stam only received a couple of small jobs as a result. ( *Id.* at ¶ 28). On the other hand, Miller felt that Stam performed very well in Paris, and Stam herself felt that the shows "turned out to be a great success for me." (Miller Decl. ¶ 11; Stam Aff. ¶ 6.)

After returning to New York, Stam's relationship with N.Y. Models continued to deteriorate. Stern was having personal difficulties at home and did not want N.Y. Models to have any communication with her parents without her permission. Speros, however, received a call from Stam's father and they discussed Stam's career, including whether she should do upcoming shows in New York in 2003. This apparently led to a family disagreement with Stam's father yelling at her. (Speros.Aff.¶¶ 66-76.) Stam was infuriated by Speros' conversation with her father and began questioning whether she wanted to stay with N.Y. Models. (Stam. Aff. ¶ 9; Speros Aff. ¶ 70 .) Stam had developed a friendship with another model from her hometown in Canada who worked for another New York agency, IMG, and Stam began considering a move to IMG. (Stam Aff. ¶ 10; Miller Decl. ¶ 16.)

Toward the end of 2002, Stam began talking to Miller about leaving N.Y. Models. Miller advised Stam that she should stay with N.Y. Models, that it had a good reputation and that she could have a successful career there. (Miller Decl. ¶ 20; Stam Aff. ¶ 11.) Miller further suggested that Stam meet with Speros to ease the friction between them. ( *Id.*) Stam declined this advice and in or around January 2003 sent Miller a handwritten note expressing her unhappiness with N.Y. Models and her desire to end her relationship with the agency. (Miller Decl. ¶ 22 & Ex. B.) The note, a copy of which

has been put in the record, reads as follows:

**\*3** On a day to day basis I'm not happy here.

New York Models does not agree with my other agencies on countless decisions and is causing too much commotion at this point in my career.

They are pushing me too fast and do not seem to have my best interests in mind. For example, I feel they do not care that returning to school at age 16 is a top priority for me.

This unnecessary pressure is putting stress on me and is making everything much too complicated.

It is because of this that I wish to no longer be involved with the New York Model Management.

Yours, Jessica Stam

(Miller Decl. Ex. B.) On January 29, 2003, Miller, concerned that Stam might also leave Miller's agency if she stood in the way of Stam's decision, acceded to Stam's request and wrote a letter to N.Y. Models demanding a written release of Stam. (Miller Decl. Ex. C.) Thereafter Stam executed a written statement dated February 21, 2003, disaffirming "any agreement that I may have entered into, or which may have been entered into on my behalf, with New York Model Management." (Decl. of Edward H. Rosenthal ("Rosenthal Decl."), Ex. I.) This lawsuit followed.


## DISCUSSION


### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). In reviewing the record, the district court must assess the evidence in "a light most favorable to the nonmoving party" and resolve all ambiguities and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48 (emphasis in original). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Id.* at 256; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party." ' *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (quoting *Anderson,* 477 U.S. at 248). A fact is material when "it 'might affect the outcome of the suit under the governing law." ' *Id.* (quoting *Anderson,* 477 U.S. at 248).

Affidavits submitted in support of or in opposition to a motion for summary judgment must "be made on personal knowledge," and must "set forth such facts as would be admissible in evidence" at trial. Fed.R.Civ.P. 56(e). Hearsay contained in such affidavits, in the absence of a sworn statement by the alleged declarant, cannot provide support for or opposition to a summary judgment motion. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999); *H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454-55 (2d Cir.1991).


### B. Tortious Interference Claims

**\*4** Plaintiffs claim that defendants tortiously interfered both with Stam's existing contract with N.Y. Models, and with plaintiffs' prospective expectation of income from their future bookings of Stam with clients requesting her services.

### 1. Tortious Interference with Contract

To prove tortious interference with contract under New York law, plaintiffs must show "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen,* 239 F.3d 256, 274 (2d Cir.2001). As to the first two elements, plaintiffs have put forth sufficient evidence to show that the contract at issue, the Stam Agreement, is valid, and that defendants had knowledge of the contract. With respect to the third element, the Court must first determine whether the disaffirmance of a contract by a minor constitutes a breach sufficient to support a tortious interference claim. If the answer to this question is affirmative, the Court must then determine whether there are genuine issues of material fact relating to question of whether Miller intentionally and improperly procured the breach.

Stam undisputedly disaffirmed the contract, which, under California law, minors are entitled to do.[FN2] Such a disaffirmance functions to rescind the contract. *Warner Bros. Pictures v. Brodel,* 31 Cal.2d 766, 192 P.2d 949, 3 A.L.R.2d 691 (1948), *cert. denied,* 335 U.S. 844, 69 S.Ct. 67, 93 L.Ed. 394 (1948). The ability of a child to disaffirm a contract is grounded in the principle, well settled in our jurisprudence, that adults contract with children at their peril. *See, e.g., Ballard v. Anderson,* 4 Cal.3d 873, 878-79 (Cal.1971) ("The right of the infant to avoid his contracts is one conferred by law for his protection against his own improvidence and the designs of others. The policy of the law is to discourage adults from contracting with an infant and they cannot complain if as a consequence of violating the rule they are injured by the exercise of the right of disaffirmance vested in the infant.") (citation and internal punctuation omitted).

> FN2. The Stam Agreement contains a choice of law provision that establishes California as the governing law. (Lundgren Aff., Ex. A at 7.) The relevant California statutory language reads as follows: "Except as otherwise provided by statute, a contract of a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards." CAL. FAM.CODE § 6710 (West 1994).

Certain exceptions to this right and power of disaffirmance nonetheless exist. For example, a minor performer may not disaffirm a contract he or she has entered into "if the contract has been approved by the superior court in any county in which the minor resides or is employed or in which any party to the contract has its principal office in this state for the transaction of business." CAL. FAM.CODE § 6751 (West 1994). While one court has found models to be covered by this statute, *see Faloona by Fredrickson v.. Hustler Magazine, Inc.,* 607 F.Supp. 1341, 1355 n. 45 (D.C.Tex.1985), no such approval has apparently been obtained for the instant contract, so the applicability of this statute to the Stam Agreement need not be determined.

**\*5** Further, in certain circumstances a minor may not disaffirm a contract that a parent or guardian has entered into on the minor's behalf. *Doyle v. Giuliucci,* 62 Cal.2d 606, 609, 43 Cal.Rptr. 697, 401 P.2d 1 (1965); *Hohe v. San Diego Unified Sch. Dist.,* 224 Cal.App.3d 1559, 1565, 274 Cal.Rptr. 647, 649 (Cal.Ct.App.1990). The Stam Agreement clearly indicates that if the model is under 18, the parent or guardian "is required to execute this Agreement *on [her] behalf."* (Rosenthal Dec. Ex. H (emphasis added).) However, it is not clear that this language precludes Stam from disaffirming the contract. In *Doyle v. Giuliucci,* the issue was whether the right of a minor to disaffirm extended to a contract her parent had entered into to provide medical services to the minor. The contract included an arbitration clause, and the minor sought to disaffirm the contract because it bound her to arbitrate any malpractice claims. The court held that the law providing for disaffirmance "applies to contracts of minors and protects them from their own improvidence in assuming contractual obligations. It does not apply to contracts between adults and is therefore not controlling on the question of a parent's power to bind his child to arbitrate by entering into a contract of which the child is a third party

beneficiary." *Doyle,* 62 Cal.2d at 609. In *Hohe v. San Diego Unified School District,* the minor plaintiff sought to disaffirm a liability release form she and her father had signed relating to a hypnotism performance at her school during which she was injured. The court found that the release could not be disaffirmed, again because the law "was not intended to affect contracts entered into by adults on behalf of their children." *Hohe,* 224 Cal.App.3d at 1564.

The agreements in *Doyle* and *Hohe* were unambiguously agreements entered into by the minors' parents, and the object of those agreements was to alter or limit the legal liabilities among the parties and the minor. The minor is a beneficiary of such an agreement because it is only her parent's execution of that agreement that enables the minor to obtain some benefit- *e.g.,* medical services or participation in a performance-which would be unavailable to her if the provider of the benefit were not able to limit its liability. No performance is required of the third-party beneficiary under such agreements. Allowing a minor to disaffirm such agreements would make providers of benefits less willing to provide them to minors, since they would not be able contractually to control their liability. Such an outcome would be undesirable from a policy standpoint. *See, e.g., Doyle,* 62 Cal.2d at 609-10 ("If minors were always free to disaffirm arbitration awards [pursuant to agreements entered into on their behalf] ... they would be effectively denied the benefits of arbitration, for few adults would agree to submit minors' claims to arbitration.")

The Stam Agreement presents a different situation. The agreement contains no release from liability, but rather resembles a standard service contract spelling out the performance required of each party to the contract-namely, of Stam and the modeling agencies. It is clear that while the contract requires Stam to perform as a model, no performance is required of Debbie Stam, who by signing merely signals her assent to her daughter's entry into the agreement without assuming any obligation of her own. Such indications of parental approval are not enough to override the right of the child to disaffirm her own contracts. Indeed, under California law, if both the minor and the parent sign a contract under which both are contractually bound to perform, the minor may disaffirm without affecting the parent's contractual obligation. *Raden v. Laurie,* 120 Cal.App.2d 778, 783, 262 P.2d 61, 65 (Cal.Ct.App.1953). Other jurisdictions have spoken even more unequivocally to the question: *see Bombardier v. Goodrich,* 110 A. 11, 11 (Vt.1920) ("The assent of the father adds nothing to the binding force of an infant's promise."); *Hines v. Cheshire,* 36 Wash.2d 467, 474, 219 P.2d 100, 104-05 (Wash.1950) ("[T]he law seems to be settled that an infant is not precluded from disaffirming by reason of the fact that an adult joined with him in signing the contract. The fact that the adult assuming such joint liability happened to be the minor's father would be immaterial.") (citing cases); *Schmidgall v. Engelke,* 81 Ill.App.2d 103, 224 N.E.2d 590 (Ill.App.1967) ("A minor's right to disaffirm his contract is not affected by parental approval, and a parent by his relationship to minor is without authority to enter into contracts binding on a minor."); *Hogue v. Wilkinson,* 291 S.W.2d 750, 755 (Tex.Civ.App.1956) ("Even if the mother and grandfather had signed the written contracts as agents of the minor plaintiff, such contracts would not have bound the minor if he wished to disaffirm."). There is nothing about the Stam Agreement, in short, that appears to take it outside the statutory rubric allowing a minor to disaffirm her contract.

**\*6** The Stam Agreement, in light of the foregoing, was clearly voidable as a contract entered into by a minor. Consequently, the disaffirmance of such a contract does not literally constitute a breach and, therefore, an essential element of a claim for tortious interference with contract would appear to be missing. New York courts, however, appear to permit tortious interference claims to proceed where there is a disaffirmance of a voidable contract that is procured by wrongful means, unlawful restraint of trade, or lack of competitive motive. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 193-94, 406 N.E.2d 445, 428 N.Y.S.2d 628 (1980); *Cent. Sports Army Club v. Arena Assocs. Inc.,* 952 F.Supp. 181, 190 (S.D.N.Y 1997). Plaintiff has not alleged unlawful restraint of trade or lack of competitive motive; in fact, a competitive motive is explicitly pleaded in the complaint. (Compl.¶¶ 113, 125, 127, 130, 132, 134, 136.) Therefore, in order to succeed on their tortious interference with contract claim, plaintiffs must show that Miller procured Stam's disaffirmance of her contract by wrongful means. "Wrongful means" are defined to include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 624, 664 N.E.2d 492, 497, 641 N.Y.S.2d 581, 586 (1996) (quoting *Guard-Life,* 50 N.Y.2d at 191).[FN3]

FN3. The "more demanding" requirement of proof that the alleged tortfeasor employed wrongful means places a claim for tortious interference with a voidable contract in close relationship with claims for interference with prospective economic relations, which claims also require a showing of dishonest or improper means. *Guard-Life,* 50 N.Y.2d at 191.

Plaintiffs' claim here is that Miller procured Stam's disaffirmance through fraud and misrepresentation. Specifically, plaintiffs claim that Miller provided "misinformation" to Stam about N.Y. Models. (Speros Aff. ¶ 103; Pls.' Mem. at 15.) The evidence offered to support this claim consists of statements allegedly made by Miller to Stam's parents that were allegedly reported by Stam's parents to N.Y. Models. The alleged misinformation included statements that N.Y. Models was "not a top agency"; that models at a competing agency, IMG, made more money; and that N.Y. Models "is only good for the beginning of a career." (Speros Aff. ¶ 104; Smith Aff. ¶¶ 51-52). Plaintiffs also claim that similar disparaging remarks were made by Miller to Stam which were repeated to her boyfriend and her boyfriend's mother, who in turn reported them to Speros at N.Y. Models. (Speros Aff. ¶¶ 91-92, 98.)

The obvious problem with all of plaintiffs' assertions about Miller's alleged dishonesty and disparagement is that they are not supported by any admissible evidence. The opposing affidavits offered by plaintiffs contain numerous unsupported assertions that Miller "clearly and blatantly interfered with our relationship with Stam causing her to leave New York Models" (Smith Aff. ¶ 50), that Miller "lied to us on a number of occasions" (Speros Aff. ¶ 39), and that Stam was "being given misinformation" by Miller ( *Id.* at ¶ 123). Yet the only evidentiary support for these assertions comes from inadmissible hearsay, in that none of the declarants-Stam's parents, Stam's boyfriend, nor Stam's boyfriend's mother-swore out statements or were deposed. Moreover, Stam states in her own affidavit that Miller never made any negative or disparaging remarks about N.Y. Models and, in fact, told her that N.Y. Models was a good and competent modeling agency. Plaintiffs chose not to depose Stam and have no evidentiary basis to contest her statement.[FN4]

FN4. Plaintiffs also rely for their claims of Miller's misconduct on allegations that Miller intentionally thwarted communication between them and Stam-specifically, that Miller gave them "useless telephone numbers" (Speros Aff. ¶ 33; Aff. of Marion Smith in Opp. to Defs.' Mot. for Summ. J. ("Smith Aff.") ¶ 42); that Miller failed to give plaintiffs a contact number for Stam on an unspecified date while Stam was working in Montreal, then gave them a "number that was useless for a residence that Stam was not going back to ... before she left for the airport to go back to Toronto" (Speros Aff. ¶¶ 78-79); and that plaintiffs' employee once tried to call Stam in London while the employee was in Mexico, but the call "did not go through. Somebody picked up and hung up on me" (Speros Aff. ¶ 86). These incidents, if they occurred, do not create a genuine issue of material fact as there is no evidence that the telephone number in Montreal was in fact "useless" or that Miller had anything to do with who hung up the phone in London. These stray incidents, even if supported by competent evidence, would not create an issue of material fact sufficient to overcome Stam's unrebutted testimony that Miller attempted to persuade her *not* to leave N.Y. Models.

**\*7** Plaintiffs contend that their allegations of misrepresentations are supported by the undisputed fact that Miller told them in January 2003 that Stam did not intend to participate in the New York Fashion Week Runway Shows in February 2003, but Stam subsequently participated in the shows. (Speros Aff. ¶¶ 64, 109.) This fact, in itself, is not evidence of misrepresentation. As plaintiffs concede, Miller told them Stam did not plan to participate only after plaintiffs "repeatedly" asked Miller and Stam to decide whether she would do the shows or return to school, and "required a straight answer." ( *Id.* at ¶¶ 49-57, 63-64.) No evidence has been adduced to suggest that Miller lied, and even plaintiffs' account of events suggests that Stam remained undecided about her immediate future at the time plaintiffs wanted a decision. Indeed, one of the subjects of the controversial telephone conversation between Speros and Stam's father was whether or not Stam would appear in the New York shows. (Speros Aff. ¶ 66.) Even if it is assumed, *arguendo,* that Miller made a misrepresentation, it was not made to Stam to induce her to breach or disaffirm her contract. To the contrary, it was (allegedly) made to N.Y. Models. Any dispute regarding this event cannot support plaintiffs' tortious interference

claim.

More to the point, the uncontroverted evidence shows that Stam was unhappy, that tensions between her agencies and with her family were causing her stress, and that she articulated her dissatisfaction and distress as the reason for ending her relationship with plaintiffs. (Stam Aff. ¶¶ 7-9, 12; Miller Decl. Ex. B.) It is also uncontroverted that Miller did not attempt to persuade Stam to leave N.Y. Models. In fact, the only admissible evidence establishes that she, in fact, attempted to persuade Stam to stay with N.Y. Models and work out the problems with Speros. (Stam Aff. ¶ 11; Miller Decl. ¶ 20.) This evidence radically undermines the contention that Stam would not have disaffirmed the contract but for the interference of Miller.[FN5] This "but for" showing is required in order to prevail on a claim of tortious interference with contract. The inducement element requires the plaintiff to establish that but for the allegedly tortious conduct of the defendant, the third party would not have breached her contract. *Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc.,* 14 F.Supp.2d 331, 335 (S.D.N.Y.1998) (citing *Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 828 (2d Cir.1990). Based on the admissible evidence in the record, no reasonable juror could conclude that defendants improperly or intentionally procured Stam's disaffirmance of the Stam Agreement, much less that wrongful means were used, and plaintiffs' tortious interference with contract claim therefore cannot survive summary judgment.

> FN5. Plaintiffs' only response to Stam's affidavit is to claim that Stam "was being induced [to leave N.Y. Models] even though she may not have been aware of that fact." (Pls.' Mem. at 15.) This argument-which is nothing more than argument-falls far short of the evidentiary requirements of Fed.R.Civ.P. 56(e).

### 2. Tortious Interference with Prospective Economic Relations

Plaintiffs claim that when defendants caused Stam to terminate her business relationship with N.Y. Models and LA Models, those agencies lost the economic expectancy that they had in future bookings of Stam with clients who requested her services. They claim that defendant knew about that expectancy and that she interfered with it willfully.

*8 In order to prove tortious interference with business relations, plaintiffs must show (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) that the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship. *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994) (citing New York and Second Circuit cases); *Oxyn Telecomms, Inc. v. Onse Telecom,* No. 01 Civ. 1012, 2003 U.S. Dist. LEXIS 17371 (S.D.N.Y. Sept. 30, 2003).

The court accepts for the sake of argument the reasonable notion that plaintiffs' clients who had developed an interest in Stam would likely have booked jobs for her through N.Y. Models had Stam not terminated the contract, and that this pre-existing client interest constituted a business relation that was harmed by Stam's disaffirmance. Even if this notion holds up, the claims are untenable for essentially the same reasons that plaintiffs' allegations of tortious interference with contracts fail. Plaintiffs have not satisfied the third prong of the test by showing that Miller either acted with the sole purpose of harming plaintiffs, or that dishonest, unfair, or improper means were used. The court has been pointed to no piece of evidence demonstrating malicious intent or willfulness on Miller's part; plaintiff's case on this point consists of conclusory allegations. As the Second Circuit has noted, this will not suffice to defeat a motion for summary judgment. *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) ("The summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."). Likewise, as discussed *supra,* plaintiffs have failed to marshal any competent evidence indicating dishonest, unfair, or improper means. These claims, then, may not go forward.

### C. Breach of Contract Claims

Plaintiffs claim that Miller and IMM breached the Mother Agency Agreement, and violated the covenant of good faith and fair dealing implied in a contractual relationship, when Miller allegedly interfered with Stam's relationship with plaintiffs, allegedly avoided plaintiffs, and allegedly made misrepresentations to Stam and/or plaintiffs.[FN6] The elements of breach of contract are (1) the existence of a contract; (2) breach; and (3) damages resulting from the breach. The Mother Agency Agreement embodied an arrangement in which N.Y. Models would be allowed to represent Stam in New York City, and would be entitled to commissions on its bookings of Stam there. The contract, by its terms, would remain in force "until the date [Stam] is no longer represented by [NY Models]." (Miller Decl. Ex. A.) The Mother Agency Agreement did not create or identify any other obligations to N.Y. Models in defendants beyond sharing commissions with N.Y. Models; it did not even restrict defendants from allowing another agency simultaneously to represent Stam in New York City or elsewhere. The essence of plaintiffs' claim is that Miller took the actions described above in an effort to end Stam's relationship with plaintiffs, so that Miller's contractual obligation to N.Y. Models would end as well. Since the factual allegations underlying these claims of bad faith essentially duplicate those of the foregoing claims, which the court found to be inadequately supported in the record, these claims too must fail.

> FN6. The complaint separately alleged a claim of breach of the implied covenant of good faith and fair dealing which, as defendants correctly assert, is implicit in, and therefore duplicative of, a breach of contract claim under New York law. *See Ari & Co. v. Regent Int'l Corp.,* 273 F.Supp.2d 518, 522 (S.D.N.Y.2003) (citing *Harris v. Provident Life & Accidental Ins. Co.,* 310 F.3d 73, 81 (2d Cir.2002)). In their opposition to defendants' motion, plaintiffs appear to concede this point, essentially combining the two claims and asserting that the breach of contract inhered in Miller's breach of the implied covenant.

## D. Defamation Claims

**\*9** Plaintiffs assert that Miller defamed and disparaged N.Y. Models when she allegedly made the above-quoted statements to Stam's parents that were subsequently reported to plaintiffs. (Speros Aff. ¶ 104; Smith Aff. ¶ 52.) Defendants argue that the alleged statements, to the extent that they are actually false statements of fact susceptible of a defamatory meaning (which defendants too dispute) or that they caused any injury to plaintiffs, cannot form the basis of a defamation claim when only inadmissible hearsay evidence is proffered to prove they were uttered. The court agrees and finds that since there is no admissible evidence that the alleged statements were even made, there is no need to go further to determine whether any or all of the alleged statements are not defamatory as a matter of fact or law. These claims must be dismissed.

## E. Unfair Competition Claims

Plaintiffs allege that defendants violated New York's common law of unfair competition when they caused Stam to sever her relationship with N.Y. Models so that defendants, rather than plaintiffs, could reap the rewards of the money and effort expended by plaintiffs in promoting, grooming, photographing, transporting, and otherwise providing management services for Stam. Specifically, they allege that Miller told plaintiffs before Stam's disaffirmance that Stam did not intend to participate in the New York shows in February 2003, but then booked Stam for some of the shows after her disaffirmance, thereby cutting plaintiffs out of any commissions from Stam's work.

"Common law unfair competition must be grounded in either deception or appropriation of the exclusive property of the plaintiff." *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys ., Inc.,* 879 F.2d 1005, 1025 (2d Cir.1989); *Michele Pommier Models, Inc.,* 14 F.Supp.2d at 337. Because the court has found that plaintiffs have failed to produce evidence of deception, it must be determined whether defendants have appropriated plaintiffs' exclusive property. If there is any property at stake in this case, the court can only conclude that it would consist in Stam's future performances as a model, or the investments that plaintiffs made in increasing her appeal and marketability. Plaintiffs have not cited any law, and the court has not unearthed any, that would justify treating these

intangibles as giving rise to a property interest. This is particularly so where, as here, plaintiffs' only interest lies in a voidable contract in which plaintiffs have no legal right to future performance but only an expectancy. _Guard-Life,_ 50 N.Y .2d at 192-93. Plaintiffs are disappointed, and understandably so, that their investment did not yield dividends. This disappointment, without sufficient evidence to create a genuine issue of material fact as to defendants' wrongful actions or intent, does not present a matter for trial.

### F. Misrepresentation Claim

As defendants point out (Defs.' Mem. at 22), plaintiffs' misrepresentation claim is actually a claim for fraud, since it pleads all the elements of common law fraud: that defendants willfully made misrepresentations to plaintiffs, who relied on those misrepresentations to their detriment. As the court's consideration of plaintiffs' evidence has made clear, plaintiffs have failed to present any proper evidentiary support for their allegations that defendants willfully made false statements to plaintiffs upon which they relied to their detriment. Therefore, this claim cannot succeed.

### CONCLUSION

**\*10** In light of the foregoing, the court grants defendants' motion for summary judgment as to all plaintiffs' claims, and dismisses this action in its entirety. The Clerk is directed to close the case.

SO ORDERED.

S.D.N.Y.,2004.
NYC Management Group, Inc. v. Brown-Miller
Not Reported in F.Supp.2d, 2004 WL 1087784 (S.D.N.Y.)


Motions, Pleadings and Filings (Back to top)

• 1:03cv02617 (Docket) (Apr. 15, 2003)
END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.