```
N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS AND STATE RECORDS          ALBANY, NY 12231-0001
                              FILING RECEIPT
================================================================================
ENTITY NAME: V. MODELS CORP.


DOCUMENT TYPE: DISSOLUTION (DOMESTIC)                         COUNTY: KING

SERVICE COMPANY: ** NO SERVICE COMPANY **             SERVICE CODE: 00

================================================================================
FILED:08/15/2005 DURATION:********  CASH#:050815000642 FILM #:050815000655

ADDRESS FOR PROCESS
-------------------




REGISTERED AGENT
-------------------
```



```
================================================================================
FILER                         FEES       60.00   PAYMENTS      60.00
-----                         ----                             ------
                              FILING     60.00   CASH           0.00
                              TAX         0.00   CHECK         60.00
ANATOLY OSADCHY CPA           CERT        0.00   CHARGE         0.00
3173 SHORE PARKWAY            COPIES      0.00   DRAWDOWN       0.00
                              HANDLING    0.00   OPAL           0.00
BROOKLYN, NY 11235                               REFUND         0.00
                                                               ------
================================================================================
                                                         DOS-1025 (11/89)
```

Apr 17 07 11:32a   VNY Model Management   2122063655   p.4
07/11/2006   16:55   7579389825   OFFICE DEPOT   PAGE   02/35

# VNY MODEL MANAGEMENT, LLC.

## MODEL MANAGEMENT AGREEMENT

AGREEMENT made as of the __19__ day of __June__, 200 _6_, by and between VNY MODEL MANAGEMENT, LLC., 928 Broadway, Suite 801, New York, NY 10010 ("Manager"), and _____, _Jordan Richardson Inc_ _____ ("Model").

**WITNESSETH:**

IN CONSIDERATION of the sum of One Dollar ($1.00), each to the other paid in hand and the mutual covenants and promises herein contained, the parties hereto agree as follows:

1. Model hereby engages the services of Manager as Model's sole and exclusive manager, representative and advisor throughout the world with respect to Model's professional career, talents, services and business affairs in the fashion, modeling and entertainment industries ("Career"). Manager hereby accepts such engagement, and agrees to counsel, confer and advise Model in the guidance of Model's career and activities; to use reasonable efforts to arrange for, exploit and commercialize Model's name, talent and abilities in connection therewith; supervise, negotiate and arrange the terms of any and all offers of employment or contracts for services of any nature whatsoever. Manager agrees to render advice and assistance with respect to the development and improvement of Model's Career and all business interest related thereto.

2. (A) Manager is not and shall not act as an agent for Model. Model shall promptly refer to Manager all offers, communications or requests for Model's appearances or services.

   (B) Manager shall not be required to render services exclusively to Model, and shall, at all times, be free to perform the same or similar services for others, as well as engage in any and all other business activities.

3. The term of this Agreement (the "Term") shall consist of an initial period plus any and all option periods. The initial period of this Agreement shall be two (2) years commencing on the date first above written and ending on __June__, 200 _8_ (the "Initial Period"). The Term shall be automatically extended for additional periods of two (2) years each (collectively, "Option Periods"), unless Manager notifies Model, in writing, that it wishes to terminate this Agreement at any time before the expiration of the Term. In the event Manager gives Model notice of termination, this Agreement shall terminate thirty (30) days from the date of such notice, unless the notice states otherwise.

1

Manager's obligation to continue to pay Model its fees hereunder, if any, shall survive termination of this Agreement.

4. (A) As compensation for Manager's services hereunder, Model shall pay Manager sums equal to twenty percent (20%) of all "gross receipts" ("Fee") as hereinafter defined, off the top, from all sources paid or accrued to, or earned or received by Model or on Model's behalf or for Model's benefit, directly or indirectly, during the Term of this Agreement, and thereafter: (i) for any employment, engagement, commitment or contract in existence on the date hereof or negotiated for or entered into during the Term, and any renewal, extension, modification, amendment thereof or addition thereto, including a new agreement for an additional term with the same or related parties; (ii) any employment, engagement, commitment or contract substituted for or replacing, directly or indirectly, employments, engagements, commitments or contracts currently in existence or negotiated for or entered into during the Term and any renewal, extension, modification, amendment thereof or addition thereto, including a new agreement for an additional term with the same or related parties; and, (iii) any and all judgments, awards, settlements, payments, damages and proceeds relating to any suits, claims, actions or proceedings arising out of the alleged breach of non-performance by others of any of the contracts, engagements, commitments or other agreements referred to herein. Expiration or termination of this Agreement shall not affect Manager's rights to compensation as herein provided.

(B) Manager's full participation in Model's gross receipts from contracts / agreements entered into or substantially negotiated during the Term hereof shall continue for as long as gross receipts are payable to Model per the terms of said contracts / agreements, and any renewals, extensions, re-negotiations, modifications, or amendments thereof.

(C) The term "gross receipts" as used herein shall be deemed to include all forms of income payments, consideration and compensation including but not limited to advances, earnings, fees, royalties, bonuses and income in kind, regardless of by whom procured, secured or arranged, however, within the scope of Model's Career and professional activities hereunder. The term Model's "professional activities" shall include without limitation, any use of Model's talents and activities throughout the fashion, modeling and entertainment industries.

(D) Model understands that Manager is entitled to receive from some or all of the clients who may utilize Model's services a service charge, agency fee or other compensation ("Client Fee") over and above the Fee Manager receives from Model, and Model acknowledges that ~~that~~ such compensation is an additional inducement for Manager to act on Model's behalf and an important element in the compensation Manager receives from representing Model. In the event that Model accepts a booking for which his/her fee includes the Client Fee, Model agrees that Manager has the right to deduct such Client Fee from Model's gross compensation paid by the client in addition to Manager's Fee. Manager's Fee and Client Fee extend to any booking or engagement performed by Model subsequent to the termination of this Agreement if such booking or



2

2122063655 p.3
Apr 17 07 11:32a  VNY Model Management  PAGE 04/09
07/11/2006 16:55  7578389025  OFFICE DEPOT



engagement was negotiated, solicited or accepted by Model prior to such termination or is a continuation or work which began prior to termination, including renewals, options and renegotiated contracts.

5. (A) Gross receipts shall be sent to Manager. Model shall cause all contracts and agreements with third parties concerning Model's professional activities to provide for Model's compensation under those contracts and agreements to be paid directly to Manager. Upon Manager's receipt of gross receipts, Manager shall deduct from such gross receipts: (i) any and all fees, costs, and expenses advanced or incurred by Manager on Model's behalf, including any and all expenses advanced or incurred by Manager on Model's behalf before and after execution of this Agreement; and, (ii) all compensation or consideration due Manager hereunder. Manager shall remit the balance of gross receipts, if any, to Model no later than ten (10) calendar days after receipt of gross receipts by Manager.



(B) In the event that gross receipts are sent to Model, Model shall promptly notify Manager of its receipt of same. In this event, Model shall promptly, and in no event later than five (5) calendar days after receipt thereof send the entire gross receipts proceeds to Manager for allocation and distribution as per Par. 5(A), above.

6. Model shall, notwithstanding anything elsewhere contained herein, reimburse Manager for any and all costs or expenses Manager may incur, or any moneys Manager may advance in connection with Model's Career and professional activities hereunder, including but not limited to photographs, clothing and accessories, any and all equipment, advertising, publicity or promotion costs, long-distance telephone calls, travel and transportation expenses, administration, auditing fees, and any and all other costs incurred by Manager, from any and all monies earned by Model hereunder, and, if no monies are earned by Model hereunder or monies earned are insufficient to cover Manager's expenses. Model shall nevertheless reimburse Manager within six (6) months of Manager's incurring any particular expense. Manager may, but shall not be obligated to, commence legal proceedings to collect amounts due to Model from clients, but if Manager does, Model shall bear the expenses associated with such proceedings.



7. Model grants to Manager during the Term the nonexclusive right to use and publish and to permit others to use and publish Model's professional name, likeness and biographical material concerning Model, for advertising and purposes of trade and otherwise without limitation in connection with the furtherance of Model's Career and professional activities. Manager shall have the right to advertise the fact that Manager represents Model in connection with Model's activities hereunder. Manager shall have the right, within Manager's sole discretion, to publish Model's name, likeness, image, biographical information and statistics on its website for as long as Model is represented by Manager.



8. (A) Model warrants and represents that Model: (i) has the full right, power and authority to enter into this agreement and to grant to Manager the rights granted herein; (ii) is under no obligation or disability or prohibition which will or might prevent Model



3



from keeping or performing Model's covenants, promises, representations and warranties contained herein; (iii) will not, during the Term, enter into any agreement or commitment which shall or might in any manner interfere with or prevent Model's carrying out the terms and conditions of this Agreement; and, (iv) will not, during the Term, engage any other person, firm or corporation to act as Model's personal manager or in any similar capacity.

(B) Model shall indemnify and hold Manager harmless from any loss, liability or damage (including reasonable attorney's fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties, representations, covenants or promises made by Model hereunder. Model will reimburse Manager on demand for any payment made by Manager at any time in respect of any liability or claim to which the foregoing indemnity relates.



9. Model hereby authorizes and appoints Manager to be Model's agent and attorney-in-fact for the purpose of (a) negotiating, renegotiating, contracting and executing for Model and in Model's name and on Model's behalf and any and all agreements, documents, and instruments providing for Model's services to clients pursuant hereto; (b) approving and permitting the use of Model's name, image, voice, caricatures and the like for the purposes of advertising and publicity; (c) collecting and receiving sums payable to Model, endorsing Model's name upon and depositing in Manager's account all checks payable to Model, and retaining therefrom all sums owing to Manager; and, (d) demanding, suing for and collecting, all claims, money, interest and other items that may be due Model or belong to Model.

10. Manager shall have the right to assign this Agreement and any of Manager's rights hereunder without limitation. Manager shall have the right to delegate the performance of Manager's obligations hereunder without limitation. Model shall not have the right to assign this Agreement or delegate any of Model's obligations hereunder.

11. Manager shall not be liable for any breach of contract or act or omission on the part of anyone with whom any engagement or contract is negotiated, arranged or secured.

12. No breach or failure to perform any terms of this Agreement by either Manager or Model which would otherwise be a material breach of this Agreement, shall be considered a material breach of this Agreement, unless the party alleged to be in breach does not cure the same within a further period of thirty (30) days after receipt of written notice from the alleging party.

13. Manager shall have the right, at Manager's election, to suspend the operation of this Agreement if for any reason whatsoever Model is unable or unwilling to render services in the entertainment industries. Such suspension shall commence upon written notice to Model and shall last for the duration of any such unavailability or unwillingness to render services. At Manager's election, a period of time equal to the duration of such suspension shall be added to Term. In addition, if Model fails to render services in the



entertainment industries as aforesaid, then Manager may, in addition to other remedies provided for herein, terminate this contract upon written notice to Model. Notwithstanding anything to the contrary contained herein, Model shall be responsible for reimbursing Manager for any and all costs and expenses incurred by Manager in connection with Model's Career and professional activities within ten (10) calendar days of the date of termination. In the event that Model fails to so reimburse Manager, Manager shall have the right to avail itself of any all relief, including damages, injunction and equity, available to it under the law.

14. Any notice hereunder shall be sent to Model at the address above specified or any other address of which Model gives Manager notice. Any notices hereunder shall be sent to Manager at the address above specified or any other address of which Manager gives Model notice, with a copy to Natalia Nastaskin, Esq., 250 West 57th Street, Suite 917, New York, New York 10107. All notices shall be delivered personally, by mail, e-mail, facsimile or telegraph. The date of personal delivery, mailing receipt date, e-mail date, facsimile date or delivery to a telegraph office shall be the effective date of the notice.

15. This Agreement does not constitute or acknowledge any partnership or joint venture between the parties. Model understands and agrees that he / she is an independent contractor and not an employee of Manager, and, as such, shall be responsible for paying his/her own taxes from any and all monies earned hereunder.

16. This Agreement represents the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any provision thereof, shall be binding unless in writing signed by Model and Manager. No waiver of any provision or default under this Agreement shall affect Manager's rights thereafter to enforce such provisions or to exercise any right or remedy in the event of any other default, whether or not similar. This Agreement shall be construed in accordance with the laws of the State of New York, applicable to contracts entered into and wholly performed therein. If any provision of this Agreement violates or conflicts with any law, governmental rule or regulation or judicial decree, including any requirements for judicial approval, to the extent required, of all or any part of this Agreement, such provision or provisions shall be deemed amended to the minimum extent necessary to effect compliance with such law, rule, regulation or decree and as so amended shall remain in full force and effect.

17. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, administrators, executors, successors and assigns.

18. MODEL REPRESENTS AND WARRANTS THAT MODEL HAS BEEN ADVISED OF MODEL'S RIGHT TO SEEK LEGAL COUNSEL OF MODEL'S OWN CHOOSING IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS CONTRACT.

19. IF MODEL IS EIGHTEEN (18) YEARS OF AGE OR OVER, MODEL MAY SIGN THIS AGREEMENT ON HIS/HER OWN BEHALF, AND BY SO DOING MODEL

Apr 17 07 11:34a        VNY Model Management                            2122063655                    p.6

07/17/2006   15:31   7978388825                OFFICE DEPOT                             PAGE   02/30

EXPRESSLY REPRESENTS AND WARRANTS THAT MODEL HAS REACHED 18 YEARS OF AGE. IF MODEL HAS NOT YET REACHED 18 YEARS OF AGE, HIS/HER PARENT(S) OR LEGAL GUARDIAN(S) MUST READ THIS AGREEMENT AND SIGN WHERE INDICATED BELOW. IN ADDITION, MODEL AND HIS/HER PARENT(S) OR LEGAL GUARDIAN(S) ACKNOWLEDGE THAT IT IS MODEL'S AND THEIR RESPONSIBILITY TO OBTAIN ALL NECESSARY GOVERNMENTAL CONSENTS, PERMITS AND APPROVALS REQUIRED BY STATE AND FEDERAL LAWS AND REGULATIONS FOR THE PERFORMANCE OF SERVICES HEREUDNER BY MINORS, INCLUDING WITHOUT LIMITATION WORK PERMITS VISAS, AND COURT APPROVALS WHERE NECESSARY. AT MODEL'S REQUEST MANAGER WILL GUIDE AND COUNSEL MODEL WITH RESPECT TO OBTAINING SUCH CONSENTS, PERMITS, VISAS AND APPROVALS, AND MODEL AGREES TO SIGN ALL DOCUMENTS REQUIRED IN CONNECTION THEREWITH. MODEL ACKNOWLEDGES THAT UPON HIS/HER REACHING 18 YEARS OF AGE THIS AGREEMENT WILL CONTINUE IN FULL FORCE AND EFFECT THROUGHOUT ITS TERM AND ANY RENEWALS THEREOF, AND MODEL'S CONTINUED ACCEPTANCE OF ASSIGNMENTS FROM MANAGER SHALL CONSTITUTE RATIFICATION OF ALL OF THE TERMS AND CONDITIONS HEREOF.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

**MANAGER:**
VNY MODEL MANAGEMENT, LLC.

BY: _____
         Lana Winters
TITLE:   President

*handwritten notes:*
* homework 3 hr per day minimum
* home time with prior notification or approval
* Jordan Richardson has the right to cancel the contract with a written notice 30 days prior to the expiration of the contract

**AGREED AND ACCEPTED:**
**MODEL:**

_____
Jordan-Annettee J Richardson
Print Name

Model's Soc. Sec. #: 230558610

**AGREED AND ACCEPTED:**
**MODEL'S PARENT /**
**LEGAL GUARDIAN**

_____
Print Name

_____
Capacity in which signed

6



| Date | Payee | Amount | Memo |
|---|---|---|---|
| 1/29/07 | Jordan Richardson | $17,241.15 | Nordstrom + 2 H+M (check 2394) — posted FEB 02 |
| 2/2/07 | Jordan Richardson | $4,621.64 | Nordstrom x 2 (check 2430) — posted FEB 27 |
| 2/14/07 | Jordan Richardson | $1,600.00 | Delias (check 2436) — posted MAR 07 |
| 2/15/07 | Jordan Richardson | $4,014.50 | H.E.M.Bo/ H+M (check 2438) — posted MAR 07 |
| 2/20/07 | Jordan Richardson | $23,083.00 | (check 2448) — posted FEB 27 |
| 2/26/07 | Jordan Richardson | $1,691.47 | JCPenney (check 2465) — posted MAR 07 |
| 3/15/07 | Jordan Richardson | $3,092.00 | JCPenney (check 2488) — posted MAR 23 |
| 3/15/07 | Jordan Richardson | $2,379.75 | Delias (check 2527) — posted MAR 23 |
| 3/19/07 | Jordan Richardson | $2,800.00 | Nordstrom (check 2537) — posted MAR 27 |
| 3/29/07 | Jordan Richardson | $20,585.00 | H+M + Macy's etc (check 2563) — posted APR 10 |



CHECK NO. 1808          $4,769.72 PAID 06/28
CHECK NO. 1835          $70,308.15 PAID 07/25
CHECK NO. 1879          $103,950.95 PAID 08/02
CHECK NO. 1897          $11,003.10 PAID 08/03
CHECK NO. 1915          $2,530.00 PAID 08/14
CHECK NO. 1935          $39,661.22 PAID 08/24
SEP 14                  $2,860.31
SEP 14                  $2,734.69
                        $2,658.50
                        $7,770.83

FROM : bella                    FAX NO. : 7183320403              Apr. 19 2007 04:19PM  P1

☐ CORRECTED (if checked)

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|
| V N Y  MODEL  MANAGEMENT  LLC<br>928  BROADWAY,  STE.  801<br>NEW  YORK,  NY  10010<br>(   )   - | $<br>2 Royalties<br>$<br>3 Other Income<br>$<br>5 Fishing boat proceeds<br>$ | 2006<br>Form 1099-MISC<br>4 Federal income tax withheld<br>$<br>6 Medical and health care payments<br>$ | Copy B<br>For Recipient |
| PAYER'S Federal identification number<br>■■■■■ | RECIPIENT'S identification number<br>■■■■■ | 7 Nonemployee compensation<br>$  405713.79 | 8 Substitute payments in lieu of dividends or interest<br>$ | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| RECIPIENT'S name<br>JORDAN  RICHARDSON | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ | |
| Street address (including apt. no.) | | 11 | 12 | |
| City, state, and ZIP code<br>, | | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| Account number (see instructions)<br>2 | | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no.<br>■■■■■ | 18 State income<br>$<br>$ |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | (Keep for your records.) | Department of the Treasury - Internal Revenue Service | |

Form 1099-MISC   MV1099M-B

# NISSENBAUM LAW GROUP, LLC
(FORMERLY NISSENBAUM & ASSOCIATES, LLC)
ATTORNEYS AT LAW
WWW.GDNLAW.COM

2400 MORRIS AVENUE
UNION, NEW JERSEY 07083

P. 908.686.8000
F. 908.686.8550



**NISSENBAUM LAW GROUP, LLC**

GARY D. NISSENBAUM, ESQ.*
GDN@GDNLAW.COM

GAVIN I. HANDWERKER, ESQ.*
GIH@GDNLAW.COM

LAURA J. FREEDMAN, ESQ.*
LJF@GDNLAW.COM

NEELAM K. SINGH, ESQ.*
NS@GDNLAW.COM

CHRISTINE M. YEARING, ESQ.*
CMY@GDNLAW.COM

OLIVIA R. GONZALEZ, ESQ.*
OG@GDNLAW.COM

CAROLE J. ZEMPEL, PARALEGAL
CZ@GDNLAW.COM

AMY PRZYTYCKI, PARALEGAL
AP@GDNLAW.COM

*Please reply to:* _X_ NJ ___ NY

**NEW YORK:**
140 BROADWAY, 46TH FLOOR
NEW YORK, NEW YORK 10005
P. 212.871.5711
F. 212.871.5712

\* *Admitted in both*
*New Jersey and New York*

April 23, 2007

**VIA FACSIMILE ONLY**
Wilmer Grier, Esq.
603 Jefferson Avenue
Brooklyn, New York 11221

Re: Jordan Richardson, Jordan Richardson, Inc.
and Lisa-Athena S. Abu Hantash

Dear Ms. Grier:

In response to your inquiry regarding work for Jordan, you were previously advised that Ms. Richardson's obligation to perform any modeling services for your clients ended on April 22, 2007. That has not changed. As such, she does not intend to accept any assignments from V Model Management and/or VNY Model Management now or in the future.

NISSENBAUM LAW GROUP, LLC

By: _____
Gavin I. Handwerker

## SHIELDS v. GROSS
Cite as 461 N.Y.S.2d 254 (Ct.App. 1983)

**58 N.Y.2d 342**

such as actors, musicians, dancers and professional athletes. McKinney's General Obligations Law § 3–105.

**5. Infants ⚖=49**

General Obligations Law section requiring trial court approval of infants' contracts did not apply to child model. McKinney's General Obligations Law § 3–105.

**6. Infants ⚖=49**

Procedures for prior court approval of infants' contracts set forth in General Obligations Law, while entirely appropriate and necessary for performing artists and professional athletes, are impractical for child model who, whether employed regularly or sporadically, works from session to session, sometimes for many different photographers. McKinney's General Obligations Law § 3–105.

**7. Torts ⚖=8.5(8)**

Parent who wishes to limit publicity and exposure of her child need only limit the use authorized in the consent, for defendant's immunity from claim for invasion of privacy is no broader than consent executed to him. McKinney's Civil Rights Law § 51.

---

Richard Golub and Gary S. Graifman, New York City, for appellant-respondent.

Sandor Frankel and Peter M. Thall, New York City, for respondent-appellant.

### OPINION OF THE COURT

SIMONS, Judge.

The issue on this appeal is whether an infant model may disaffirm a prior unrestricted consent executed on her behalf by her parent and maintain an action pursuant

The consents provided in pertinent part:

"I hereby give the photographer, his legal representatives, and assigns, those for whom the photographer is acting, and those acting with his permission, or his employees, the right and permission to copyright and/or use, reuse and/or publish, and republish photographic pictures or portraits of me, or in which I may be distorted in character, or form, in conjunction with my own or a fictitious name, on

**255**

to section 51 of the Civil Rights Law against her photographer for republication of photographs of her. We hold that she may not.

Plaintiff is now a well-known actress. For many years prior to these events she had been a child model and in 1975, when she was 10 years of age, she obtained several modeling jobs with defendant through her agent, the Ford Model Agency. One of the jobs, a series of photographs to be financed by Playboy Press, required plaintiff to pose nude in a bathtub. It was intended that these photos would be used in a publication entitled "Portfolio 8" (later renamed "Sugar and Spice"). Before the photographic sessions, plaintiff's mother and legal guardian, Teri Shields, executed two consents in favor of defendant.* After the pictures were taken, they were used not only in "Sugar and Spice" but also, to the knowledge of plaintiff and her mother, in other publications and in a display of larger-than-life photo enlargements in the windows of a store on Fifth Avenue in New York City. Indeed, plaintiff subsequently used the photos in a book that she published about herself and to do so her mother obtained an authorization from defendant to use them. Over the years defendant has also photographed plaintiff for *Penthouse Magazine, New York Magazine* and for advertising by the Courtauldts and Avon companies.

In 1980 plaintiff learned that several of the 1975 photographs had appeared in a French magazine called "Photo" and, disturbed by that publication and by information that defendant intended others, she attempted to buy the negatives. In 1981, she commenced this action in tort and contract seeking compensatory and punitive damages and an injunction permanently en-

reproductions thereof in color, or black and white made through any media by the photographer at his studio or elsewhere, for any purpose whatsoever; including the use of any printed matter in conjunction therewith.

"I hereby waive any right to inspect or approve the finished photograph or advertising copy or printed matter that may be used in conjunction therewith or to the eventual use that it might be applied."

58 N.Y.2d 342

plaintiff's subse-

ss appeals. De-
ent of the trial
requests, in the
of the Appellate
iking the limita-
purposes of ad-
the order of the
be affirmed or,
a new trial be
ate Division ac-
ndings that the
restricted as to
ted with only a
erning the legal
arent's consents.

ommon law did
tion for invasion
Jew York Times
.Y.S.2d 941, 434
Rochester Fold-
4 N.E. 442). In
to the Roberson
acted sections 50
aw. Section 50
demeanor to use
rtrait or picture
without prior
51 is remedial
use of action on
permitting relief
see Arrington v.
, 55 N.Y.2d at p.
4 N.E.2d 1319;
N.Y.2d 276, 280,
d 853). Section
the prior "writ-
the civil action
d", referring to
n turn, provides
corporation that
ses, or for the
me, portrait or
without having
consent of such
or her parent or
demeanor" (em-

oberson, the in-
f action against

## SHIELDS v. GROSS
### Cite as 461 N.Y.S.2d 254 (Ct.App. 1983)

the advertiser under the common law for using her pictures, the new statute gives a cause of action to those similarly situated unless they have executed a consent or release in writing to the advertiser before use of the photographs. The statute acts to restrict an advertiser's prior unrestrained common-law right to use another's photograph until written consent is obtained. Once written consent is obtained, however, the photograph may be published as permitted by its terms (see *Welch v. Mr. Christmas*, 57 N.Y.2d 143, 454 N.Y.S.2d 971, 440 N.E.2d 1317).

[2, 3] Concededly, at common law an infant could disaffirm his written consent (see *Joseph v. Schatzkin*, 259 N.Y. 241, 181 N.E. 464; *Casey v. Kastel*, 237 N.Y. 305, 142 N.E. 671) or, for that matter, a consent executed by another on his or her behalf (see *Lee v. Silver*, 262 App.Div. 149, 28 N.Y.S.2d 333, affd. 287 N.Y. 575, 38 N.E.2d 233; *Goldfinger v. Doherty*, 153 Misc. 826, 276 N.Y.S. 289, affd. 244 App.Div. 779, 280 N.Y.S. 778; *Aborn v. Janis*, 62 Misc. 95, 113 N.Y.S. 309, affd. 122 App.Div. 893, 106 N.Y.S. 1115). Notwithstanding these rules, it is clear that the Legislature may abrogate an infant's common-law right to disaffirm (see, e.g., General Obligations Law, § 3-101, subd. 3; § 3-102, subd. 1; § 3-103; Education Law, § 281; Insurance Law, § 145) or, conversely, it may confer upon infants the right to make binding contracts (see *Matter of T.W.C.*, 38 N.Y.2d 128, 130, 379 N.Y.S.2d 1, 341 N.E.2d 526 [Domestic Relations Law, § 115-b]; *Hamm v. Prudential Ins. Co. of Amer.*, 137 App. Div. 504, 122 N.Y.S. 35 [Insurance Law, § 145, formerly § 55]; *Matter of Presler*, 171 Misc. 559, 13 N.Y.S.2d 49). Where a statute expressly permits a certain class of agreements to be made by infants, that settles the question and makes the agreement valid and enforceable. That is precisely what happened here. The Legislature, by adopting section 51, created a new cause of action and it provided in the statute itself the method for obtaining an infant's consent to avoid liability. Construing the statute strictly, as we must since it is in derogation of the common law (see McKin-

ney's Cons. Laws of N.Y., Book 1, Statutes, § 301, subd. b), the parent's consent is binding on the infant and no words prohibiting disaffirmance are necessary to effectuate the legislative intent. Inasmuch as the consents in this case complied with the statutory requirements, they were valid and may not be disaffirmed (see *Matter of T.W.C.*, supra).

[4, 5] Nor do we believe that the consents may be considered void because the parties failed to comply with the provisions of section 3-105 of the General Obligations Law requiring prior court approval of infants' contracts. By its terms, section 3-105 applies only to performing artists, such as actors, musicians, dancers and professional athletes moreover, it is apparent by comparing other statutes with it that the Legislature knowingly has differentiated between child performers and child models. Thus, section 3229 (formerly § 3216-c) of the Education Law, which applies to "Child performers", is referred to in section 3-105 (subd. 2, par. a) of the General Obligations Law but section 3230 of the Education Law, which applies to child models, is not. Child models are also recognized as a separate work classification in section 172 (subd. 2, par. f) of the Labor Law. Furthermore, section 3-105 was not designed to expand the rights of infants to disaffirm their contracts, as the concurring Justice at the Appellate Division would apply it, but to provide assurance to those required to deal with infants that the infants would not later disaffirm executory contracts to the adult contracting party's disadvantage (see *Matter of Prinze [Jonas]*, 38 N.Y.2d 570, 575, 381 N.Y.S.2d 824, 345 N.E.2d 295). Sections 50 and 51 as we interpret them serve the same purpose, to bring certainty to an important industry which necessarily uses minors for its work. This same need for certainty was the impetus behind not only section 3-105 but the various other sections of the General Obligations Law which prohibit disaffirmance of an infant's contract.



[6] Realistically, the procedures of prior court approval set forth in section 3–105, while entirely appropriate and necessary for performing artists and professional athletes, are impractical for a child model who, whether employed regularly or sporadically, works from session to session, sometimes for many different photographers. Moreover, they work for fees which are relatively modest when compared to those received by actors or professional athletes who may be employed by one employer at considerably greater remuneration for a statutorily permissible three-year term. Indeed, the fee in this case was $450, hardly sufficient to warrant the elaborate court proceedings required by section 3–105 or to necessitate a court's determination of what part should be set aside and preserved for the infant's future needs. Nor do we think court approval necessary under the circumstances existing in the normal child model's career. Given the nature of the employment, it is entirely reasonable for the Legislature to substitute the parents' judgment and approval of what is best for their child for that of a court.

It should be noted that plaintiff did not contend that the photographs were obscene or pornographic. Her only complaint was that she was embarrassed because "they [the photographs] are not me now." The trial court specifically found that the photographs were not pornographic and it enjoined use of them in pornographic publications. Thus, there is no need to discuss the unenforceability of certain contracts which violate public policy (see, e.g., Penal Law, § 235.00 et seq.) or to equate an infant's common-law right to disaffirm with that principle, as the dissent apparently does.

[7] Finally, it is claimed that the application of the statute as we interpret it may result in unanticipated and untoward consequences. If that be so, there is an obvious remedy. A parent who wishes to limit the publicity and exposure of her child need only limit the use authorized in the consent, for a defendant's immunity from a claim for invasion of privacy is no broader than the consent executed to him (see *Welch v. Mr. Christmas*, 57 N.Y.2d 143, 454 N.Y.S.2d 971, 440 N.E.2d 1317, supra; *Adrian v. Unterman*, 281 App.Div. 81, 118 N.Y.S.2d 121, affd. 306 N.Y. 771, 118 N.E.2d 477).

The order of the Appellate Division should be modified by striking the further injunction against use of the photographs for uses of advertising and trade, and as so modified, the order should be affirmed.

JASEN, Judge (dissenting).

Since I believe that the interests of society and this State in protecting its children must be placed above any concern for trade or commercialism, I am compelled to dissent. The State has the right and indeed the obligation to afford extraordinary protection to minors.

At the outset, it should be made clear that this case does not involve the undoing of a written consent given by a mother to invade her infant daughter's privacy so as to affect *prior* benefits derived by a person relying on the validity of the consent pursuant to sections 50 and 51 of the Civil Rights Law. Rather, what is involved is the right of an infant, now 17 years of age, to disaffirm her mother's consent with respect to *future use* of a nude photograph taken of her at age 10.

The majority holds, as a matter of law, not only in this case but as to all present and future consents executed by parents on behalf of children pursuant to sections 50 and 51 of the Civil Rights Law, that once a parent consents to the invasion of privacy of a child, the child is forever bound by that consent and may never disaffirm the continued invasion of his or her privacy, even where the continued invasion of the child's privacy may cause the child enormous embarrassment, distress and humiliation.

I find this difficult to accept as a rational rule of law, particularly so when one considers that it has long been the rule in this State that a minor enjoys an almost absolute right to disaffirm a contract entered into either by the minor or by the minor's parent on behalf of the minor (*Sternlieb v. Normandie Nat. Securities Corp.*, 263 N.Y.

245, 188 N.E. 726; *Josep[h]* N.Y. 241, 181 N.E. 464; Book Co. v. Connelly, 20[ ] 722; *Rice v. Butler*, 160 [ ] 275; *Sparman v. Keim*, [ ] v. Green, 69 N.Y. 553) question does not in an[y] this salutary right.

This right has been fact that the minor hel[d] an adult (*Sternlieh v. No[rmandie Nat. Secu]rities Corp., supra*) or attempted to contractua[lly] (*Kaufman v. American* Misc.2d 8, 174 N.Y.S.2d grounds 6 A.D.2d 223, mod. and certified que[stion] negative 5 N.Y.2d 1016, 158 N.E.2d 128). Signif[icant]ly not the minor can rest[ ] tracting party to the [ ] prior to entering the co[ntract] only to the extent that t[he] firming the contract, c[ ] into a better position th[an] entering the contract. [Nor]mandie Nat. Securities C[orp. v.] Butler, supra.) In the [ ] noted that those who co[ntract] do so at their own peril[, ] kin, supra, at p. 243.)

Understandably, such [ ] evolved as a result of t[he] provide children with as [much] possible against being t[aken] or exploited by adults. [To re]scind is a legal right [ ] protection of the infant [ ] supra, at p. 556). This [ ] the legal concept that a[n infant] of contracting because [he cannot] stand the scope of his ri[ghts or] appreciate the conseque[nces or implica]tions of his decisions. [It is] feared that as an infa[nt is] under the complete influ[ence] may be unable to act in [his own best interest] would allow him to def[end his own] interests. (28 N.Y.Jur. [Infants,] 221–222.) Allowing a [minor to] disaffirm a contract is [a rule of] common law develop[ed]

245, 188 N.E. 726; *Joseph v. Schatzkin,* 259 N.Y. 241, 181 N.E. 464; *International Text Book Co. v. Connelly,* 206 N.Y. 188, 99 N.E. 722; *Rice v. Butler,* 160 N.Y. 578, 55 N.E. 275; *Sparman v. Keim,* 83 N.Y. 245; *Green v. Green,* 69 N.Y. 553) and the statute in question does not in any manner abrogate this salutary right.

This right has been upheld despite the fact that the minor held himself out to be an adult (*Sternlieb v. Normandie Nat. Securities Corp., supra*) or that a parent also attempted to contractually bind the minor (*Kaufman v. American Youth Hostels,* 13 Misc.2d 8, 174 N.Y.S.2d 580, mod. on other grounds 6 A.D.2d 223, 177 N.Y.S.2d 587, mod. and certified question answered in negative 5 N.Y.2d 1016, 185 N.Y.S.2d 268, 158 N.E.2d 128). Significantly, whether or not the minor can restore the other contracting party to the position he was in prior to entering the contract is pertinent only to the extent that the minor, by disaffirming the contract, cannot put himself into a better position than he was in before entering the contract. (*Sternlieb v. Normandie Nat. Securities Corp., supra; Rice v. Butler, supra.*) In the past, this court has noted that those who contract with minors do so at their own peril. (*Joseph v. Schatzkin, supra,* at p. 243.)

Understandably, such a broad right has evolved as a result of the State's policy to provide children with as much protection as possible against being taken advantage of or exploited by adults. "The right to rescind is a legal right established for the protection of the infant" (*Green v. Green, supra,* at p. 556). This right is founded in the legal concept that an infant is incapable of contracting because he does not understand the scope of his rights and he cannot appreciate the consequences and ramifications of his decisions. Furthermore, it is feared that as an infant he may well be under the complete influence of an adult or may be unable to act in any manner which would allow him to defend his rights and interests. (28 N.Y.Jur., Infants, § 3, pp. 221–222.) Allowing a minor the right to disaffirm a contract is merely one way the common law developed to resolve those inequities and afford children the protection they require to compensate for their immaturity.

Can there be any question that the State has a compelling interest in protecting children? Indeed, the most priceless possessions we have in the Nation are our children. Recognizing this compelling interest in children, the State has assumed the role of *parens patriae,* undertaking with that role the responsibility of protecting children from their own inexperience. Acting in that capacity, the State has put the interests of minors above that of adults, organizations or businesses. (*Rice v. Butler, supra; Kaufman v. American Youth Hostels, supra; Sternlieb v. Normandie Nat. Securities Corp., supra.*) The broad right given a minor to disaffirm a contract is, of course, an obvious example of the State's attempt to afford an infant protection against exploitation by adults. (28 NY Jur, Infants, *op. cit.*) Thus, I am persuaded that, in this case, 17-year-old Brooke Shields should be afforded the right to disaffirm her mother's consent to use a photograph of her in the nude, taken when she was 10 years old, unless it can be said, as the majority holds, that the Legislature intended to abrogate that right when it enacted sections 50 and 51 of the Civil Rights Law.

The legislative history of this statute enacted in the early 1900's is understandably scarce. The case law prior to its passage, however, indicates that a minor's right to disaffirm a contract under the common law was well established at that time. Additionally, it is well accepted that this statute was enacted in response to this court's decision in *Roberson v. Rochester Folding Box Co.,* 171 N.Y. 538, 64 N.E. 442; see, also, *Arrington v. New York Times Co.,* 55 N.Y.2d 433, 439, 449 N.Y.S.2d 941, 434 N.E.2d 1319, in which the court held that a minor had no recourse against an entrepreneur who made commercial use out of her picture without her consent. Apparently, in order to alleviate litigation over whether or not consent had been given, the Legislature required that such consent be in writing and, if the person was a minor, that the

**254**  461 NEW YORK SUPPLEMENT, 2d SERIES    58 N.Y.2d 337

to be sitting outside the judicial department of his residence. The short answer to this argument is that our Constitution specifically provides that once a Justice is properly assigned in accordance with subdivision g of section 26, as Justice Roberts was, he acquires all of "the powers, duties and jurisdiction of a judge or justice of the court to which assigned." (Art. VI, § 26, subd. k.) Since Special Narcotics Court Judges have, as we interpret CPL 700.05 (subd. 4) in light of article 5–B of the Judiciary Law, been given city-wide jurisdiction to authorize the interception of drug-related conversations, Justice Roberts' assignment fully complied with both subdivisions g and k of section 26 of article VI of the New York Constitution.

Accordingly, the orders of the Appellate Division should be affirmed.

COOKE, C.J., and JONES, WACHTLER, FUCHSBERG, MEYER and SIMONS, JJ., concur.

In each case: Order affirmed.



448 N.E.2d 108
58 N.Y.2d 338

Brooke SHIELDS, Respondent-Appellant,
v.
Garry GROSS, Appellant-Respondent.

Court of Appeals of New York.

March 29, 1983.

Infant model brought action against photographer seeking damages and injunctive relief to prevent the photographer from using photographs taken when the model was ten years old. The Supreme Court, Trial Term, New York County, Edward J. Greenfield, J., denied the application for a permanent injunction except to the extent of enjoining the photographer from licensing or permitting the licensing of photographs for use in pornographic publications. Appeal was taken. The Supreme Court, Appellate Division, First Judicial Department, 88 A.D.2d 846, 451 N.Y.S.2d 419, modified the judgment and granted the model a permanent injunction enjoining the photographer from using the pictures for purposes of advertising or trade. Cross-appeals were taken. The Court of Appeals, Simons, J., held that: (1) the model could not maintain an action against the photographer where the model's mother had effectively consented, and (2) the section requiring prior court approval of infants' contracts did not apply to the model.

Order modified and, as modified, affirmed.

Jasen, J., dissented with an opinion in which Fuchsberg and Meyer, JJ., concurred.

1. Torts ⟲8.5(8)

Section creating civil cause of action for use of person's name, portrait or picture for advertising purposes without prior written consent acts to restrict advertiser's prior unrestrained common-law right to use another's photograph until written consent is obtained; once written consent is obtained, photograph may be published as permitted by its terms. McKinney's Civil Rights Law § 51.

2. Infants ⟲47

Where statute expressly permits certain class of agreements to be made by infants, that settles the question and makes agreement valid and enforceable.

3. Torts ⟲8.5(8)

Under section creating civil cause of action for use of person's name, portrait or picture for advertising purposes without prior written consent, parent's consent was binding on infant model and no words prohibiting disaffirmance were necessary to effectuate legislative intent. McKinney's Civil Rights Law § 51.

4. Infants ⟲49

General Obligations Law section requiring prior court approval of infants' contracts applies only to performing artists, such as actors, mu[sicians], professional athletes. [Ob]ligations Law § 3-[...]

5. Infants ⟲49

General Oblig[ations Law re]quiring trial court [approval of con]tracts did not apply [to ...] ney's General Ob[ligations...]

6. Infants ⟲49

Procedures for [approval of] infants' contracts s[...] gations Law, while [...] necessary for perfo[rming artist or pro]sional athletes, an[d does not apply to] model who, whethe[r she works] sporadically, works [...] sometimes for ma[ny photogra]phers. McKinney['s General Obligations] Law § 3-105.

7. Torts ⟲8.5(8)

Parent who w[aives privacy] and exposure of h[er child to] the use authorized [by her, de]fendant's immunity [from invasion] of privacy is no br[oader than exe]cuted to him. McK[inney's Civil Rights Law] § 51.

A. Richard Golub, New York City, f[or ...]

Sandor Frankel a[nd ..., New] York City, for resp[ondent]

OPINION O[F THE COURT]

SIMONS, Judge.

The issue on thi[s appeal is whether an] infant model may [disaffirm a prior un]stricted consent ex[ecuted on her behalf by] her parent and mai[ntain ...]

* The consents provid[ed ...]
"I hereby give th[e ...] representatives, and [...] the photographer i[s ...] with his permission, [...] and permission to c[...] and/or publish, an[y ...] pictures or portraits [...] be distorted in char[ac]tion with my own [...]

parent sign the consent form. There is no indication that by requiring consent from the minor's parents, the Legislature intended in any way to abrogate that minor's right to disaffirm a contract at some future date. Indeed, the requirement of ⊥parental consent, like the broad right to disaffirm a contract, was granted in order to afford the minor as much protection against exploitation as possible. The assumption, of course, was that a parent would protect the child's interests. But if that assumption proves invalid, as may well be the case if a minor upon reaching the age of maturity realizes that the parent, too, has been exploiting him or her or had failed to adequately guard his or her interest by giving consent for pictures which caused humiliation, embarrassment and distress, then the child should be able to cure the problem by disaffirming the parent's consent. To say, as does the majority, that the mother could have limited her consent avoids the issue. If the parent has failed to put any restrictions on the consent, as occurred in this case, and has thus failed to protect the child's future interests, I see no reason why the child must continue to bear the burden imposed by her mother's bad judgment. This means the child is forever bound by its parent's decisions, even if those decisions turn out to have been exploitative of the child and detrimental to the child's best interests.

Furthermore, nothing compels the majority's conclusion that the right to disaffirm a contract was eliminated when the Legislature created a new cause of action for invasion of privacy merely because that statute provided safeguards for the child's privacy by giving the parent the right to grant or withhold consent. When both rights are

\* The discussion in this opinion of the policy behind affording a child the extraordinary protection of the right to disaffirm a contract should not be read, as the majority does, to equate the right to disaffirm with the principle that a court will refuse to enforce contracts which violate public policy. Indeed, had the courts below found that her mother had contracted for her daughter to pose in an obscene manner or that the photographs were obscene or pornographic, then we would not need to decide the applicability of the infant's right to

viewed, as I believe they must be, as protection for the child, logic and policy compels the conclusion that the two rights should exist coextensively. The requirement that a parent consent before the child's privacy can be invaded by commercial interests establishes the parent as the first guardian of the child's interest. But the State retains its long-standing role of *parens patriae* so that if the parent fails to protect the child's interests, the State will intervene and do so. One means of doing so is to allow the child to exercise its right to disaffirm if the child concludes that its parent improvidently consented to the invasion of the child's privacy interests. Given the strong policy concern of the State in ⊥the child's best interests,\* I can only conclude that the Legislature did not intend to abrogate the child's common-law right to disaffirm a contract when it required, by statute, the additional protection of written, parental consent prior to any commercial use of the child's image.

This conclusion is further supported by other statutes in which the Legislature has clearly abrogated the infant's right to disaffirm a contract in those situations in which it has determined that the damage incurred by the minor will be minimal and the cost to the contracting party or society would be great. Invariably, these are contractual situations in which the minor has incurred a contractual obligation in order to receive a benefit which cannot be deemed anything other than a benefit. For example, section 281 of the Education Law negates a minor's right to disaffirm a contract when that contract afforded him a student loan to pursue an advanced education. (See, also, General Obligations Law, § 3-103.) No one can argue that the contract was any-

disaffirm that contract as I assume the majority would find the contract and the consent incorporated in it to violate public policy. (Penal Law, § 235.00 *et seq.*; *People v. Ferber*, 52 N.Y.2d 674, 439 N.Y.S.2d 863, 422 N.E.2d 523 [Jasen, J., dissenting], rev. — U.S. —, 102 S.Ct. 3348, 73 L.Ed.2d 1113, on remand, 57 N.Y.2d 256, 455 N.Y.S.2d 582, 441 N.E.2d 1100.) A contract held to be unenforceable because it violates public policy is void *ab initio* and, thus, there is no need to consider whether or not it may be disaffirmed.

---

58 N.Y.2d 353

thing other than beneficia[l] Such legislation was endor[sed by the] Revision Commission on the [Legis]lative finding "that the t[ype of contract] involved is clearly for the [benefit of the] infant". (1961 Report of [Law Revision] Comm., pp. 269, 275, citin[g Con]tracts Relating to the Ser[vices of] Minors and the Treatmen[t of Earn]ings Therefrom.)

Two factors distinguish s[ection 50-51] of the Civil Rights Law fr[om the sta]ry provisions which do, in [fact,] abolish the minor's right t[o disaffirm a con]tract. The first is that i[n each case] the Legislature⊥has intend[ed to] have made their intention [clear by using] language which directly [refers to an in]fant's common-law right. [There is not] any reference in the Civil [Rights Law to a] minor's right to disaffirm [espe]cially when it is clear t[hat the right to] disaffirm was well esta[blished and] that the Legislature did n[ot intend to abrogate] that right. Secondly, unli[ke those types] of contracts which the Le[gislature has des]ignated as immune from [the minor's right] to disaffirm, it cannot b[e said that a con]tract releasing all rights [of privacy, or] even limited rights to tho[se privacy interests, is nec]essarily beneficial to th[e child. This is] even more true when the [photographs, as in this] case, are of the variety [that could be ex]ploited in the future or u[sed in a manner] of questionable taste.

I do not believe that [the Legislature's] intent in enacting sectio[n 50-51 of the] Civil Rights Law was to [protect the inter]ests of business and com[merce at the expense of] the State's interest in p[rotecting its chil]dren. Since this statut[e was enacted in] response to this court's d[ecision in Roberson] v. *Rochester Folding Bo[x Co.*, which] denied an infant plaintif[f recovery for] the invasion of her priva[cy by a commercial] enterprise in using her [picture without] consent, it would seem t[hat the legis]lative intent was to exp[and privacy pro]tections, rather than to [limit them for] commercial enterprises.

| | 58 N.Y.2d 353 | SHIELDS v. GROSS | 261 |

Cite as 461 N.Y.S.2d 254 (Ct.App. 1983)

**58 N.Y.2d 349**

must be, as protec-
and policy compels
two rights should
e requirement that
the child's privacy
mercial interests es-
he first guardian of
t the State retains
f *parens patriae* so
o protect the child's
ntervene and do so.
s to allow the child
isaffirm if the child
improvidently con-
 the child's privacy
ong policy concern
l's best interests,* I |355
the Legislature did
he child's common-
a contract when it
e additional protec-
al consent prior to
the child's image.

rther supported by
the Legislature has
ant's right to disaf-
situations in which
he damage incurred
inimal and the cost
or society would be
are contractual sit-
inor has incurred a
i order to receive a
e deemed anything
or example, section
w negates a minor's
ontract when that
a student loan to
ication. (See, also,
w, § 3-103.)  No
contract was any-

; I assume the majori-
act and the consent
ite public policy. (Pe-
 *People v. Ferber*, 52
1 863, 422 N.E.2d 523
v. ― U.S. ― , 102
1113, on remand, 57
.2d 582, 441 N.E.2d
to be unenforceable
policy is void *ab initio*
d to consider whether
ned.

---

thing other than beneficial to the minor. Such legislation was endorsed by the Law Revision Commission on the basis of a legislative finding "that the type of contract involved is clearly for the benefit of the infant". (1961 Report of N.Y.Law Rev. Comm., pp. 269, 275, citing Touster, Contracts Relating to the Services of Talented Minors and the Treatment of Their Earnings Therefrom.)

Two factors distinguish sections 50 and 51 of the Civil Rights Law from those statutory provisions which do, in certain contexts, abolish the minor's right to disaffirm a contract. The first is that in all cases when the Legislature has intended to do so, they have made their intention clear by specific language which directly refers to the infant's common-law right. The absence of any reference in the Civil Rights Law to the minor's right to disaffirm a contract, especially when it is clear that the right to disaffirm was well established, indicates that the Legislature did not intend to affect that right. Secondly, unlike the other kinds of contracts which the Legislature has designated as immune from the minor's right to disaffirm, it cannot be said that a contract releasing all rights to photographs or even limited rights to those pictures is necessarily beneficial to the infant. This is even more true when the pictures, as in this case, are of the variety which can be exploited in the future or used in publications of questionable taste.

I do not believe that the Legislature's intent in enacting sections 50 and 51 of the Civil Rights Law was to elevate the interests of business and commercialism above the State's interest in protecting its children. Since this statute was enacted in response to this court's decision in *Roberson v. Rochester Folding Box Co. (supra)*, which denied an infant plaintiff any recovery for the invasion of her privacy by a commercial enterprise in using her picture without her consent, it would seem to me that the legislative intent was to expand individual protections, rather than to afford protection to commercial enterprises.

The fact that when an infant disaffirms a contract there may be harsh results to the person or commercial enterprise attempting to exploit the child has never caused the courts to alter the scope of the protection that right affords the child. The overriding interest of society in protecting its children has long been held to outweigh the interests of merchants who attempt to contract with children. (*Sternlieb v. Normandie Nat. Securities Corp., supra*, 263 N.Y. at p. 250, 188 N.E. 726.)

In those situations in which the Legislature has decided that business ventures need additional protection, it has done so not merely by abolishing the infant's right to disaffirm, but, rather, by providing alternative protection. Section 3-105 of the General Obligations Law provides for judicial approval of contracts for the services of child performers or professional athletes. It is clear that the statute protects not only |353 the business interests which are investing in and profiting from the child's talents, but also the child. For instance, paragraph d of subdivision 2 generally restricts such contracts to a three-year period and paragraph e of subdivision 2 provides that even after approving a contract of a child performer, the court may, if it finds that the child's well-being is in any way being impaired by its performance under the contract, revoke or modify the contract so as to protect the child. Similarly, it provides for supervision by the court of the child's earnings to assure that the child will benefit from his labors. The clear intent of such provisions is to protect the child against any exploitation. The failure of the Legislature to cover child models in this provision indicates to me that they intended child models to retain the protections afforded by the common-law right to disaffirm a contract. It is unfortunate that by virtue of the majority's interpretation of the Civil Rights Law those children may not in the future be afforded protection against exploitation by their own parents.

It is even more unfortunate that by its interpretation of sections 50 and 51 the majority takes away a large part of the

protection those children had at common law.

COOKE, C.J., and JONES and WACHTLER, JJ., concur with SIMONS, J.

JASEN, J., dissents in part and votes to affirm in a separate opinion in which FUCHSBERG and MEYER, JJ., concur.

Order modified, with costs to defendant, in accordance with the opinion herein and, as so modified, affirmed.



448 N.E.2d 116
58 N.Y.2d 354

In the Matter of LOCAL 252, TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, Respondent,

v.

NEW YORK STATE PUBLIC EMPLOYMENT RELATIONS BOARD, Appellant,

and

Metropolitan Suburban Bus Authority, Intervenor-Appellant.

Court of Appeals of New York.

March 30, 1983.

Petition was filed seeking review of a determination of the Public Employment Relations Board that a union engaged in a strike during a certain time period in January 1980. The Supreme Court, Appellate Division, First Department, 89 A.D.2d 551, 453 N.Y.S.2d 17, annulled the determination. Appeal was taken. The Court of Appeals, Jones, J., held that the determination of the PERB that a strike occurred when bus drivers refused to drive buses which violated the requirements of the Vehicle and Traffic Law was supported by substantial evidence.

Judgment reversed.

1. Labor Relations ⇐578

Conclusion of Public Employment Relations Board that union's invoking reference to provisions of Vehicle and Traffic Law in order to justify drivers refusing to drive buses which violated requirements of law was merely pretext for concerted refusal of drivers to operate buses was amply supported in record. McKinney's Civil Service Law § 209; McKinney's Vehicle and Traffic Law § 100 et seq.

2. Labor Relations ⇐290

Where reliance on sudden concern for overly meticulous and abnormal observance of statutory commands is purely a subterfuge, incidental circumstance that continued performance of duties in normal manner might entail violation of statute does not legally preclude finding that there has been "strike." McKinney's Civil Service Law § 209.

3. Labor Relations ⇐578

Public Employment Relations Board's finding that strike occurred when bus drivers refused to drive buses which violated requirements of Vehicle and Traffic Law was supported by substantial evidence, including evidence that union was responsible for job action, job action was timed to occur immediately following expiration of interim impasse arrangement and only violations posing no imminent danger to safety of public or drivers were involved in charge. McKinney's Civil Service Law § 209; McKinney's Vehicle and Traffic Law § 100 et seq.

---

Martin L. Barr and Anthony Cagliostro, Albany, for appellant.

Mary P. Bass and Lester G. Freundlich, New York City, for intervenor-appellant.

Amy Gladstein and Walter M. Meginniss, Jr., Brooklyn, for respondent.

Marc Silverman, Ruth Raisfeld and Laura Jacobs, New York City, for "Straphangers Campaign," amicus curiae.

OPINION OF THE COURT

JONES, Judge.

The Public Employment Relations is not precluded from determining tha certed refusal of bus drivers to pe duties in the normal manner for the pose of securing job-related demands c tutes a strike in violation of the Taylor although the normal manner of per ance would entail violations of the V and Traffic Law where citation to violations is only a pretext. In thi stance the record contains substantial dence to sustain such determination by the board.

Local 252 of the Transport Workers ion of America, AFL–CIO, is the cert bargaining representative for a negotia unit of some 640 public employees of Metropolitan Suburban Bus Autho Approximately 460 of these employees, group which is the subject of the ins illegal strike charge, are bus drivers in authority's surface transportation sys which serves areas in Nassau County.

The authority and the union were un to reach agreement on a contract for calendar year 1979, the prior agreem having expired on December 31, 1978. A result, the unit members were working der terms and conditions imposed by authority pursuant to the impasse pro dures of section 209 of the Civil Serv Law. In November of 1979, the union a the authority began negotiations for a b gaining agreement to take effect in 19

Sometime in November, the president the union instructed the bus drivers "safety classes" that they did not have operate buses which violated the requi ments of the Vehicle and Traffic Law. I told them that the union would back the up if they refused to drive buses with viol tions but that any bus which was in comp ance with provisions of law was to be dri en.

At a negotiating meeting in December 1979, the union president warned the au thority that there would be "big trouble" the parties did not agree on a contract b