# EXHIBIT "A"



A STYLE FOR EVERY STORY™
JORDAN RICHARDSON WEARS
LEVI'S® SKINNY KNEE KNOCKER
THE ORIGINAL
Levi's
SEARS AND SEARS.COM
Levi.com

UNITED COLORS
OF BENETTON.

SHAPE

TEXTURE

FORMULATED WITH BREAKTHROUGH HUMIDITY-CONTROLLING BUFFERS AND NUTRILEUM TO MOISTURIZE WHILE SMOOTHING YOUR HAIR.

**FROM FRIZZY TO SMOOTH. DRY TO SILKY.**
WITH NEW VIVE PRO SMOOTH INTENSE
BY L'ORÉAL PARIS.

**IT'S NOT MAGIC. IT'S SCIENCE.**
VIVE PRO'S DUAL-ACTION TECHNOLOGY
TRANSFORMS HAIR'S SHAPE AND TEXTURE.
TO LOCK MOISTURE IN AND KEEP HUMIDITY OUT.

**THE SHAPE**– SUPER SMOOTH.
**THE TEXTURE**– SLEEK, FRIZZ-FREE.
IT'S THE END OF DRY, FRIZZY HAIR.

**BECAUSE YOU'RE WORTH IT™**

L'ORÉAL®
PARIS

# EXHIBIT "B"

(*) See Below

# V MODEL MANAGEMENT NEW YORK, INC.

## MODEL MANAGEMENT AGREEMENT

AGREEMENT made as of the 22 day of April, 2005, by and between V MODELS MANAGEMENT, INC., 1133 Broadway, Suite 1201, New York, NY 10010 ("Manager"), and Jordan-Annettee Jazzmun Richardson ("Model").

**WITNESSETH:**

IN CONSIDERATION of the sum of One Dollar ($1.00), each to the other paid in hand and the mutual covenants and promises herein contained, the parties hereto agree as follows:

1. Model hereby engages the services of Manager as Model's sole and exclusive manager, representative and advisor throughout the world with respect to Model's professional career, talents, services and business affairs in the fashion, modeling and entertainment industries ("Career"). Manager hereby accepts such engagement, and agrees to counsel, confer and advise Model in the guidance of Model's career and activities; to use reasonable efforts to arrange for, exploit and commercialize Model's name, talent and abilities in connection therewith; supervise, negotiate and arrange the terms of any and all offers of employment or contracts for services of any nature whatsoever. Manager agrees to render advice and assistance with respect to the development and improvement of Model's Career and all business interest related thereto

2. (A) Manager shall not act as an agent for the purpose of obtaining any engagements or contracts or offers thereof on behalf of Model and is not in any way required to do so. Model shall promptly refer to Manager all offers, communications or requests for Model's appearances or services.

(B) Manager shall not be required to render services exclusively to Model, and shall, at all times, be free to perform the same or similar services for others, as well as engage in any and all other business activities.

Lana Can see many models

3. The term of this Agreement (the "Term") shall consist of an initial period plus any and all option periods. The initial period of this Agreement shall be two (2) years commencing on the date first above written and ending on April 22, 2007 (the "Initial Period"). The Term shall be automatically extended for additional periods of two (2) years each (collectively, "Option Periods"), unless Manager notifies Model, in writing, that it wishes to terminate this Agreement at any time before the expiration of the Term. In the event Manager gives Model notice of termination, this Agreement shall terminate thirty (30) days from the date of such notice, unless the notice states otherwise.

Jordan Do Not accept any assignments after 22Apr07!!!

Old Contract - 1st Contract

Manager's obligation to continue to pay Model its fees hereunder, if any, shall survive termination of this Agreement.

4. (A) As compensation for Manager's services hereunder, Model shall pay Manager sums equal to twenty percent (20%) of all "gross receipts" ("Fee") as hereinafter defined, off the top, from all sources paid or accrued to, or earned or received by Model or on Model's behalf or for Model's benefit, directly or indirectly, during the Term of this Agreement, and thereafter: (i) for any employment, engagement, commitment or contract in existence on the date hereof or negotiated for or entered into during the Term, and any renewal, extension, modification, amendment thereof or addition thereto, including a new agreement for an additional term with the same or related parties; (ii) any employment, engagement, commitment or contract substituted for or replacing, directly or indirectly, employments, engagements, commitments or contracts currently in existence or negotiated for or entered into during the Term and any renewal, extension, modification, amendment thereof or addition thereto, including a new agreement for an additional term with the same or related parties; and, (iii) any and all judgments, awards, settlements, payments, damages and proceeds relating to any suits, claims, actions or proceedings arising out of the alleged breach of non-performance by others of any of the contracts, engagements, commitments or other agreements referred to herein. Expiration or termination of this Agreement shall not affect Manager's rights to compensation as herein provided.

(B) Manager's full participation in Model's gross receipts from contracts / agreements entered into or substantially negotiated during the Term hereof shall continue for as long as gross receipts are payable to Model per the terms of said contracts / agreements, and any renewals, extensions, re-negotiations, modifications, or amendments thereof.

(C) The term "gross receipts" as used herein shall be deemed to include all forms of income payments, consideration and compensation including but not limited to advances, earnings, fees, royalties, bonuses and income in kind, regardless of by whom procured, secured or arranged, however, within the scope of Model's Career and professional activities hereunder. The term Model's "professional activities" shall include without limitation, any use of Model's talents and activities throughout the fashion, modeling and entertainment industries.

(D) Model understands that Manager is entitled to receive from some or all of the clients who may utilize Model's services a service charge, agency fee or other compensation ("Client Fee") over and above the Fee Manager receives from Model, and Model acknowledges that that such compensation is an additional inducement for Manager to act on Model's behalf and an important element in the compensation Manager receives from representing Model. In the event that Model accepts a booking for which his/her fee includes the Client Fee, Model agrees that Manager has the right to deduct such Client Fee from Model's gross compensation paid by the client in addition to Manager's Fee. Manager's Fee and Client Fee extend to any booking or engagement performed by Model subsequent to the termination of this Agreement if such booking or

engagement was negotiated, solicited or accepted by Model prior to such termination or is a continuation or work which began prior to termination, including renewals, options and renegotiated contracts.

5. (A) Gross receipts shall be sent to Manager. Model shall cause all contracts and agreements with third parties concerning Model's professional activities to provide for Model's compensation under those contracts and agreements to be paid directly to Manager. Upon Manager's receipt of gross receipts, Manager shall deduct from such gross receipts: (i) any and all fees, costs, and expenses advanced or incurred by Manager on Model's behalf, including any and all expenses advanced or incurred by Manager on Model's behalf before and after execution of this Agreement; and, (ii) all compensation or consideration due Manager hereunder. Manager shall remit the balance of gross receipts, if any, to Model no later than ten (10) calendar days after receipt of gross receipts by Manager.

(B) In the event that gross receipts are sent to Model, Model shall promptly notify Manager of its receipt of same. In this event, Model shall promptly, and in no event later than five (5) calendar days after receipt thereof send the entire gross receipts proceeds to Manager for allocation and distribution as per Par. 5(A), above.

6. Model shall, notwithstanding anything elsewhere contained herein, reimburse Manager for any and all costs or expenses Manager may incur, or any moneys Manager may advance in connection with Model's Career and professional activities hereunder, including but not limited to photographs, clothing and accessories, any and all equipment, advertising, publicity or promotion costs, long-distance telephone calls, travel and transportation expenses, administration, auditing fees, and any and all other costs incurred by Manager, from any and all monies earned by Model hereunder, and, if no monies are earned by Model hereunder or monies earned are insufficient to cover Manager's expenses, Model shall nevertheless reimburse Manager within six (6) months of Manager's incurring any particular expense. Manager may, but shall not be obligated to, commence legal proceedings to collect amounts due to Model from clients, but if Manager does, Model shall bear the expenses associated with such proceedings.

7. Model grants to Manager during the Term the nonexclusive right to use and publish and to permit others to use and publish Model's professional name, likeness and biographical material concerning Model, for advertising and purposes of trade and otherwise without limitation in connection with the furtherance of Model's Career and professional activities. Manager shall have the right to advertise the fact that Manager represents Model in connection with Model's activities hereunder. Manager shall have the right, within Manager's sole discretion, to publish Model's name, likeness, image, biographical information and statistics on its website for as long as Model is represented by Manager.

8. (A) Model warrants and represents that Model: (i) has the full right, power and authority to enter into this agreement and to grant to Manager the rights granted herein; (ii) is under no obligation or disability or prohibition which will or might prevent Model

from keeping or performing Model's covenants, promises, representations and warranties contained herein; (iii) will not, during the Term, enter into any agreement or commitment which shall or might in any manner interfere with or prevent Model's carrying out the terms and conditions of this Agreement; and, (iv) will not, during the Term, engage any other person, firm or corporation to act as Model's personal manager or in any similar capacity.

(B) Model shall indemnify and hold Manager harmless from any loss, liability or damage (including reasonable attorney's fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties, representations, covenants or promises made by Model hereunder. Model will reimburse Manager on demand for any payment made by Manager at any time in respect of any liability or claim to which the foregoing indemnity relates.

9. Model hereby authorizes and appoints Manager to be Model's agent and attorney-in-fact for the purpose of (a) negotiating, renegotiating, contracting and executing for Model and in Model's name and on Model's behalf and any and all agreements, documents, and instruments providing for Model's services to clients pursuant hereto; (b) approving and permitting the use of Model's name, image, voice, caricatures and the like for the purposes of advertising and publicity; (c) collecting and receiving sums payable to Model, endorsing Model's name upon and depositing in Manager's account all checks payable to Model, and retaining therefrom all sums owing to Manager; and, (d) demanding, suing for and collecting, all claims, money, interest and other items that may be due Model or belong to Model.

10. Manager shall have the right to assign this Agreement and any of Manager's rights hereunder without limitation. Manager shall have the right to delegate the performance of Manager's obligations hereunder without limitation. Model shall not have the right to assign this Agreement or delegate any of Model's obligations hereunder.

11. Manager shall not be liable for any breach of contract or act or omission on the part of anyone with whom any engagement or contract is negotiated, arranged or secured.

12. No breach or failure to perform any terms of this Agreement by either Manager or Model which would otherwise be a material breach of this Agreement, shall be considered a material breach of this Agreement, unless the party alleged to be in breach does not cure the same within a further period of thirty (30) days after receipt of written notice from the alleging party.

13. Manager shall have the right, at Manager's election, to suspend the operation of this Agreement if for any reason whatsoever Model is unable or unwilling to render services in the entertainment industries. Such suspension shall commence upon written notice to Model and shall last for the duration of any such unavailability or unwillingness to render services. At Manager's election, a period of time equal to the duration of such suspension shall be added to Term. In addition, if Model fails to render services in the

entertainment industries as aforesaid, then Manager may, in addition to other remedies provided for herein, terminate this contract upon written notice to Model. Notwithstanding anything to the contrary contained herein, Model shall be responsible for reimbursing Manager for any and all costs and expenses incurred by Manager in connection with Model's Career and professional activities within ten (10) calendar days of the date of termination. In the event that Model fails to so reimburse Manager, Manager shall have the right to avail itself of any all relief, including damages, injunction and equity, available to it under the law.

14. Any notice hereunder shall be sent to Model at the address above specified or any other address of which Model gives Manager notice. Any notices hereunder shall be sent to Manager at the address above specified or any other address of which Manager gives Model notice, with a copy to Natalia Nastaskin, Esq., 250 West 57th Street, Suite 917, New York, New York 10107. All notices shall be delivered personally, by mail, e-mail, facsimile or telegraph. The date of personal delivery, mailing receipt date, e-mail date, facsimile date or delivery to a telegraph office shall be the effective date of the notice.

15. This Agreement does not constitute or acknowledge any partnership or joint venture between the parties. Model understands and agrees that he / she is an independent contractor and not an employee of Manager, and, as such, shall be responsible for paying his/her own taxes from any and all monies earned hereunder.

16. This Agreement represents the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any provision thereof, shall be binding unless in writing signed by Model and Manager. No waiver of any provision or default under this Agreement shall affect Manager's rights thereafter to enforce such provisions or to exercise any right or remedy in the event of any other default, whether or not similar. This Agreement shall be construed in accordance with the laws of the State of New York, applicable to contracts entered into and wholly performed therein. If any provision of this Agreement violates or conflicts with any law, governmental rule or regulation or judicial decree, including any requirements for judicial approval, to the extent required, of all or any part of this Agreement, such provision or provisions shall be deemed amended to the minimum extent necessary to effect compliance with such law, rule, regulation or decree and as so amended shall remain in full force and effect.

17. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, administrators, executors, successors and assigns.

18. MODEL REPRESENTS AND WARRANTS THAT MODEL HAS BEEN ADVISED OF MODEL'S RIGHT TO SEEK LEGAL COUNSEL OF MODEL'S OWN CHOOSING IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS CONTRACT.

EXPRESSLY REPRESENTS AND WARRANTS THAT MODEL HAS REACHED 18 YEARS OF AGE. IF MODEL HAS NOT YET REACHED 18 YEARS OF AGE, HIS/HER PARENT(S) OR LEGAL GUARDIAN(S) MUST READ THIS AGREEMENT AND SIGN WHERE INDICATED BELOW. IN ADDITION, MODEL AND HIS/HER PARENT(S) OR LEGAL GUARDIAN(S) ACKNOWLEDGE THAT IT IS MODEL'S AND THEIR RESPONSIBILITY TO OBTAIN ALL NECESSARY GOVERNMENTAL CONSENTS, PERMITS AND APPROVALS REQUIRED BY STATE AND FEDERAL LAWS AND REGULATIONS FOR THE PERFORMANCE OF SERVICES HEREUDNER BY MINORS, INCLUDING WITHOUT LIMITATION WORK PERMITS VISAS, AND COURT APPROVALS WHERE NECESSARY. AT MODEL'S REQUEST MANAGER WILL GUIDE AND COUNSEL MODEL WITH RESPECT TO OBTAINING SUCH CONSENTS, PERMITS, VISAS AND APPROVALS, AND MODEL AGREES TO SIGN ALL DOCUMENTS REQUIRED IN CONNECTION THEREWITH. MODEL ACKNOWLEDGES THAT UPON HIS/HER REACHING 18 YEARS OF AGE THIS AGREEMENT WILL CONTINUE IN FULL FORCE AND EFFECT THROUGHOUT ITS TERM AND ANY RENEWALS THEREOF, AND MODEL'S CONTINUED ACCEPTANCE OF ASSIGNMENTS FROM MANAGER SHALL CONSTITUTE RATIFICATION OF ALL OF THE TERMS AND CONDITIONS HEREOF.

Don't accept any assignment * after 22Apr 06

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

**MANAGER:**
**V MODELS MANAGEMENT, INC.**

BY: Lana Winters
Lana Winters
TITLE: President

**AGREED AND ACCEPTED:**
**MODEL:**

Jordan Richardson
Jordan-Annettee J Richardson
Print Name

Model's Soc. Sec. #: ______________

**AGREED AND ACCEPTED:**
**MODEL'S PARENT / LEGAL GUARDIAN**

Liza-Athena S. Abu-Hantash
Liza-Athena S. Abu-Hantash
Print Name

______________
Capacity in which signed

Jordan Richardson

Talent Signature

Witness:

Name: JORDAN RICHARDSON

Date: 22 April 05

# V MODELS

## AGREEMENT ADDENDUM – CHARGE BACK EXPENSES

I agree and fully understand that expenses incurred for my promotion as talent with V Models, will be charged to my account and I will be responsible for there reimbursement or payment. these expenses include, but are not limited to:

1. Laser composites and/or composite cards printing.
2. Laser copies of photographs.
3. CD-Rom, e-mail and other electronic media.
4. Air Express charges (UPS, Federal Express).
5. Magazine purchased for tear sheets.
6. Airline tickets.
7. Messenger services.
8. Taxi or car services.
9. Polaroid's.
10. Portfolios and/or New Covers.
11. Model Apartments, including maid service.

**IN WITNESS WHEREOF, I CONFIRM THAT I HAVE READ AND UNDERSTOOD, OR INDEPENDENTLY RECEIVED ASSISTANCE TO UNDERSTAND, THE TERMS AND CONDITIONS OF THIS ADDENDUM. I ACCEPT THESE TERMS BY ENDORSING MY SIGNATURE BELOW.**

Talent Signature: [signature]

Witness: ______________________

Name: JORDAN RICHARDSON

Date: 22 April 05

# ADDENDUM 1.0

Duties of Personal Manager

New add below:

Personal Manager and V Models Compensation

1. If a client does not make payment because the Model has failed to perform as required, but does not include unforeseen evens (natural or manmade) to Model's arrival to client location, and Model only performs such services permitted by any applicable laws, the Model will reimburse (after receiving a copy of the clients billable invoice with written request for payment is received and verified) Personal Manager for the compensation Personal Manager would otherwise have received with respect to the work that should have been performed.

2. Personal Manager shall be responsible for Model compensation payments which must be received within 10 days upon V Models receipt of client payment. All payments to Model shall be mailed within 7-business days receipt of client payment and mailed to address below.

　　　　Address: Jordan- Annettee Jazzmin Richardson
　　　　　　　　105 B Friendly Drive
　　　　　　　　Newport News, Va. 23605-1218

3. Manager and Model hereby agree that Model shall be allowed to devote (4) hours per day to academic activities for no less (5) days a week or (5) days within a 7-day cycle.

4. Manager shall provide on a monthly basis an itemized listing of all moneys paid out by the agency in which the Model is expected to repay.

5. Manger is aware that Model is to be available the Friday before and (7) days after the July 4 holiday for court ordered visitation.

IN WITNESS WHEREOF, I CONFIRM THAT I HAVE READ AND UNDERSTOOD, OR INDEPENDENTLY RECEIVED ASISTANCE TO UNDERSTAND, THE TERMS AND CONDITIONS OF THIS ADDENDUM. I ACCEPT THESE TERMS BY ENDORSING MY SIGNATIVE BELOW.

# EXHIBIT "C"

# VNY MODEL MANAGEMENT, LLC.

## MODEL MANAGEMENT AGREEMENT

AGREEMENT made as of the 19 day of June, 2006, by and between VNY MODEL MANAGEMENT, LLC., 928 Broadway, Suite 801, New York, NY 10010 ("Manager"), and Jordan Richardson Inc ("Model").

**WITNESSETH:**

IN CONSIDERATION of the sum of One Dollar ($1.00), each to the other paid in hand and the mutual covenants and promises herein contained, the parties hereto agree as follows:

1. Model hereby engages the services of Manager as Model's sole and exclusive manager, representative and advisor throughout the world with respect to Model's professional career, talents, services and business affairs in the fashion, modeling and entertainment industries ("Career"). Manager hereby accepts such engagement, and agrees to counsel, confer and advise Model in the guidance of Model's career and activities; to use reasonable efforts to arrange for, exploit and commercialize Model's name, talent and abilities in connection therewith; supervise, negotiate and arrange the terms of any and all offers of employment or contracts for services of any nature whatsoever. Manager agrees to render advice and assistance with respect to the development and improvement of Model's Career and all business interest related thereto.

2. (A) Manager is not and shall not act as an agent for Model.. Model shall promptly refer to Manager all offers, communications or requests for Model's appearances or services.

(B) Manager shall not be required to render services exclusively to Model, and shall, at all times, be free to perform the same or similar services for others, as well as engage in any and all other business activities.

3. The term of this Agreement (the "Term") shall consist of an initial period plus any and all option periods. The initial period of this Agreement shall be two (2) years commencing on the date first above written and ending on June, 2008 (the "Initial Period"). The Term shall be automatically extended for additional periods of two (2) years each (collectively, "Option Periods"), unless Manager notifies Model, in writing, that it wishes to terminate this Agreement at any time before the expiration of the Term. In the event Manager gives Model notice of termination, this Agreement shall terminate thirty (30) days from the date of such notice, unless the notice states otherwise.

Manager's obligation to continue to pay Model its fees hereunder, if any, shall survive termination of this Agreement.

4. (A) As compensation for Manager's services hereunder, Model shall pay Manager sums equal to twenty percent (20%) of all "gross receipts" ("Fee") as hereinafter defined, off the top, from all sources paid or accrued to, or earned or received by Model or on Model's behalf or for Model's benefit, directly or indirectly, during the Term of this Agreement, and thereafter: (i) for any employment, engagement, commitment or contract in existence on the date hereof or negotiated for or entered into during the Term, and any renewal, extension, modification, amendment thereof or addition thereto, including a new agreement for an additional term with the same or related parties; (ii) any employment, engagement, commitment or contract substituted for or replacing, directly or indirectly employments, engagements, commitments or contracts currently in existence or negotiated for or entered into during the Term and any renewal, extension, modification, amendment thereof or addition thereto, including a new agreement for an additional term with the same or related parties; and, (iii) any and all judgments, awards, settlements, payments, damages and proceeds relating to any suits, claims, actions or proceedings arising out of the alleged breach of non-performance by others of any of the contracts, engagements, commitments or other agreements referred to herein. Expiration or termination of this Agreement shall not affect Manager's rights to compensation as herein provided.

(B) Manager's full participation in Model's gross receipts from contracts / agreements entered into or substantially negotiated during the Term hereof shall continue for as long as gross receipts are payable to Model per the terms of said contracts / agreements, and any renewals, extensions, re-negotiations, modifications, or amendments thereof.

(C) The term "gross receipts" as used herein shall be deemed to include all forms of income payments, consideration and compensation including but not limited to advances, earnings, fees, royalties, bonuses and income in kind, regardless of by whom procured, secured or arranged, however, within the scope of Model's Career and professional activities hereunder. The term Model's 'professional activities" shall include without limitation, any use of Model's talents and activities throughout the fashion, modeling and entertainment industries.

(D) Model understands that Manager is entitled to receive from some or all of the clients who may utilize Model's services a service charge, agency fee or other compensation ("Client Fee") over and above the Fee Manager receives from Model, and Model acknowledges that ~~that~~ such compensation is an additional inducement for Manager to act on Model's behalf and an important element in the compensation Manager receives from representing Model. In the event that Model accepts a booking for which his/her fee includes the Client Fee, Model agrees that Manager has the right to deduct such Client Fee from Model's gross compensation paid by the client in addition to Manager's Fee. Manager's Fee and Client Fee extend to any booking or engagement performed by Model subsequent to the termination of this Agreement if such booking or

engagement was negotiated, solicited or accepted by Model prior to such termination or is a continuation or work which began prior to termination, including renewals, options and renegotiated contracts.

5. (A) Gross receipts shall be sent to Manager. Model shall cause all contracts and agreements with third parties concerning Model's professional activities to provide for Model's compensation under those contracts and agreements to be paid directly to Manager. Upon Manager's receipt of gross receipts, Manager shall deduct from such gross receipts: (i) any and all fees, costs, and expenses advanced or incurred by Manager on Model's behalf, including any and all expenses advanced or incurred by Manager on Model's behalf before and after execution of this Agreement; and, (ii) all compensation or consideration due Manager hereunder. Manager shall remit the balance of gross receipts, if any, to Model no later than ten (10) calendar days after receipt of gross receipts by Manager.

(B) In the event that gross receipts are sent to Model, Model shall promptly notify Manager of its receipt of same. In this event, Model shall promptly, and in no event later than five (5) calendar days after receipt thereof send the entire gross receipts proceeds to Manager for allocation and distribution as per Par. 5(A), above.

6. Model shall, notwithstanding anything elsewhere contained herein, reimburse Manager for any and all costs or expenses Manager may incur, or any moneys Manager may advance in connection with Model's Career and professional activities hereunder, including but not limited to photographs, clothing and accessories, any and all equipment, advertising, publicity or promotion costs, long-distance telephone calls, travel and transportation expenses, administration, auditing fees, and any and all other costs incurred by Manager, from any and all monies earned by Model hereunder, and, if no monies are earned by Model hereunder or monies earned are insufficient to cover Manager's expenses. Model shall nevertheless reimburse Manager within six (6) months of Manager's incurring any particular expense. Manager may, but shall not be obligated to, commence legal proceedings to collect amounts due to Model from clients, but if Manager does, Model shall bear the expenses associated with such proceedings.

7. Model grants to Manager during the Term the nonexclusive right to use and publish and to permit others to use and publish Model's professional name, likeness and biographical material concerning Model, for advertising and purposes of trade and otherwise without limitation in connection with the furtherance of Model's Career and professional activities. Manager shall have the right to advertise the fact that Manager represents Model in connection with Model's activities hereunder. Manager shall have the right, within Manager's sole discretion, to publish Model's name, likeness, image, biographical information and statistics on its website for as long as Model is represented by Manager.

8. (A) Model warrants and represents that Model: (i) has the full right, power and authority to enter into this agreement and to grant to Manager the rights granted herein; (ii) is under no obligation or disability or prohibition which will or might prevent Model

from keeping or performing Model's covenants, promises, representations and warranties contained herein; (iii) will not, during the Term, enter into any agreement or commitment which shall or might in any manner interfere with or prevent Model's carrying out the terms and conditions of this Agreement; and, (iv) will not, during the Term, engage any other person, firm or corporation to act as Model's personal manager or in any similar capacity.

(B) Model shall indemnify and hold Manager harmless from any loss, liability or damage (including reasonable attorney's fees) arising out of or connected with any claim by a third party which is inconsistent with any of the warranties, representations, covenants or promises made by Model hereunder. Model will reimburse Manager on demand for any payment made by Manager at any time in respect of any liability or claim to which the foregoing indemnity relates.

9. Model hereby authorizes and appoints Manager to be Model's agent and attorney-in-fact for the purpose of (a) negotiating, renegotiating, contracting and executing for Model and in Model's name and on Model's behalf and any and all agreements, documents, and instruments providing for Model's services to clients pursuant hereto; (b) approving and permitting the use of Model's name, image, voice, caricatures and the like for the purposes of advertising and publicity; (c) collecting and receiving sums payable to Model, endorsing Model's name upon and depositing in Manager's account all checks payable to Model, and retaining therefrom all sums owing to Manager; and, (d) demanding, suing for and collecting, all claims, money, interest and other items that may be due Model or belong to Model.

10. Manager shall have the right to assign this Agreement and any of Manager's rights hereunder without limitation. Manager shall have the right to delegate the performance of Manager's obligations hereunder without limitation. Model shall not have the right to assign this Agreement or delegate any of Model's obligations hereunder.

11. Manager shall not be liable for any breach of contract or act or omission on the part of anyone with whom any engagement or contract is negotiated, arranged or secured.

12. No breach or failure to perform any terms of this Agreement by either Manager or Model which would otherwise be a material breach of this Agreement, shall be considered a material breach of this Agreement, unless the party alleged to be in breach does not cure the same within a further period of thirty (30) days after receipt of written notice from the alleging party.

13. Manager shall have the right, at Manager's election, to suspend the operation of this Agreement if for any reason whatsoever Model is unable or unwilling to render services in the entertainment industries. Such suspension shall commence upon written notice to Model and shall last for the duration of any such unavailability or unwillingness to render services. At Manager's election, a period of time equal to the duration of such suspension shall be added to Term. In addition, if Model fails to render services in the



entertainment industries as aforesaid, then Manager may, in addition to other remedies provided for herein, terminate this contract upon written notice to Model. Notwithstanding anything to the contrary contained herein, Model shall be responsible for reimbursing Manager for any and all costs and expenses incurred by Manager in connection with Model's Career and professional activities within ten (10) calendar days of the date of termination. In the event that Model fails to so reimburse Manager, Manager shall have the right to avail itself of any all relief, including damages, injunction and equity, available to it under the law.

14. Any notice hereunder shall be sent to Model at the address above specified or any other address of which Model gives Manager notice. Any notices hereunder shall be sent to Manager at the address above specified or any other address of which Manager gives Model notice, with a copy to Natalia Nastaskin, Esq., 250 West 57th Street, Suite 917, New York, New York 10107. All notices shall be delivered personally, by mail, e-mail, facsimile or telegraph. The date of personal delivery, mailing receipt date, e-mail date, facsimile date or delivery to a telegraph office shall be the effective date of the notice.

15. This Agreement does not constitute or acknowledge any partnership or joint venture between the parties. Model understands and agrees that he / she is an independent contractor and not an employee of Manager, and, as such, shall be responsible for paying his/her own taxes from any and all monies earned hereunder.

16. This Agreement represents the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement or any provision thereof, shall be binding unless in writing signed by Model and Manager. No waiver of any provision or default under this Agreement shall affect Manager's rights thereafter to enforce such provisions or to exercise any right or remedy in the event of any other default, whether or not similar. This Agreement shall be construed in accordance with the laws of the State of New York, applicable to contracts entered into and wholly performed therein. If any provision of this Agreement violates or conflicts with any law, governmental rule or regulation or judicial decree, including any requirements for judicial approval, to the extent required, of all or any part of this Agreement, such provision or provisions shall be deemed amended to the minimum extent necessary to effect compliance with such law, rule, regulation or decree and as so amended shall remain in full force and effect.

17. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, administrators, executors, successors and assigns.

18. MODEL REPRESENTS AND WARRANTS THAT MODEL HAS BEEN ADVISED OF MODEL'S RIGHT TO SEEK LEGAL COUNSEL OF MODEL'S OWN CHOOSING IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS CONTRACT.

19. IF MODEL IS EIGHTEEN (18) YEARS OF AGE OR OVER, MODEL MAY SIGN THIS AGREEMENT ON HIS/HER OWN BEHALF, AND BY SO DOING MODEL

EXPRESSLY REPRESENTS AND WARRANTS THAT MODEL HAS REACHED 18 YEARS OF AGE. IF MODEL HAS NOT YET REACHED 18 YEARS OF AGE, HIS/HER PARENT(S) OR LEGAL GUARDIAN(S) MUST READ THIS AGREEMENT AND SIGN WHERE INDICATED BELOW. IN ADDITION, MODEL AND HIS/HER PARENT(S) OR LEGAL GUARDIAN(S) ACKNOWLEDGE THAT IT IS MODEL'S AND THEIR RESPONSIBILITY TO OBTAIN ALL NECESSARY GOVERNMENTAL CONSENTS, PERMITS AND APPROVALS REQUIRED BY STATE AND FEDERAL LAWS AND REGULATIONS FOR THE PERFORMANCE OF SERVICES HEREUDNER BY MINORS, INCLUDING WITHOUT LIMITATION WORK PERMITS VISAS, AND COURT APPROVALS WHERE NECESSARY. AT MODEL'S REQUEST MANAGER WILL GUIDE AND COUNSEL MODEL WITH RESPECT TO OBTAINING SUCH CONSENTS, PERMITS, VISAS AND APPROVALS, AND MODEL AGREES TO SIGN ALL DOCUMENTS REQUIRED IN CONNECTION THEREWITH. MODEL ACKNOWLEDGES THAT UPON HIS/HER REACHING 18 YEARS OF AGE THIS AGREEMENT WILL CONTINUE IN FULL FORCE AND EFFECT THROUGHOUT ITS TERM AND ANY RENEWALS THEREOF, AND MODEL'S CONTINUED ACCEPTANCE OF ASSIGNMENTS FROM MANAGER SHALL CONSTITUTE RATIFICATION OF ALL OF THE TERMS AND CONDITIONS HEREOF.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

* homework 3 hr per day minimum with
* home time notification prior
* Jordan Richardson or representative has the right to cancel the contract with A written notice 30 days prior to the expiration of the contract

**MANAGER:**
**VNY MODEL MANAGEMENT, LLC.**

BY: ______________________
Lana Winters

TITLE: President

**AGREED AND ACCEPTED:**
**MODEL:**

______________________

Jordan-Annette J Richardson
Print Name

______________________

Model's Soc. Sec. #: 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

**AGREED AND ACCEPTED:**
**MODEL'S PARENT / LEGAL GUARDIAN**

______________________

Lisa-Althea St Aubin Hartosh
Print Name

Mum
Capacity in which signed

Office DEPOT
*Taking Care of Business*

## Fax Transmission

*PLEASE PRINT*

TO: Lana

FROM: Liza

FAX NUMBER: 212 206 3655

SENDER'S PHONE #:

DATE: 2: 17 July 2006

# OF PAGES: (Including Cover)

CUSTOMER NOTES: Jordan's Contract going back to Lawyer

If you have any difficulties with this transmission, please contact the sender at the phone number listed above.

### OFFICE DEPOT'S TERMS OF USE

SENDER AGREES NOT TO USE THIS FAX TO: (I) TRANSMIT MATERIAL WHOSE TRANSMISSION IS UNLAWFUL, HARASSING, LIBELOUS, ABUSIVE, THREATENING, HARMFUL, VULGAR, OBSCENE, PORNOGRAPHIC OR OTHERWISE OBJECTIONABLE; (II) CREATE A FALSE IDENTITY, OR OTHERWISE ATTEMPT TO MISLEAD OTHERS AS TO THE IDENTITY OF THE SENDER OR THE ORIGIN OF THIS FAX; (III) POST OR TRANSMIT ANY MATERIAL THAT MAY INFRINGE THE COPYRIGHT, TRADE SECRET, OR OTHER RIGHTS OF ANY THIRD PARTY; (IV) VIOLATE ANY FEDERAL, STATE OR LOCAL LAW IN THE LOCATION, OR (V) CONDUCT ACTIVITIES RELATED TO GAMBLING, SWEEPSTAKES, RAFFLES, LOTTERIES, CONTESTS, PONZI SCHEMES OR THE LIKE.

PLEASE NOTE THAT OFFICE DEPOT DOES NOT REVIEW THE CONTENTS OF ANY FAX SENT USING ITS SERVICES. FURTHER, BY SIGNING BELOW THE SENDER OF THIS FAX HEREBY AGREES TO INDEMNIFY OFFICE DEPOT TO THE FULLEST EXTENT OF THE LAW AND FOR ANY AND ALL CLAIMS, SUITS, OR DAMAGES ARISING OUT OR IN CONNECTION WITH THE REQUEST TO SEND, OR SENDING THIS FAX.

X ______________________
(CUSTOMER'S SIGNATURE)

### VISIT OFFICE DEPOT FOR YOUR:

- Color Copies- High Volume Copies
- Digital color, and Black & White copies
- Business Cards, Letterhead and Envelopes
- Custom Pre-Inked Stamps
- Customs Signs and Banners
- UPS Shipping Service
- Passport Photos
- Ad Specialties

**Store Information**

Office Depot #384
*Steve Prentiss, Store Manager*
*Pat Brown, DPS Site Manager*
1082 W Mercury Blvd
Hampton, Virginia 23666
757-838-7610
**Fax: 757-838-8025**

Thank you for using Office Depot's Customer FAX Service

# EXHIBIT "D"

# See Past

## See past of Jordan RICHARDSON on JOBs

Jobs past:

From 04/15/05 to 04/15/05 with JOSEPH PARADISO: TEST
From 04/27/05 to 04/27/05 with TARGET STORES, PPS: job #685944
From 05/04/05 to 05/07/05 with TEEN VOGUE: orlando
From 05/27/05 to 05/27/05 with KOHLS DEPT STORE: junior - half day
From 06/06/05 to 06/10/05 with ALLOY: CATALOG IN WILMINGTON
From 06/18/05 to 06/20/05 with YOUNG MAGAZINE GERMANY: EDIT
From 06/26/05 to 06/28/05 with PLATNUM PRODUCTIONS: GOODIES COMMERCIAL
From 06/29/05 to 06/29/05 with TEEN VOGUE: beauty
From 07/03/05 to 06/28/05 with PLATNUM PRODUCTIONS: GOODIES COMERCIAL
From 07/20/05 to 07/20/05 with TOMMY HILFIGER WEB: Unrecongnizable/Online
From 07/21/05 to 07/21/05 with TOMMY HILFIGER WEB:
From 07/27/05 to 07/27/05 with DAVID MILOSEVICH: TARGET SHOW
From 07/28/05 to 07/28/05 with JANE MAGAZINE: EDIT 10 GIRLS
From 07/31/05 to 07/31/05 with ABERCROMBIE && FITCH: abercrombie/holister
From 08/01/05 to 08/03/05 with ABERCROMBIE && FITCH:
From 08/04/05 to 08/04/05 with TEEN VOGUE: SAMSUNG ADV
From 08/10/05 to 08/10/05 with DEVELOPMENT: bloomingdales
From 08/11/05 to 08/11/05 with DEVELOPMENT:
From 08/12/05 to 08/12/05 with MAREK AND RADEK: test
From 08/18/05 to 08/18/05 with AMERICAN EAGLE /NY OFFICE: SHOW
From 09/09/05 to 09/09/05 with TOMMY HILFIGER: SHOW AT 8PM
From 09/10/05 to 09/10/05 with BABY PHAT:
From 09/11/05 to 09/11/05 with CAT SWANSON: show at 11
From 09/12/05 to 09/13/05 with JD CASTING: OLD NAVY / JOB # OLD-HOL-C55168
From 09/12/05 to 09/12/05 with TOMMY HILFIGER: web
From 09/16/05 to 09/16/05 with NORDSTROM: web
From 09/21/05 to 09/22/05 with JENNIFER VENDETTI: benetton
From 09/26/05 to 09/27/05 with JC PENNY'S: JOB # ROXANNE LOWIT PROM
From 10/04/05 to 10/04/05 with SEVENTEEN: Main Beauty ( February Issue )
From 10/08/05 to 10/08/05 with ROCKIT NEW YORK: David's Bridal Prom
From 10/11/05 to 10/11/05 with SEVENTEEN: Main Fashion Story
From 10/17/05 to 10/22/05 with CREATIVE EXCHANGE AGENCY: american eagle 2006 CAMPAIGN
From 10/24/05 to 10/24/05 with DAVID S BRIDAL: WEBSITE
From 10/27/05 to 10/27/05 with JC PENNY'S: prom jpcco p6800
From 10/29/05 to 10/29/05 with JENNIFER VENDETTI: nylon/redhook ny
From 11/02/05 to 11/02/05 with JC PENNY'S: Job Reference AOR # 269401 - in store posters 4 months
From 11/04/05 to 11/04/05 with DAVIDS BRIDAL:
From 11/05/05 to 11/05/05 with DAVIDS BRIDAL: Reshoot
From 11/07/05 to 11/08/05 with SEVENTEEN: March Fashion
From 11/16/05 to 11/16/05 with GLAMOUR MAGAZINE: 8 pag sigles 2 girls main fashion-beauty
From 11/17/05 to 11/17/05 with AMERICAN EAGLE /NY OFFICE: Press Kit Shoot
From 11/17/05 to 11/17/05 with AMERICAN EAGLE /NY OFFICE: show
From 11/19/05 to 11/19/05 with TEEN VOGUE: beauty
From 11/22/05 to 11/22/05 with TEEN VOGUE: Beauty "pink"
From 11/30/05 to 12/01/05 with VIBE: 14 Pages Fashion March Issue
From 12/05/05 to 12/05/05 with DDB CHICAGO INC: ARIZONA SWIM (JC PENNEY) IN LA job # P68014
From 12/06/05 to 12/06/05 with DEUTSCH INC.: job # OLD HOL C55168 , old navy instore posters jan+feb '06 san fran+ ny - job of sept 12-13 '05
From 12/14/05 to 12/14/05 with JC PENNY'S: AOR 266756 WEEK 3B - preprint brochure 1time in mag - job in dallas
From 12/15/05 to 12/16/05 with TEEN VOGUE: Fashion Story
From 12/18/05 to 12/21/05 with BARRINGTON CASTING: Target Campaign (Miami)
From 01/09/06 to 01/09/06 with AMERICAN EAGLE/PITTSBURG OFFICE: pittsburg
From 01/10/06 to 01/10/06 with SETH SABAL STUDIO:
From 01/20/06 to 01/20/06 with SEARS:
From 01/21/06 to 01/21/06 with SEVENTEEN: Fashion/Beauty
From 01/26/06 to 01/26/06 with AGA: avon
From 01/31/06 to 01/31/06 with AMERICAN EAGLE /NY OFFICE:
From 02/01/06 to 02/01/06 with DELIA'S: 0605trzaska
From 02/02/06 to 02/02/06 with DELIA'S: 0605trzaska

From 02/04/06 to 02/04/06 with ANAIT BIAN: SHOW AT 6PM
From 02/05/06 to 02/05/06 with CHARLOTTE RONSON: pres 8.30-10PM
From 02/05/06 to 02/05/06 with KEANAN DUFFTY:
From 02/07/06 to 02/07/06 with ABERCROMBIE && FITCH: 2 HOURS LA STORE
From 02/09/06 to 02/09/06 with BECKERMAN:
From 02/10/06 to 02/10/06 with LINDA LOUDERMILK: Linda Loudermilk
From 02/10/06 to 02/10/06 with PROJECT RUNWAY:
From 02/11/06 to 02/11/06 with LINDA LOUDERMILK: Lind Loudermilk Look Book
From 02/11/06 to 02/10/06 with TOTAL MANAGEMENT: Nike /katie 917-346-5947
From 02/11/06 to 02/11/06 with DANIEL PEDDLE: NIKE / KATE 917-346-5947
From 02/16/06 to 02/16/06 with UNITED COLORS COMMUNICATIONS SA: BENETTON S/S 2006 USAGE
From 02/21/06 to 02/21/06 with TOMMY HILFIGER WEB:
From 02/23/06 to 02/23/06 with ART AND COMMERCE: italian vogue 1 guy-7 girls
From 02/24/06 to 02/24/06 with AMBROSI CHICAGO: SEARS , PO #26462
From 03/15/06 to 03/16/06 with JC PENNY'S: INSTORE GRAPHIC , JOB IN MIAMI , PO# 269404 Summer 3 GFX
From 03/20/06 to 03/20/06 with JC PENNY'S: preprint in dallas , AOR#270627
From 03/21/06 to 03/21/06 with JC PENNY'S: prerint in dallas , AOR#266718
From 03/22/06 to 03/22/06 with JC PENNY'S: preprint in dallas , AOR#266717
From 03/27/06 to 03/27/06 with SURFACE MAGAZINE: 10 Pages
From 04/01/06 to 04/01/06 with DAVIDS BRIDAL:
From 04/03/06 to 04/03/06 with TRACE MAGAZINE: Black Girls Rule Issue
From 04/06/06 to 04/06/06 with SEVENTEEN:
From 04/12/06 to 04/12/06 with GLAMOUR MAGAZINE: beauty 2 girls , all singles
From 04/18/06 to 04/18/06 with MACYS FLORIDA:
From 04/20/06 to 04/20/06 with COSMO GIRL:
From 04/26/06 to 04/26/06 with L OREAL: L'OREAL VIVE HAIR CARE , job number A06CV017
From 05/09/06 to 05/09/06 with MACYS FLORIDA:
From 05/16/06 to 05/16/06 with JC PENNY'S: AOR 270689
From 05/18/06 to 05/19/06 with MACYS FLORIDA:
From 05/20/06 to 05/25/06 with MC CANN ERICKSON: L'OREAL USA COMMERCIAL/ VIVE SHAMPOO BRANDS
From 05/31/06 to 05/31/06 with JC PENNY'S: WEEK 27B , AOR 266782
From 06/01/06 to 06/02/06 with AMERICAN EAGLE/PITTSBURG OFFICE: aerie lingerie line
From 06/05/06 to 06/06/06 with BARRINGTON CASTING: Job Reference: IR Target Women 0606-2
From 06/19/06 to 06/19/06 with JC PENNY'S: in dallas , WEEK 29A , AOR# 266729
From 06/20/06 to 06/20/06 with JC PENNY'S: IN DALLAS , WEEK 30M AOR# 266786
From 06/21/06 to 06/21/06 with JC PENNY'S: IN DALLAS , WEEK 30A AOR# 266730
From 06/27/06 to 06/27/06 with JC PENNY'S: AOR 266731 week 31A / AOR 266789 week 31B
From 07/24/06 to 07/24/06 with JC PENNY'S: AOR:269407 Job# 269407 Holiday GFX
From 07/29/06 to 07/29/06 with NORDSTROM:
From 07/31/06 to 07/31/06 with JC PENNY'S: AOR:266793 Wk:35B
From 08/04/06 to 08/04/06 with KEVIN SINCLAIRE:
From 08/04/06 to 08/04/06 with MARC BAPTISTE STUDIO: Portrait Story Clam Magazine Paris
From 08/08/06 to 08/08/06 with NORDSTROM: Website
From 08/14/06 to 08/14/06 with JC PENNY'S: week 37b aor 266795
From 08/25/06 to 08/25/06 with JC PENNY'S: AOR #266740 WEEK 40A / AOR #266799 WEEK 40B
From 08/28/06 to 08/28/06 with DELIA S: Job Ref:0614
From 08/29/06 to 08/29/06 with MACY'S WEST: P.O. #13597
From 08/30/06 to 08/31/06 with H&&M HENNES & MAURITZ AB: CATALOG
From 09/06/06 to 09/06/06 with MACY'S WEST: Impulse Mailer: 062-2697
From 09/07/06 to 09/07/06 with TRACY REESE: dailey news with tracy reese
From 09/08/06 to 09/08/06 with VERRIER: SHOW AT 4PM
From 09/08/06 to 09/08/06 with CHRIS AIRE: Show
From 09/08/06 to 09/08/06 with REYES: PRESENTATION
From 09/09/06 to 09/09/06 with ESTABLISHMENT CASTING: cancellation fee/GAP Body Spring 2007 Print Campaign
From 09/09/06 to 09/09/06 with ACADEMY OF ART:
From 09/10/06 to 09/10/06 with ESTABLISHMENT CASTING: gap body/ 6 months/hamptons/GAP Body Spring 2007 Print Campaign
From 09/11/06 to 09/11/06 with RACHEL COMEY: 3pm
From 09/12/06 to 09/12/06 with ARAKS: araks show
From 09/13/06 to 09/13/06 with BBH: LEVIS PRINT/POS SPRING 2007/PO#3057
From 09/13/06 to 09/13/06 with YEOHLEE: SHOW AT 4PM
From 09/15/06 to 09/15/06 with MANUEL: SHOW AT 1PM
From 09/15/06 to 09/15/06 with LISA THON: Show
From 09/15/06 to 09/15/06 with MAL SIRRAH: Show
From 09/18/06 to 09/18/06 with JC PENNY'S: AOR #266742 , WEEK 42A
From 09/19/06 to 09/19/06 with JC PENNY'S: WEEK 43B AOR #266637
From 09/20/06 to 09/20/06 with JC PENNY'S: WEEK 44B AOR #266640 + WEEK 43A AOR #266743
From 09/21/06 to 09/21/06 with DELIA S: Delia's Holiday 2006
From 09/26/06 to 09/26/06 with JC PENNY'S: WEEK 44A , AOR #266744
From 09/27/06 to 09/27/06 with JC PENNY'S: WEEK 44M , AOR #266639 + WEEK 44A.10 , AOR #266744

From 10/02/06 to 10/02/06 with JC PENNY'S: WEEK 45B AOR# 266642
From 10/03/06 to 10/03/06 with NORDSTROM: JOB# B716A
From 10/04/06 to 10/04/06 with ABERCROMBIE && FITCH: Mark Beard London sitting
From 10/06/06 to 10/06/06 with JC PENNY'S: AOR #266745 , WEEK 45A
From 10/09/06 to 10/21/06 with HOUSE PRODUCTIONS: AE+AERIE CAMPAIGNS SPRING '07 , 3 MONTHS FROM DEC 24 '06 TO APRIL 15 '07 / 8 WOF
From 10/24/06 to 10/24/06 with JC PENNY'S: SWIM GRAPHICS / AOR# 269414
From 10/25/06 to 10/25/06 with JC PENNY'S: w48a po 266748 / 266647 w48b
From 11/01/06 to 11/01/06 with JC PENNY'S: WEEK 49B AOR# 266648 + WEEK 50A AOR# 266750
From 11/02/06 to 11/02/06 with JC PENNY'S: WEEK 50 B / AOR # 266676
From 11/03/06 to 11/03/06 with ESSENCE MAGAZINE: Beauty Feb Issue 6/8 pages
From 11/10/06 to 11/13/06 with VIBE: 10 pages Fashion Feb Issue
From 11/14/06 to 11/14/06 with JC PENNY'S: WEEK 51A AOR #266751 + WEEK 51B AOR #266677
From 11/15/06 to 11/15/06 with JC PENNY'S: WEEK 52B - AOR 266678
From 11/26/06 to 11/26/06 with NORDSTROM: Job # B710a
From 11/30/06 to 11/30/06 with SAATCHI AND SAATCHI: jc penney/ miami / spring 2007JOb #402 JCP JCP6012
From 12/02/06 to 12/02/06 with CHRISTINE SUAREZ: BEAUTY COLURES MAG 10 pages
From 12/04/06 to 12/04/06 with JC PENNY'S: week 1B/ aor 266203--- week 1A/ aor 266201
From 12/05/06 to 12/05/06 with H&&M HENNES & MAURITZ AB: miami
From 12/12/06 to 12/12/06 with MACY'S WEST: in ny 1 day
From 12/14/06 to 12/14/06 with JC PENNY'S: AOR 266204, WEEK 2A + AOR 266207, WEEK 3B
From 12/15/06 to 12/15/06 with DELIA'S: Job Ref:0704
From 12/22/06 to 12/22/06 with MACY'S WEST: Impulse Reshoot Ad Codes 071-0291
From 01/08/07 to 01/08/07 with LANCE CHESHIRE PHOTOGRAPHY: test
From 01/09/07 to 01/09/07 with JC PENNY'S: JOB/PO#: NET 1/09-Christy
From 01/19/07 to 01/19/07 with SEVENTEEN: Beauty
From 01/25/07 to 01/25/07 with DELIA'S: PO # 0704
From 01/28/07 to 01/28/07 with H&&M HENNES & MAURITZ AB: catalog/miami
From 02/03/07 to 02/03/07 with VENEXIANA: Reference Fall 07 Show
From 02/05/07 to 02/05/07 with GEMMA KAHNG: SHOW AT 7PM
From 02/22/07 to 02/22/07 with NORDSTROM: Web
From 02/23/07 to 02/23/07 with MACY'S WEST: PO: 12101
From 03/01/07 to 03/01/07 with DELIA'S: Delia's Summer 07 Reaction Shoot/ Job Ref.:0706
From 03/02/07 to 03/02/07 with BBH: levis campaign/ PO# 3859
From 03/07/07 to 03/07/07 with BARRINGTON CASTING: Levi's/ FA 07 Brand Imagery shoot/ PO# 3879
From 03/08/07 to 03/11/07 with H&&M HENNES & MAURITZ AB: arizona
From 03/22/07 to 03/22/07 with NORDSTROM: IN NY/ half day JOB# B852a
From 04/19/07 to 04/19/07 with JENNIFER VENDETTI: levis reshoot

# EXHIBIT "E"

TRANSMISSION VERIFICATION REPORT

TIME : 07/17/2006 15:31
NAME : OFFICE DEPOT
FAX : 7578388025
TEL : 7578387160
SER.# : BROF5J293004

| | |
|---|---|
| DATE,TIME | 07/17 15:31 |
| FAX NO./NAME | 12122063655 |
| DURATION | 00:00:46 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD ECM |

**Office DEPOT**
*Taking Care of Business*

## Fax Transmission

***PLEASE PRINT***

**TO:** Lana

**FROM:** LZA

**FAX NUMBER:** 212 206 3655

**SENDER'S PHONE #:** ______

**DATE:** 2'

**# OF PAGES:** ______ *(Including Cover)*

**CUSTOMER NOTES:** ______

If you have any difficulties with this transmission, please contact the sender at the phone number listed above.

**OFFICE DEPOT'S TERMS OF USE**

SENDER AGREES NOT TO USE THIS FAX TO: (I) TRANSMIT MATERIAL WHOSE TRANSMISSION IS UNLAWFUL, HARASSING, LIBELOUS, ABUSIVE, THREATENING, HARMFUL, VULGAR, OBSCENE, PORNOGRAPHIC OR OTHERWISE OBJECTIONABLE; (II) CREATE A FALSE IDENTITY, OR OTHERWISE ATTEMPT TO MISLEAD OTHERS AS TO THE IDENTITY OF THE SENDER OR THE ORIGIN OF THIS FAX; (III) POST OR TRANSMIT ANY MATERIAL THAT MAY INFRINGE THE COPYRIGHT, TRADE SECRET, OR OTHER RIGHTS OF ANY THIRD PARTY; (IV) VIOLATE ANY FEDERAL, STATE OR LOCAL LAW IN THE LOCATION, OR (V) CONDUCT ACTIVITIES RELATED TO GAMBLING, SWEEPSTAKES, RAFFLES, LOTTERIES, CONTESTS, PONZI SCHEMES OR THE LIKE.

"E"

# EXHIBIT "F"

to be sitting outside the judicial department of his residence. The short answer to this argument is that our Constitution specifically provides that once a Justice is properly assigned in accordance with subdivision g of section 26, as Justice Roberts was, he acquires all of "the powers, duties and jurisdiction of a judge or justice of the court to which assigned." (Art. VI, § 26, subd. k.) Since Special Narcotics Court Judges have, as we interpret CPL 700.05 (subd. 4) in light of article 5-B of the Judiciary Law, been given city-wide jurisdiction to authorize the interception of drug-related conversations, Justice Roberts' assignment fully complied with both subdivisions g and k of section 26 of article VI of the New York Constitution.

Accordingly, the orders of the Appellate Division should be affirmed.

COOKE, C.J., and JONES, WACHTLER, FUCHSBERG, MEYER and SIMONS, JJ., concur.

In each case: Order affirmed.

448 N.E.2d 108

58 N.Y.2d 338

⊥338 ⊥Brooke SHIELDS, Respondent-Appellant,

v.

Garry GROSS, Appellant-Respondent.

Court of Appeals of New York.

March 29, 1983.

Infant model brought action against photographer seeking damages and injunctive relief to prevent the photographer from using photographs taken when the model was ten years old. The Supreme Court, Trial Term, New York County, Edward J. Greenfield, J., denied the application for a permanent injunction except to the extent of enjoining the photographer from licensing or permitting the licensing of photographs for use in pornographic publications. Appeal was taken. The Supreme Court, Appellate Division, First Judicial Department, 88 A.D.2d 846, 451 N.Y.S.2d 419, modified the judgment and granted the model a permanent injunction enjoining the photographer from using the pictures for purposes of advertising or trade. Cross-appeals were taken. The Court of Appeals, Simons, J., held that: (1) the model could not maintain an action against the photographer where the model's mother had effectively consented, and (2) the section requiring prior court approval of infants' contracts did not apply to the model.

Order modified and, as modified, affirmed.

Jasen, J., dissented with an opinion in which Fuchsberg and Meyer, JJ., concurred.

**1. Torts ⇐8.5(8)**

Section creating civil cause of action for use of person's name, portrait or picture for advertising purposes without prior written consent acts to restrict advertiser's prior unrestrained common-law right to use another's photograph until written consent is obtained; once written consent is obtained, photograph may be published as permitted by its terms. McKinney's Civil Rights Law § 51.

**2. Infants ⇐47**

Where statute expressly permits certain class of agreements to be made by infants, that settles the question and makes agreement valid and enforceable.

**3. Torts ⇐8.5(8)**

Under section creating civil cause of action for use of person's name, portrait or picture for advertising purposes without prior written consent, parent's consent was binding on infant model and no words prohibiting disaffirmance were necessary to effectuate legislative intent. McKinney's Civil Rights Law § 51.

**4. Infants ⇐49**

General Obligations Law section requiring prior court approval of infants' contracts applies only to performing artists,

such as actors, mu fessional athletes. ligations Law § 3

**5. Infants ⇐49**

General Oblig quiring trial court tracts did not appl ney's General Ol

**6. Infants ⇐49**

Procedures fo infants' contracts s gations Law, while necessary for perfo sional athletes, a model who, wheth sporadically, works sometimes for m phers. McKinney Law § 3-105.

**7. Torts ⇐8.5(8)**

Parent who w and exposure of h the use authorized fendant's immunity of privacy is no br cuted to him. McK § 51.

⊥339 ⊥A. Richard Golub New York City, f

⊥340 ⊥Sandor Frankel a York City, for resp

⊥341 ⊥OPINION (

SIMONS, Judge.

The issue on thi infant model may stricted consent ex her parent and mai

* The consents provid "I hereby give t representatives, an the photographer i with his permission, and permission to c and/or publish, an pictures or portraits be distorted in char tion with my own



aintiff's subse-

s appeals. De-
ent of the trial
requests, in the
f the Appellate
ing the limita-
purposes of ad-
he order of the
e affirmed or,
a new trial be
te Division ac-
dings that the
restricted as to
ted with only a
rning the legal
rent's consents.
ommon law did
ion for invasion
ew *York Times*
Y.S.2d 941, 434
*Rochester Fold-*
4 N.E. 442). In
o the *Roberson*
cted sections 50
aw. Section 50
lemeanor to use
trait or picture
without prior
51 is remedial
use of action on
ermitting relief
ee *Arrington v.*
55 N.Y.2d at p.
4 N.E.2d 1319;
N.Y.2d 276, 280,
d 853). Section
the prior "writ-
the civil action
d", referring to
n turn, provides
corporation that
ses, or for the
me, portrait or
*without having*
*consent of such*
*or her parent or*
*demeanor*" (em-

*oberson,* the in-
f action against

the advertiser under the common law for using her pictures, the new statute gives a cause of action to those similarly situated unless they have executed a consent or release in writing to the advertiser before use of the photographs. The statute acts to restrict an advertiser's prior unrestrained common-law right to use another's photograph until written consent is obtained. Once written consent is obtained, however, the photograph may be published as permitted by its terms (see *Welch v. Mr. Christmas,* 57 N.Y.2d 143, 454 N.Y.S.2d 971, 440 N.E.2d 1317).

[2, 3] Concededly, at common law an infant could disaffirm his written consent (see *Joseph v. Schatzkin,* 259 N.Y. 241, 181 N.E. 464; *Casey v. Kastel,* 237 N.Y. 305, 142 N.E. 671) or, for that matter, a consent executed by another on his or her behalf (see *Lee v. Silver,* 262 App.Div. 149, 28 N.Y.S.2d 333, affd. 287 N.Y. 575, 38 N.E.2d 233; *Goldfinger v. Doherty,* 153 Misc. 826, 276 N.Y.S. 289, affd. 244 App.Div. 779, 280 N.Y.S. 778; *Aborn v. Janis,* 62 Misc. 95, 113 N.Y.S. 309, affd. 122 App.Div. 893, 106 N.Y.S. 1115). Notwithstanding these rules, it is clear that the Legislature may abrogate an infant's common-law right to disaffirm (see, e.g., General Obligations Law, § 3-101, subd. 3; § 3-102, subd. 1; § 3-103; Education Law, § 281; Insurance Law, § 145) or, conversely, it may confer upon infants the right to make binding contracts (see *Matter of T.W.C.,* 38 N.Y.2d 128, 130, 379 N.Y.S.2d 1, 341 N.E.2d 526 [Domestic Relations Law, § 115-b]; *Hamm v. Prudential Ins. Co. of Amer.,* 137 App.Div. 504, 122 N.Y.S. 35 [Insurance Law, § 145, formerly § 55]; *Matter of Presler,* 171 Misc. 559, 13 N.Y.S.2d 49). Where a statute expressly permits a certain class of agreements to be made by infants, that settles the question and makes the agreement valid and enforceable. That is precisely what happened here. The Legislature, by adopting section 51, created a new cause of action and it provided in the statute itself the method for obtaining an infant's consent to avoid liability. Construing the statute strictly, as we must since it is in derogation of the common law (see McKinney's Cons. Laws of N.Y., Book 1, Statutes, § 301, subd. b), the parent's consent is binding on the infant and no words prohibiting disaffirmance are necessary to effectuate the legislative intent. Inasmuch as the consents in this case complied with the statutory requirements, they were valid and may not be disaffirmed (see *Matter of T.W.C., supra*).

[4, 5] Nor do we believe that the consents may be considered void because the parties failed to comply with the provisions of section 3-105 of the General Obligations Law requiring prior court approval of infants' contracts. By its terms, section 3-105 applies only to performing artists, such as actors, musicians, dancers and professional athletes moreover, it is apparent by comparing other statutes with it that the Legislature knowingly has differentiated between child performers and child models. Thus, section 3229 (formerly § 3216-c) of the Education Law, which applies to "Child performers", is referred to in section 3-105 (subd. 2, par. a) of the General Obligations Law but section 3230 of the Education Law, which applies to child models, is not. Child models are also recognized as a separate work classification in section 172 (subd. 2, par. f) of the Labor Law. Furthermore, section 3-105 was not designed to expand the rights of infants to disaffirm their contracts, as the concurring Justice at the Appellate Division would apply it, but to provide assurance to those required to deal with infants that the infants would not later disaffirm executory contracts to the adult contracting party's disadvantage (see *Matter of Prinze [Jonas],* 38 N.Y.2d 570, 575, 381 N.Y.S.2d 824, 345 N.E.2d 295). Sections 50 and 51 as we interpret them serve the same purpose, to bring certainty to an important industry which necessarily uses minors for its work. This same need for certainty was the impetus behind not only section 3-105 but the various other sections of the General Obligations Law which prohibit disaffirmance of an infant's contract.

**[6]** Realistically, the procedures of prior court approval set forth in section 3–105, while entirely appropriate and necessary for performing artists and professional athletes, are impractical for a child model who, whether employed regularly or sporadically, works from session to session, sometimes for many different photographers. Moreover, they work for fees which are relatively modest when compared to those received by actors or professional athletes who may be employed by one employer at considerably greater remuneration for a statutorily permissible three-year term. Indeed, the fee in this case was $450, hardly sufficient to warrant the elaborate court proceedings required by section 3–105 or to necessitate a court's determination of what part should be set aside and preserved for the infant's future needs. Nor do we think court approval necessary under the circumstances existing in the normal child model's career. Given the nature of the employment, it is entirely reasonable for the Legislature to substitute the parents' judgment and approval of what is best for their child for that of a court.

It should be noted that plaintiff did not contend that the photographs were obscene or pornographic. Her only complaint was that she was embarrassed because "they [the photographs] are not me now." The trial court specifically found that the photographs were not pornographic and it enjoined use of them in pornographic publications. Thus, there is no need to discuss the unenforceability of certain contracts which violate public policy (see, e.g., Penal Law, § 235.00 *et seq.*) or to equate an infant's common-law right ⊥347 to disaffirm with that principle, as the dissent apparently does.

**[7]** Finally, it is claimed that the application of the statute as we interpret it may result in unanticipated and untoward consequences. If that be so, there is an obvious remedy. A parent who wishes to limit the publicity and exposure of her child need only limit the use authorized in the consent, for a defendant's immunity from a claim for invasion of privacy is no broader than the consent executed to him (see *Welch v. Mr. Christmas*, 57 N.Y.2d 143, 454 N.Y.S.2d 971, 440 N.E.2d 1317, *supra; Adrian v. Unterman*, 281 App.Div. 81, 118 N.Y.S.2d 121, affd. 306 N.Y. 771, 118 N.E.2d 477).

The order of the Appellate Division should be modified by striking the further injunction against use of the photographs for uses of advertising and trade, and as so modified, the order should be affirmed.

JASEN, Judge (dissenting).

Since I believe that the interests of society and this State in protecting its children must be placed above any concern for trade or commercialism, I am compelled to dissent. The State has the right and indeed the obligation to afford extraordinary protection to minors.

At the outset, it should be made clear that this case does not involve the undoing of a written consent given by a mother to invade her infant daughter's privacy so as to affect *prior* benefits derived by a person relying on the validity of the consent pursuant to sections 50 and 51 of the Civil Rights Law. Rather, what is involved is the right of an infant, now 17 years of age, to disaffirm her mother's consent with respect to *future use* of a nude photograph taken of her at age 10.

The majority holds, as a matter of law, not only in this case but as to all present and future consents executed by parents on behalf of children pursuant to sections 50 and 51 of the Civil Rights Law, that once a parent consents to the invasion of privacy of a child, the child is forever bound by that consent and may never disaffirm the continued invasion of his or her privacy, even where the continued invasion of the child's privacy may cause the child enormous embarrassment, distress and humiliation.

I find this difficult to accept as a rational rule of law, particularly so when one considers that it has long been ⊥348 the rule in this State that a minor enjoys an almost absolute right to disaffirm a contract entered into either by the minor or by the minor's parent on behalf of the minor (*Sternlieb v. Normandie Nat. Securities Corp.*, 263 N.Y.

245, 188 N.E. 726; *Jose* N.Y. 241, 181 N.E. 464; *Book Co. v. Connelly*, 2( 722; *Rice v. Butler*, 16 275; *Sparman v. Keim*, *v. Green*, 69 N.Y. 553) question does not in ar this salutary right.

This right has been fact that the minor hel an adult (*Sternlieb v. N rities Corp., supra*) or attempted to contractu (*Kaufman v. American* Misc.2d 8, 174 N.Y.S.2d grounds 6 A.D.2d 223, mod. and certified qu negative 5 N.Y.2d 101( 158 N.E.2d 128). Signi not the minor can res tracting party to the prior to entering the c only to the extent that firming the contract, into a better position th entering the contract. *mandie Nat. Securities* *Butler, supra.*) In the noted that those who c do so at their own peril *kin, supra*, at p. 243.)

Understandably, such evolved as a result of t provide children with as possible against being or exploited by adults. scind is a legal right protection of the infan *supra*, at p. 556). This the legal concept that a of contracting because stand the scope of his r appreciate the consequ tions of his decisions. feared that as an infa under the complete infl may be unable to act in would allow him to de interests. (28 N.Y.Jur 221–222.) Allowing a disaffirm a contract is ⊥349 common law developed

3, 454 N.Y.S.2d
Adrian v. Un-
3 N.Y.S.2d 121,
2d 477).
ellate Division
ng the further
ne photographs
rade, and as so
l be affirmed.

).
erests of socie-
ing its children
ncern for trade
npelled to dis-
ght and indeed
raordinary pro-

be made clear
ve the undoing
by a mother to
s privacy so as
ed by a person
consent pursu-
he Civil Rights
ed is the right
f age, to disaf-
vith respect to
graph taken of

matter of law,
to all present
by parents on
to sections 50
w, that once a
ion of privacy
bound by that
firm the con-
privacy, even
of the child's
enormous em-
iliation.
t as a rational
vhen one con-
ne rule in this
almost abso-
tract entered
y the minor's
(*Sternlieb v.*
*rp.*, 263 N.Y.

245, 188 N.E. 726; *Joseph v. Schatzkin*, 259 N.Y. 241, 181 N.E. 464; *International Text Book Co. v. Connelly*, 206 N.Y. 188, 99 N.E. 722; *Rice v. Butler*, 160 N.Y. 578, 55 N.E. 275; *Sparman v. Keim*, 83 N.Y. 245; *Green v. Green*, 69 N.Y. 553) and the statute in question does not in any manner abrogate this salutary right.

This right has been upheld despite the fact that the minor held himself out to be an adult (*Sternlieb v. Normandie Nat. Securities Corp., supra*) or that a parent also attempted to contractually bind the minor (*Kaufman v. American Youth Hostels*, 13 Misc.2d 8, 174 N.Y.S.2d 580, mod. on other grounds 6 A.D.2d 223, 177 N.Y.S.2d 587, mod. and certified question answered in negative 5 N.Y.2d 1016, 185 N.Y.S.2d 268, 158 N.E.2d 128). Significantly, whether or not the minor can restore the other contracting party to the position he was in prior to entering the contract is pertinent only to the extent that the minor, by disaffirming the contract, cannot put himself into a better position than he was in before entering the contract. (*Sternlieb v. Normandie Nat. Securities Corp., supra; Rice v. Butler, supra.*) In the past, this court has noted that those who contract with minors do so at their own peril. (*Joseph v. Schatzkin, supra*, at p. 243.)

Understandably, such a broad right has evolved as a result of the State's policy to provide children with as much protection as possible against being taken advantage of or exploited by adults. "The right to rescind is a legal right established for the protection of the infant" (*Green v. Green, supra*, at p. 556). This right is founded in the legal concept that an infant is incapable of contracting because he does not understand the scope of his rights and he cannot appreciate the consequences and ramifications of his decisions. Furthermore, it is feared that as an infant he may well be under the complete influence of an adult or may be unable to act in any manner which would allow him to defend his rights and interests. (28 N.Y.Jur., Infants, § 3, pp. 221–222.) Allowing a minor the right to disaffirm a contract is merely one way the common law developed to resolve those inequities and afford children the protection they require to compensate for their immaturity.

Can there be any question that the State has a compelling interest in protecting children? Indeed, the most priceless possessions we have in the Nation are our children. Recognizing this compelling interest in children, the State has assumed the role of *parens patriae*, undertaking with that role the responsibility of protecting children from their own inexperience. Acting in that capacity, the State has put the interests of minors above that of adults, organizations or businesses. (*Rice v. Butler, supra; Kaufman v. American Youth Hostels, supra; Sternlieb v. Normandie Nat. Securities Corp., supra.*) The broad right given a minor to disaffirm a contract is, of course, an obvious example of the State's attempt to afford an infant protection against exploitation by adults. (28 NY Jur, Infants, *op. cit.*) Thus, I am persuaded that, in this case, 17-year-old Brooke Shields should be afforded the right to disaffirm her mother's consent to use a photograph of her in the nude, taken when she was 10 years old, unless it can be said, as the majority holds, that the Legislature intended to abrogate that right when it enacted sections 50 and 51 of the Civil Rights Law.

The legislative history of this statute enacted in the early 1900's is understandably scarce. The case law prior to its passage, however, indicates that a minor's right to disaffirm a contract under the common law was well established at that time. Additionally, it is well accepted that this statute was enacted in response to this court's decision in *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442; see, also, *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 439, 449 N.Y.S.2d 941, 434 N.E.2d 1319, in which the court held that a minor had no recourse against an entrepreneur who made commercial use out of her picture without her consent. Apparently, in order to alleviate litigation over whether or not consent had been given, the Legislature required that such consent be in writing and, if the person was a minor, that the

parent sign the consent form. There is no indication that by requiring consent from the minor's parents, the Legislature intended in any way to abrogate that minor's right to disaffirm a contract at some future date. Indeed, the requirement of ⊥350 parental consent, like the broad right to disaffirm a contract, was granted in order to afford the minor as much protection against exploitation as possible. The assumption, of course, was that a parent would protect the child's interests. But if that assumption proves invalid, as may well be the case if a minor upon reaching the age of maturity realizes that the parent, too, has been exploiting him or her or had failed to adequately guard his or her interest by giving consent for pictures which caused humiliation, embarrassment and distress, then the child should be able to cure the problem by disaffirming the parent's consent. To say, as does the majority, that the mother could have limited her consent avoids the issue. If the parent has failed to put any restrictions on the consent, as occurred in this case, and has thus failed to protect the child's future interests, I see no reason why the child must continue to bear the burden imposed by her mother's bad judgment. This means the child is forever bound by its parent's decisions, even if those decisions turn out to have been exploitative of the child and detrimental to the child's best interests.

Furthermore, nothing compels the majority's conclusion that the right to disaffirm a contract was eliminated when the Legislature created a new cause of action for invasion of privacy merely because that statute provided safeguards for the child's privacy by giving the parent the right to grant or withhold consent. When both rights are viewed, as I believe they must be, as protection for the child, logic and policy compels the conclusion that the two rights should exist coextensively. The requirement that a parent consent before the child's privacy can be invaded by commercial interests establishes the parent as the first guardian of the child's interest. But the State retains its long-standing role of *parens patriae* so that if the parent fails to protect the child's interests, the State will intervene and do so. One means of doing so is to allow the child to exercise its right to disaffirm if the child concludes that its parent improvidently consented to the invasion of the child's privacy interests. Given the strong policy concern of the State in ⊥351 the child's best interests,* I can only conclude that the Legislature did not intend to abrogate the child's common-law right to disaffirm a contract when it required, by statute, the additional protection of written, parental consent prior to any commercial use of the child's image.

This conclusion is further supported by other statutes in which the Legislature has clearly abrogated the infant's right to disaffirm a contract in those situations in which it has determined that the damage incurred by the minor will be minimal and the cost to the contracting party or society would be great. Invariably, these are contractual situations in which the minor has incurred a contractual obligation in order to receive a benefit which cannot be deemed anything other than a benefit. For example, section 281 of the Education Law negates a minor's right to disaffirm a contract when that contract afforded him a student loan to pursue an advanced education. (See, also, General Obligations Law, § 3-103.) No one can argue that the contract was any-

* The discussion in this opinion of the policy behind affording a child the extraordinary protection of the right to disaffirm a contract should not be read, as the majority does, to equate the right to disaffirm with the principle that a court will refuse to enforce contracts which violate public policy. Indeed, had the courts below found that her mother had contracted for her daughter to pose in an obscene manner or that the photographs were obscene or pornographic, then we would not need to decide the applicability of the infant's right to disaffirm that contract as I assume the majority would find the contract and the consent incorporated in it to violate public policy. (Penal Law, § 235.00 *et seq.*; *People v. Ferber*, 52 N.Y.2d 674, 439 N.Y.S.2d 863, 422 N.E.2d 523 [Jasen, J., dissenting], rev. — U.S. —, 102 S.Ct. 3348, 73 L.Ed.2d 1113, on remand, 57 N.Y.2d 256, 455 N.Y.S.2d 582, 441 N.E.2d 1100.) A contract held to be unenforceable because it violates public policy is void *ab initio* and, thus, there is no need to consider whether or not it may be disaffirmed.

thing other than benefic
Such legislation was endo
Revision Commission on th
lative finding "that the
involved is clearly for th
infant". (1961 Report o
Comm., pp. 269, 275, citi
tracts Relating to the Ser
Minors and the Treatmen
ings Therefrom.)

Two factors distinguish
of the Civil Rights Law fr
ry provisions which do, ir
abolish the minor's right t
tract. The first is that
the Legislature has inter
have made their intention
language which directly
fant's common-law right
any reference in the Civil
minor's right to disaffirm
cially when it is clear
disaffirm was well esta
that the Legislature did n
that right. Secondly, unl
of contracts which the L
ignated as immune from
to disaffirm, it cannot b
tract releasing all rights
even limited rights to th
essarily beneficial to th
even more true when the
case, are of the variety
ploited in the future or u
of questionable taste.

I do not believe that
intent in enacting section
Civil Rights Law was to
ests of business and co
the State's interest in
dren. Since this statu
response to this court's d
v. *Rochester Folding Bo*
denied an infant plainti
the invasion of her priva
enterprise in using her
consent, it would seem t
lative intent was to exp
tections, rather than to
commercial enterprises.

must be, as protec- and policy compels two rights should e requirement that the child's privacy nercial interests es- he first guardian of t the State retains f *parens patriae* so o protect the child's ntervene and do so. s to allow the child isaffirm if the child improvidently con- f the child's privacy rong policy concern l's best interests,* I ⌊351 the Legislature did he child's common- a contract when it e additional protec- al consent prior to the child's image.

rther supported by the Legislature has 'ant's right to disaf- situations in which he damage incurred inimal and the cost or society would be are contractual sit- inor has incurred a n order to receive a e deemed anything 'or example, section w negates a minor's ontract when that a student loan to ıcation. (See, also, ıw, § 3–103.) No contract was any-

; I assume the majori- act and the consent ite public policy. (Pe- ; *People v. Ferber*, 52 1 863, 422 N.E.2d 523 v. — U.S. —, 102 1113, on remand, 57 2d 582, 441 N.E.2d to be unenforceable policy is void *ab initio* d to consider whether ned.

thing other than beneficial to the minor. Such legislation was endorsed by the Law Revision Commission on the basis of a legislative finding "that the type of contract involved is clearly for the benefit of the infant". (1961 Report of N.Y.Law Rev. Comm., pp. 269, 275, citing Touster, Contracts Relating to the Services of Talented Minors and the Treatment of Their Earnings Therefrom.)

Two factors distinguish sections 50 and 51 of the Civil Rights Law from those statutory provisions which do, in certain contexts, abolish the minor's right to disaffirm a contract. The first is that in all cases when the Legislature ⌊352 has intended to do so, they have made their intention clear by specific language which directly refers to the infant's common-law right. The absence of any reference in the Civil Rights Law to the minor's right to disaffirm a contract, especially when it is clear that the right to disaffirm was well established, indicates that the Legislature did not intend to affect that right. Secondly, unlike the other kinds of contracts which the Legislature has designated as immune from the minor's right to disaffirm, it cannot be said that a contract releasing all rights to photographs or even limited rights to those pictures is necessarily beneficial to the infant. This is even more true when the pictures, as in this case, are of the variety which can be exploited in the future or used in publications of questionable taste.

I do not believe that the Legislature's intent in enacting sections 50 and 51 of the Civil Rights Law was to elevate the interests of business and commercialism above the State's interest in protecting its children. Since this statute was enacted in response to this court's decision in *Roberson v. Rochester Folding Box Co. (supra)*, which denied an infant plaintiff any recovery for the invasion of her privacy by a commercial enterprise in using her picture without her consent, it would seem to me that the legislative intent was to expand individual protections, rather than to afford protection to commercial enterprises.

The fact that when an infant disaffirms a contract there may be harsh results to the person or commercial enterprise attempting to exploit the child has never caused the courts to alter the scope of the protection that right affords the child. The overriding interest of society in protecting its children has long been held to outweigh the interests of merchants who attempt to contract with children. (*Sternlieb v. Normandie Nat. Securities Corp., supra*, 263 N.Y. at p. 250, 188 N.E. 726.)

In those situations in which the Legislature has decided that business ventures need additional protection, it has done so not merely by abolishing the infant's right to disaffirm, but, rather, by providing alternative protection. Section 3–105 of the General Obligations Law provides for judicial approval of contracts for the services of child performers or professional athletes. It is clear that the ⌊353 statute protects not only the business interests which are investing in and profiting from the child's talents, but also the child. For instance, paragraph d of subdivision 2 generally restricts such contracts to a three-year period and paragraph e of subdivision 2 provides that even after approving a contract of a child performer, the court may, if it finds that the child's well-being is in any way being impaired by its performance under the contract, revoke or modify the contract so as to protect the child. Similarly, it provides for supervision by the court of the child's earnings to assure that the child will benefit from his labors. The clear intent of such provisions is to protect the child against any exploitation. The failure of the Legislature to cover child models in this provision indicates to me that they intended child models to retain the protections afforded by the common-law right to disaffirm a contract. It is unfortunate that by virtue of the majority's interpretation of the Civil Rights Law those children may not in the future be afforded protection against exploitation by their own parents.

It is even more unfortunate that by its interpretation of sections 50 and 51 the majority takes away a large part of the

protection those children had at common law.

COOKE, C.J., and JONES and WACHTLER, JJ., concur with SIMONS, J.

JASEN, J., dissents in part and votes to affirm in a separate opinion in which FUCHSBERG and MEYER, JJ., concur.

Order modified, with costs to defendant, in accordance with the opinion herein and, as so modified, affirmed.

448 N.E.2d 116

58 N.Y.2d 354

⊥354 ⊥In the Matter of LOCAL 252, TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, Respondent,

v.

NEW YORK STATE PUBLIC EMPLOYMENT RELATIONS BOARD, Appellant,

and

Metropolitan Suburban Bus Authority, Intervenor-Appellant.

Court of Appeals of New York.

March 30, 1983.

Petition was filed seeking review of a determination of the Public Employment Relations Board that a union engaged in a strike during a certain time period in January 1980. The Supreme Court, Appellate Division, First Department, 89 A.D.2d 551, 453 N.Y.S.2d 17, annulled the determination. Appeal was taken. The Court of Appeals, Jones, J., held that the determination of the PERB that a strike occurred when bus drivers refused to drive buses which violated the requirements of the Vehicle and Traffic Law was supported by substantial evidence.

Judgment reversed.

1. Labor Relations ⚷578

Conclusion of Public Employment Relations Board that union's invoking reference to provisions of Vehicle and Traffic Law in order to justify drivers refusing to drive buses which violated requirements of law was merely pretext for concerted refusal of drivers to operate buses was amply supported in record. McKinney's Civil Service Law § 209; McKinney's Vehicle and Traffic Law § 100 et seq.

2. Labor Relations ⚷290

Where reliance on sudden concern for overly meticulous and abnormal observance of statutory commands is purely a subterfuge, incidental circumstance that continued performance of duties in normal manner might entail violation of statute does not legally preclude finding that there has been "strike." McKinney's Civil Service Law § 209.

3. Labor Relations ⚷578

Public Employment Relations Board's finding that strike occurred when bus drivers refused to drive buses which violated requirements of Vehicle and Traffic Law was supported by substantial evidence, including evidence that union was responsible for job action, job action was timed to occur immediately following expiration of interim impasse arrangement and only violations posing no imminent danger to safety of public or drivers were involved in charge. McKinney's Civil Service Law § 209; McKinney's Vehicle and Traffic Law § 100 et seq.

---

⊥Martin L. Barr and Anthony Cagliostro, ⊥356 Albany, for appellant.

Mary P. Bass and Lester G. Freundlich, New York City, for intervenor-appellant.

⊥Amy Gladstein and Walter M. Meginniss, ⊥357 Jr., Brooklyn, for respondent.

⊥Marc Silverman, Ruth Raisfeld and Laura ⊥358 Jacobs, New York City, for "Straphangers Campaign," amicus curiae.

OPINION OF THE COURT

JONES, Judge.

The Public Employment Relation is not precluded from determining th certed refusal of bus drivers to p duties in the normal manner for th pose of securing job-related demands tutes a strike in violation of the Tayl although the normal manner of pe ance would entail violations of the V and Traffic Law where citation to violations is only a pretext. In th stance the record contains substanti dence to sustain such determination by the board.

Local 252 of the Transport Worker ion of America, AFL–CIO, is the cer bargaining representative for a negot unit of some 640 public employees o Metropolitan Suburban Bus Auth Approximately 460 of these employee group which is the subject of the in illegal strike charge, are bus drivers i authority's surface transportation sy which serves areas in Nassau County.

The authority and the union were un to reach agreement on a contract for calendar year 1979, the prior agreem having expired on December 31, 1978. result, the unit members were working der terms and conditions imposed by authority pursuant to the impasse pr dures of section 209 of the Civil Ser Law. In November of 1979, the union the authority began negotiations for a gaining agreement to take effect in 1

Sometime in November, the president the union instructed the bus drivers "safety classes" that they did not have operate buses which violated the requ ments of the Vehicle and Traffic Law. told them that the union would back th up if they refused to drive buses with vio tions but that any bus which was in com ance with provisions of law was to be dr en.

At a negotiating meeting in December 1979, the union president warned the a thority that there would be "big trouble" the parties did not agree on a contract

# EXHIBIT "G"

16 February 2007

Ms. Lana Winters
VNY Model Management, LLC
928 Broadway, Suite 801
NewYork , NY 10010

Dear Lana:

You said, per your lawyer: I had to sign another contract because your name changed from V Model Management New York, Inc. to VNY Model Management,LLC and you changed the expiration date from 22 April 2007 to June 2008. Per my Lawyer: I have been without your signature on the contract dated 19 June 2006, expiration, June 2008, for the past 6 months. This was not lawful.

I sent the contract back to you in July 2006, signed with an addendum on it which included 3 hours of time per day, minimum to do homework; home time with prior notification; and this "Jordan Richardson, Inc. has the right to terminate any and all agreements w/VNY Model Mgt, LLC with 30 days prior notification."

I have made repeated attempts to get a copy of the signed 2nd contract (dated 19 June 2006 and expires June 2008). These attempts were made by me and my agent, My Mother, Rachelle Saunders, asking both you and your Business Manager, Nole'. I made the last attempt on 12 February 2007, when you told me I would have it by Friday, 16 February 2007. Since these attempts have been unsuccessful, the only valid contract I have with you is the 1st one dated 22 April 2005 which expires 22 April 2007.

Know then that at the 22 April 2007 contract expiration date, I will not renew Jordan Richardson's contract with your agency. Do not schedule any jobs for her beyond this date.

Sincerely,
Lisa-Athena S. Abu Hantash
Lisa-Athena S. Abu Hantash
Parent

Copies Furnished:
My Lawyer (Jukey) to Eldoro to Fax to Stone and Stone in NJ; Reg them to be my lawyer. 20 Feb 07 (Not delivered by Fed Ex; Neighbors in office Bldg and Conseerge say Lawyer not in Building) (see air Bill)
Your Lawyer, Natalia Nastaskin Esq.

Out 17 Feb to be delivered NLT Tuesday Afternoon, 20 Feb 07

Remember: The contract Runs to 22 Apr 07 and is not totally Clear until 22 May 07 Per Eldoro's Lawer.

# EXHIBIT "H"

VNY MODEL MANAGEMENT LLC 2394
DATE 1/29/07
PAY TO THE ORDER OF Jordan Richardson $ 17,241.15
Seventeen thousand two hundred forty one 15/100 DOLLARS
CHASE
FOR Nordstrom + 2 H&M
⑈0001724115⑈

FEB 02 $17,241.15

VNY MODEL MANAGEMENT LLC 142585 5011 2430
DATE 2/17/07
PAY TO THE ORDER OF Jordan Richardson $ 4,621.64
four thousand six hundred twenty one 64/100 DOLLARS
CHASE
FOR Nordstrom x 2 (1134)
⑈0000462164⑈

FEB 27 $4,621.64

VNY MODEL MANAGEMENT LLC 110585 001 2436
DATE 2/14/07
PAY TO THE ORDER OF Jordan Richardson $ 1,600 —
One thousand six hundred DOLLARS
CHASE
FOR Delias (0742)
⑈0000160000⑈

MAR 07 $1,600.00

VNY MODEL MANAGEMENT LLC 110585 001 2438
DATE 2/15/07
PAY TO THE ORDER OF Jordan Richardson $ 4,014.50
four thousand and fourteen 50/100 DOLLARS
CHASE
FOR H.E.B.../ H+M (0742)
⑈0000401450⑈

MAR 07 $4,014.50

VNY MODEL MANAGEMENT LLC 142585 5011 2443
DATE 2/20/07
PAY TO THE ORDER OF Jordan Richardson $ 23,083.00
Twenty three thousand and eighty three DOLLARS
CHASE
FOR JCpenney x 7 (1134)
⑈0002308300⑈

FEB 27 $23,083.00

VNY MODEL MANAGEMENT LLC 110585 001 2465
DATE 2/26/07
PAY TO THE ORDER OF Jordan Richardson $ 1,691.47
One thousand six hundred and ninety one 47/100 DOLLARS
CHASE
FOR JCpenney (0742)
⑈0000169147⑈

MAR 07 $1,691.47

VNY MODEL MANAGEMENT LLC 148585 8001, 8010 2488
DATE 3/5/07
PAY TO THE ORDER OF Jordan Richardson $ 3,092.00
three thousand and ninety two DOLLARS
CHASE
FOR JCpenney (1136)
⑈0000309200⑈

MAR 23 $3,092.00

VNY MODEL MANAGEMENT LLC 142585 8004 00,05 2527
DATE 3/12/07
PAY TO THE ORDER OF Jordan Richardson $ 2,379.75
Two thousand and three hundred seventy nine 75/100 DOLLARS
CHASE
FOR Delias (1136)
⑈0000237975⑈

MAR 23 $2,379.75

VNY MODEL MANAGEMENT LLC 142585 8001, 8000 8010 2537
DATE 3/19/07
PAY TO THE ORDER OF Jordan Richardson $ 2,800 —
two thousand eight hundred DOLLARS
CHASE
FOR Nordstroms (1136)
⑈0000280000⑈

MAR 27 $2,800.00

VNY MODEL MANAGEMENT LLC 142585 5000 5005 2560
DATE 3/29/07
PAY TO THE ORDER OF Jordan Richardson $ 20,585.00
twenty thousand five hundred and eighty five DOLLARS
CHASE
FOR H&M + macys (1141)
⑈0002058500⑈

APR 10 $20,585.00

VNY MODEL MANAGEMENT LLC 2055
CHASE
$4,949.95

VNY MODEL MANAGEMENT LLC 2077
CHASE
OCT 25 $18,097.75

VNY MODEL MANAGEMENT LLC 2080
CHASE
OCT 25 $10,595.09

VNY MODEL MANAGEMENT LLC 2104
CHASE
NOV 01 $9,403.43

VNY MODEL MANAGEMENT LLC 2125
CHASE
NOV 10 $3,225.76

VNY MODEL MANAGEMENT LLC 2132
CHASE
NOV 08 $6,400.00

VNY MODEL MANAGEMENT LLC 2144
CHASE
NOV 20 $3,630.40

VNY MODEL MANAGEMENT LLC 2152
CHASE
NOV 24 $2,983.05

VNY MODEL MANAGEMENT LLC 2208
CHASE
NOV 30 $55,962.00

VNY MODEL MANAGEMENT LLC 2347
CHASE
JAN 16 $4,581.46

CHECK NO. 1808 $4,769.72 PAID 06/28

CHECK NO. 1835 $70,308.15 PAID 07/25

CHECK NO. 1879 $103,950.95 PAID 08/02

CHECK NO. 1897 $11,003.10 PAID 08/03

CHECK NO. 1915 $2,530.00 PAID 08/14

CHECK NO. 1935 $39,661.22 PAID 08/24

SEP 14 $2,860.31

$2,734.69

$2,658.50

$7,770.83

FROM :bella FAX NO. :7183320403 Apr. 19 2007 04:19PM P1

☐ CORRECTED (if checked)

OMB No. 1545-0115

2006

Form 1099-MISC

**Miscellaneous Income**

**Copy B For Recipient**

PAYER'S name, street address, city, state, ZIP code, and telephone no.

V N Y MODEL MANAGEMENT LLC
928 BROADWAY, STE. 801
NEW YORK, NY 10010
( ) -

| Box | Amount |
|---|---|
| 1 Rents | $ |
| 2 Royalties | $ |
| 3 Other income | $ |
| 4 Federal income tax withheld | $ |
| 5 Fishing boat proceeds | $ |
| 6 Medical and health care payments | $ |
| 7 Nonemployee compensation | $ 405713.79 |
| 8 Substitute payments in lieu of dividends or interest | $ |
| 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | |
| 10 Crop insurance proceeds | $ |
| 11 | |
| 12 | |
| 13 Excess golden parachute payments | $ |
| 14 Gross proceeds paid to an attorney | $ |
| 15a Section 409A deferrals | $ |
| 15b Section 409A income | $ |
| 16 State tax withheld | $ $ |
| 17 State/Payer's state no. | [redacted] |
| 18 State income | $ $ |

PAYER'S Federal identification number: 2[redacted]

RECIPIENT'S identification number: [redacted]

RECIPIENT'S name: JORDAN RICHARDSON

Street address (including apt. no.)

City, state, and ZIP code

Account number (see instructions): 2

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

Form 1099-MISC MV1099M-B (Keep for your records.) Department of the Treasury - Internal Revenue Service

# EXHIBIT "I"

NISSENBAUM LAW GROUP, LLC
(FORMERLY NISSENBAUM & ASSOCIATES, LLC)
ATTORNEYS AT LAW
WWW.GDNLAW.COM

2400 MORRIS AVENUE
UNION, NEW JERSEY 07083
P. 908.686.8000
F. 908.686.8550

NISSENBAUM LAW GROUP, LLC

GARY D. NISSENBAUM, ESQ.*
GDN@GDNLAW.COM

GAVIN I. HANDWERKER, ESQ.*
GIH@GDNLAW.COM

LAURA J. FREEDMAN, ESQ.*
LJF@GDNLAW.COM

NEELAM K. SINGH, ESQ.*
NS@GDNLAW.COM

CHRISTINE M. YEARING, ESQ.*
CMY@GDNLAW.COM

OLIVIA R. GONZALEZ, ESQ.*
OG@GDNLAW.COM

CAROLE J. ZEMPEL, PARALEGAL
CZ@GDNLAW.COM

JENN LOPEZ, PARALEGAL
JL@GDNLAW.COM

*Please reply to:* x NJ _ NY:

NEW YORK:
140 BROADWAY, 46TH FLOOR
NEW YORK, NEW YORK 10005
P. 212.871.5711
F. 212.871.5712

* *Admitted in both New Jersey and New York*

April 11, 2007

**VIA FACSIMILE AND REGULAR MAIL**

Natalia Nastaskin, Esq.
The Agency Group, Ltd.
1775 Broadway, Suite 515
New York, New York 10019

Re: V Model Management New York, Inc. ("VMM") with Jordan Richardson
VNY Model Management ("VNY") with Jordan Richardson

Dear Ms. Nastaskin:

As you are already aware, my office represents Ms. Jordan Richardson, a minor, with regard to the above. Because these matters are more than likely to be headed towards litigation, I am now in charge of the file. Therefore, all future communications should be directed to my attention.

On March 21, 2007, you were advised by Christine Yearing, Esq. of my office that as of April 22, 2007 any and all agreements between Ms. Richardson and VMM were deemed terminated and that any proposed agreement between Ms. Richardson and/or Jordan Richardson, Inc. and VNY were deemed rejected. You were also informed that under no circumstances would Ms. Richardson participate in any modeling assignments or other work procured by VMM or VNY on her behalf. Despite the clear language of that letter, my client has informed me that Lana Winters has instructed her to appear for a modeling assignment on April 25. She will do no such thing. In fact, because your client is incapable of following simple instructions, she is no longer entitled

to communicate with her at all. From now on, all communications regarding Ms. Richardson shall be served through my office.

Second, because your client is unwilling to part ways with Ms. Richardson amicably, my office is preparing a summons and complaint to be filed in the United States District Court for the Southern District of New York to settle this matter. We anticipate filing our action by the end of next week. In that regard, please advise whether you are authorized to accept service on behalf of VMM, VNY and Lana Winters.

However, before I file my complaint, I would like to give you and your clients a final opportunity to take a long hard look at your chances of success in such an action and spare you the embarrassment of defending a lawsuit by alleging frivolous claims or defenses (thereby subjecting yourselves to an application pursuant to Fed. R. Civ. Pro. Rule 11). Specifically:

1. Jordan Richardson is a minor and will not reach majority age until next year. The law is quite clear that infants always have the common law right to disaffirm a contract barring certain exceptions (namely, where a court approves the contract). Since a court did not approve Ms. Richardson's contract with VMM, my client is allowed to disaffirm her agreement outright.

2. There is also the issue of an alleged second contract between VNY and Ms. Richardson and/or Jordan Richardson, Inc. That "new" contract which you deem to be in effect is unenforceable for the following reasons:

a. First, Ms. Richardson's mother sent Ms. Winters correspondence on February 16, 2007 advising her that the second contract was rejected. Specifically, Ms. Hantash wrote the following:

> "I have made repeated attempts to get a copy of the signed [second] contract (dated June 2006 and expires June 2008)... **Since these attempts have been unsuccessful, the only valid contract I have with you is the [first] one dated 22 April 2005 which expires 22 April 2007.**
>
> **Know then that at the 22 April 2007 contract expiration date, I will not renew Jordan Richardson's contract with your agency**. Do not schedule any jobs for her beyond this date." (Emphasis supplied)

Your letter of February 27, 2007 with the signed signature page, while clever, does not in any way change the simple fact that this "new" contract was rejected. Certainly, no court would accept the argument that your respective communications simply crossed in the mails. Put another way, your letter cannot revive what was already rejected.

b. Second, assuming for the moment you were creative enough to argue that the second contract became enforceable because you accepted it 11 days after my client rejected it, you will also notice that there is handwriting all over the agreement with changes, question marks and modifications made by Ms. Hantash. It is therefore no stretch of the imagination to conclude that the second agreement is unenforceable because there is no "meeting of the minds." In fact, subsequent correspondence by you to Ms. Hantash explaining the termination provision (a provision that Ms. Hantash wrote) is further evidence that VNY does not have an enforceable agreement.

c. Finally, assuming you were able to overcome both arguments, ante, you will also notice that Ms. Richardson's signature is nowhere on the second contract. I would like to know under what theory you intend to bind a minor to a personal services contract which she did not sign.

Please review with your client this small sample of facts which are undeniably favorable to my client's position. I will expect a response from you no later than **April 13** advising that your client is willing to:

(a) Sign a general release in favor of Ms. Richardson, Ms. Hantash and Jordan Richardson, Inc.;

(b) Coordinate with us the final matters that will need to be settled, including without limitation, (i) reconciliation of payments due to Ms. Richardson; and (ii) a return of Ms. Richardson's belongings including without limitation, her photo books currently in VNY's possession.

(c) We will conduct a complete audit of your books and records as relates to revenue generated by Ms. Richardson. Any further discussion of our claims in that regard will abide the results of that audit.

Nothing contained in this letter is intended to, nor shall it, constitute a waiver or relinquishment of any of my client's rights, remedies or position, which are reserved without prejudice.

Sincerely,
NISSENBAUM LAW GROUP, LLC

By: ______________________
Gavin I. Handwerker

# EXHIBIT "J"

NATALIA NASTASKIN
ATTORNEY AT LAW

c/o The Agency Group, Ltd.
1775 Broadway
Suite 515
New York, N.Y. 10019

T: (212) 245-6535
F: (212) 581-0015
E: nnesq@nyct.net

February 27, 2007

**VIA FEDERAL EXPRESS**

Ms. Jordan Richardson
22354 Graystone Drive
Carrollton, VA 23314

**RE: Model Management Agreement**
**Jordan Richardson-w-VNY Model Management LLC ("Agreement")**

Dear Ms. Richardson,

Further to your request, enclosed please find a copy of the signature page of the above-referenced Agreement. Please note, the Agreement is in full force and effect and may not be terminated, except in accordance with the terms thereof.

Nothing contained in this letter is intended to, nor shall it, constitute a waiver or relinquishment of any of my client's rights, remedies or positions, all of which are reserved.

If you have any questions, please do not hesitate to contact me.

Thank you.

Yours truly,

Natalia Nast

Natalia Nastaskin

cc: Lana Winters